UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| GRUBHUB INC., MATTHEW MALONEY and ADAM DeWITT, | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Roei Azar ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Grubhub Inc. ("Grubhub" or the "Company"), conference call transcripts and press releases by the Company and its executives, as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.        This is a securities class action on behalf of all purchasers of the common stock of Grubhub between July 30, 2019 and October 28, 2019, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Grubhub and its most senior executives under the federal securities laws.

2.        Headquartered in Chicago, Illinois, defendant Grubhub is one of the nation's leading online and mobile platforms for restaurant pick-up and delivery orders. The Company was an early entrant into the online delivery market and for many years maintained dominant market share, controlling approximately 40% of the market in early 2018.

3.        In recent years, a number of well-financed competitors, such as DoorDash and Uber Eats, have entered the online food delivery space. These companies have engaged in aggressive marketing and promotional tactics in an effort to attract and retain diners, grow restaurant partners, and increase their market share. The deep discounting provided by these competitors – which has included extremely low or even zero delivery fees – has been described as a "price war" by market analysts.

- 1 -

4.      Grubhub has outwardly eschewed this race to the bottom and downplayed concerns that new market entrants were diminishing the Company's business and prospects because of key distinguishing competitive advantages the Company purportedly possesses.  Indeed, Grubhub has claimed that the new online delivery platforms were actually expanding the Company's addressable market, which it estimated at around $200 billion annually, by bringing food to new customers and delivery to restaurants with a previously unmet need.  The Company has represented to investors that its superior business model, which focuses on securing exclusive restaurant partnerships built around Grubhub's data-rich platform and the provision of exceptional customer service to diners, would allow it to continue to profitably increase its user base.

5.      Grubhub's ostensible operational advantages were of particular importance to investors because several new online delivery entrants had access to significant private capital or outside revenue sources that would allow them to sustain a prolonged price war, even if it meant operating at a loss in the short term.  Thus, without its own significant revenue streams outside the online delivery business, Grubhub's unique business model was viewed as providing a critical competitive moat.

6.      The perceived value of Grubhub's proprietary platform, delivery network, and accumulation of customer information was also critical to attracting and retaining the Company's business partners.  A key component of the Company's business strategy and financial success rested on convincing restaurant chains to enter into exclusivity deals wherein these partners refrained from working with Grubhub's competitors in exchange for access to the Company's vaunted operational assets and customer data.  The most important of these was a 2018 partnership with fast food behemoth Yum! Brands, Inc. ("Yum!"), owner of such iconic food franchises as Pizza Hut, Taco Bell and KFC, pursuant to which Yum! purchased $200 million worth of Grubhub common stock.

7.     In October 2018, after the close of the Yum! deal, Grubhub announced that it was making a variety of strategic investments to take advantage of favorable market conditions and further drive profitable diner growth.  The Company stated it was expanding into new "Tier 2 and Tier 3 markets" outside of the mega metropolises such as New York City and Chicago that formed its historic base, building up its driver network and launching ad campaigns to attract customers.  As Grubhub Chief Executive Officer ("CEO"), defendant Matthew Maloney, explained at the time: "With multiple tailwinds, improved marketing effectiveness, increased marketing investment, more market expansion and a rapidly growing restaurant selection, we believe our efforts will yield more growth, not just now but for quarters and for years to come."  Specifically, defendants claimed these investments were justified because Grubhub was experiencing significant "high-quality" diner growth, by which they meant the attraction of customers that were ordering more and were more likely to return to the platform.

8.     During the Class Period, defendants represented to investors that these significant investments were paying dividends, and that Grubhub was continuing to economically attract "high-quality" diners, even as it expanded into new markets.  Defendants claimed that these new customers had laid the foundation for "economically sustainable growth in all types of markets" and rejected the suggestion that they possessed "any data that suggest[ed] [that the new users were] using multiple different services or different apps."  Instead, defendants stated that competitive dynamics had already been fully accounted for in the Company's fiscal plans.

9.     These and similar statements during the Class Period were materially false and misleading when made.  Specifically, defendants failed to disclose, *inter alia*, that: (i) customer orders were actually ***declining***, despite the massive investments that the Company had made to spur demand for and use of its platform; (ii) Grubhub's new customer additions were generating significantly lower revenues as compared to historic cohorts because these customers were more

prone to using competitor platforms; (iii) Grubhub's vaunted business model under which it secured exclusive partnerships had failed, and Grubhub needed to engage in the same aggressive non-partnered sales tactics embraced by its competitors to generate significant revenue growth; (iv) Grubhub was required to spend substantial additional capital in order to grow revenues and retain market share in the face of heightened competitive dynamics and market saturation, eviscerating the Company's profitability; and (v) Grubhub was tracking tens of millions of dollars below its revenue and earnings guidance and such guidance lacked any reasonable basis.

10.     On October 28, 2019, Grubhub announced deeply disappointing financial results for its third fiscal quarter of 2019.  The Company revealed an important Company demand metric, daily average grubs ("DAGs"), had actually fallen 6% sequentially despite an increase in active diners and the Company's highly touted demand initiatives.  Defendants also slashed Grubhub's 2019 earnings and revenue projections and stated that the Company would achieve only $100 million in EBITDA for 2020, *more than 70%* below market expectations.

11.     In a stark letter to shareholders, defendant Maloney belatedly laid bare the extent of the problem.  He revealed that, contrary to his prior misrepresentations, diners that the Company had been adding since the end of 2018 were of materially lower value than previous cohorts because such users tended to be existing customers of competing platforms and thus less likely to remain loyal to Grubhub or to use its platform with the same frequency as the Company's existing user base. Defendant Maloney also disclosed that the Company had entered a period of slowing growth and diminished market opportunities that required it to expend considerable sums in order to retain revenue growth and market share.  Most shocking, he stated that Grubhub had moved away from its historic business model of focusing on restaurant partnerships and was instead seeking to quickly add non-partnered restaurant volume.  In other words, Grubhub needed to embrace the same

business tactics that defendants had long derided and had used to differentiate Grubhub from its competitors.

12.     Analysts following Grubhub reacted with surprise and indignation to the abrupt about-face, which contradicted defendants' Class Period representations.   Analyst reports characterized the revelations as, among other things, "a shocker," "a disaster," "drastic," "alarming," "concerning," and "troubling."  Numerous analysts downgraded the stock and slashed price targets, with some even issuing rare double downgrades.  Several questioned the credibility of management and pointed to evidence that management had long been internally concerned about the deteriorating market conditions, but failed to acknowledge these concerns in its discussions with investors.

13.     On this news, Grubhub stock closed down more than 40% on October 29, 2019 on extremely heavy trading volume.

## JURISDICTION AND VENUE

14.     Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and certain of the defendants reside in this District.  Grubhub's principal executive offices are located in this District.

16.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Roei Azar, as set forth in the accompanying Certification incorporated herein by reference, purchased Grubhub common stock during the Class Period and has been damaged thereby.

18.     Defendant Grubhub, headquartered in Chicago, Illinois, is one of the nation's leading online and mobile platforms for restaurant pick-up and delivery orders.  The Company's common stock is listed on the NYSE under the ticker symbol "GRUB."

19.     Defendant Matthew Maloney ("Maloney") is a founder of Grubhub and served as its CEO throughout the Class Period.

20.     Defendant Adam DeWitt ("DeWitt") served as Grubhub's President and Chief Financial Officer ("CFO") throughout the Class Period.

21.     The defendants referenced above in ¶¶19-20 are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Grubhub's quarterly reports, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

22.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Grubhub. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Grubhub stock was a success, as it: (i) deceived the investing public regarding Grubhub's business, operations, and financial results; (ii) artificially inflated the price of Grubhub common stock; and (iii) caused plaintiff and other members of the Class (defined below) to purchase Grubhub common stock at artificially inflated prices.

## BACKGROUND

23.     Grubhub provides online and mobile delivery options for restaurant pick-up and delivery orders. The Company pioneered online delivery services and, for several years after its 2004 founding, enjoyed a dominant market position.

24.     The Company generates revenues primarily when diners place an order on its platform. Restaurants pay a commission, typically a percentage of the transaction, on orders processed through the platform. A restaurant can choose to pay a higher rate, which affects its prominence and exposure to diners. Additionally, restaurants that use the Company's delivery services pay an additional commission on the transaction for the use of those services. The Company also recognizes as revenue any fees charged to the diner for delivery services it provides.

25.     The Company has long sought to distinguish itself from other competing online food delivery services by virtue of its focus on entering into partnerships with restaurant chains. The Company provides its restaurant partners with online delivery services and data management tools, which they might otherwise lack, and access to valuable consumer data and outreach capabilities. In exchange, these restaurants agree to work exclusively or predominantly with Grubhub. The most notable of these partnerships was Grubhub's 2018 deal with Yum!, the parent company of several prominent fast food chains, including Pizza Hut, Taco Bell, and KFC.

26. In recent years, competition among online food delivery services has intensified as new market entrants have begun employing aggressive tactics to increase market share and undercut rivals. Certain of these competitors, such as DoorDash, have access to significant private investment capital, while others, such as Uber Eats, have significant revenue streams from other businesses. Their considerable financial resources have allowed these online delivery services to engage in aggressive discounting and promotional activities and consumer outreach, even when such efforts fail to generate short-term profitability.

27. Grubhub has represented to investors that it is relatively insulated from these difficult market dynamics due to its unique business model and distinct competitive advantages. For example, the Company's 2018 Annual Report states that "the Company's primary competition remains the traditional offline takeout ordering method." As to potential online competitors, the 2018 Annual Report states that Grubhub "competes favorably" based on the breadth of its options for customers and the superiority of its service offerings, as well as the advantages its platform and capabilities provide to the Company's restaurant partners. In discussions with analysts and investors, defendants have repeatedly highlighted Grubhub's unique partnership-focused model as providing sustainable and profitable growth even in the face of heightened competition. Indeed, the Company has claimed that new online delivery platforms were actually expanding the Company's addressable market, which it estimated at around $200 billion annually, by bringing food to new customers and delivery to restaurants with a previously unmet need.

28. In October 2018, Grubhub announced numerous strategic investments to profitably grow its business. These initiatives included Grubhub's expansion into new markets, the development of the Company's delivery network, efforts to grow enterprise partnerships, and customer outreach. Defendants claimed that the investments were timed to take advantage of

favorable market conditions and an observed ability to attract and retain "high-quality" diners that would generate sustainable growth "for quarters and for years to come."

29.     During the Company's third quarter 2018 earnings call, defendant DeWitt claimed that the investments were backed up by data demonstrating that Grubhub was able to "provide delivery in an economically sustainable manner" and had "the ability to scale across most of [its] marketing channels without sacrificing quality at higher levels of spend." He also stated that the additional expenditures were justified because Grubhub had experienced "strength in new diner acquisition" from its "most mature markets to [its] newest," driving "high-quality new diner growth."

30.     Later on the same call, when asked about whether the competitive landscape had negatively impacted Grubhub's customer acquisition costs, defendant Maloney responded that it had not. To the contrary, he claimed that the life-time value of customers was rising, which justified Grubhub's decision to invest in order to take advantage of favorable market opportunities, stating in pertinent part:

> [W]e've seen a lot of competitors enter the space, obviously, build out platforms, but *we still haven't seen the entry of any competitor impact our growth in any of our markets. And we actually see more opportunity now than ever*. I mean, that's part of this investment. It's almost like the classic Starbucks case, where a Starbucks comes in and everyone sees more business, it's bringing awareness. I think that we're seeing an accelerated transition from offline to online in our space. I think you're seeing more diners receptive to using their mobile devices to order dinner, and *I think everyone is benefiting from that. And that's part of why we're seeing – and you asked me about CPAs [costs per acquisition] – we're seeing CPAs decrease overall over the year, which is fantastic. Adam mentioned earlier that we're seeing very stable cohorts and we're seeing the cost of acquisition decrease. We're seeing the lifetime value, overall, go up, and that's why we're so aggressive right now to push the big marketing investment, but also the markets, because the markets are driving a lot of this growth as well*. And I don't think we've seen any impact to labor cost acquisition from competitors. I think it's pretty standard, and we haven't even seen it change as our growth has scaled in many markets. So I mean, as I say every time when somebody asks me about competition, *we believe we still have a significant structural advantage*. We're known for only one thing, which is takeout ordering, and we back it up with incredible support and we have the lowest diner-facing fees. I think the transactional cost is a big deal here, and over time, as there's

more platforms, whoever has the lowest fee to order is going to win, whoever has the most restaurants, which is clearly us at this moment, and the lowest transactional fees, which is also us, I think has the longest-term advantage in this market.

31.     In subsequent months, defendants represented that Grubhub's investments had proven a resounding success, as the Company continued to add "high-quality" diners. For example, in a February 2019 earnings call, defendant Maloney stated that Grubhub's "cohorts are absolutely rock solid as they always have been. The old cohorts are stable. The new cohorts are looking fantastic." He stated that "with competition, it really hasn't slowed our growth," and Grubhub was seeing "more opportunity now than [it] ever ha[d] before," as evidenced by the Company's decision to "roll[] the investment from the fourth quarter into this year." Defendant DeWitt concurred on the call, stating "when we look at our older cohorts, they're stable, and so we're not losing any orders from our old customers and the new diners that we're picking up are just as high quality as our prior new diners."

32.     Similarly, during an April 2019 earnings call, defendant Maloney stated that, "[s]ix months later, it's clear these investments have resulted in strong growth momentum and clear operating leverage." To emphasize the point, he directed investors to supplemental information in a slide deck defendants had compiled that purportedly demonstrated the exceptional quality and stability of Grubhub's diner cohorts. The slide deck represented: "Net active diner adds have increased dramatically while [cost per acquisition] has remained relatively flat over multiple years." It further stated that "[d]iner quality [was] improving even with increased investment" and that "retention rates [were] higher than historical cohorts," with cohorts from January 2019 purportedly exhibiting higher retention rates than similar cohorts in either 2017 or 2018. The slide deck also represented that "Grubhub diner cohorts are extremely stable, across [its] older and newer markets alike," claiming that the Company had witnessed steady gross food sales across its Tier 1, Tier 2 and Tier 3 markets.

33.     During the earnings call, defendant Maloney elaborated on the purported exceptional quality of the Company's diner cohorts, which he claimed were spending "just as much, if not more" than in previous years, stating in pertinent part:

> As we mentioned in our press release, we've included some updated diner quality and cohort information in the supplemental information presentation posted to our website. Given the significant investments and associated dramatic ramp in diner growth, we thought it was a good time to update you in terms of the value of our diners.
>
> Over the years, we've noted over and over again that **our disciplined approach to diner acquisition, our broad and deep restaurant network and our ever-improving user experience create incredibly sticky diner cohorts that should bring value to Grubhub for years to come**.
>
> We've also noted more recently that because of all the improvements in our platform and marketing, **we've been able to acquire high-quality new diners in older and newer markets alike even as we've dramatically increased marketing spend and new diner volume**.
>
> In the provided cohort charts, you can see that diners that first ordered from us in the first quarter of 2015 are spending just as much, if not more, today than they were last year and the year before that. These charts include diner attrition. So the few diners that leave the platform are offset by diners that remain in the cohort, spending more and more on Grubhub over time. If we show the revenue Grubhub generates from these cohorts, it would be even more positive as we all know that restaurant commission rates have risen over time.
>
> The dynamics illustrated in the supplemental information deck validate the decision we made to invest more in growth over the last 2 quarters.

34.     On the call, defendant DeWitt stated that Grubhub's "discipline[d] approach to diner acquisition is a key driver of [its] stable cohort behavior" and had supported "improving retention rates . . . for both brand new and somewhat new diners." He claimed that broad retention and stable revenue generation were characteristics evidenced across "a number of different cohorts and markets," confirming that these favorable diner attributes were a "broad phenomenon on Grubhub" and "not limited to 1 market or 1 vintage of diners." He reassured investors that "[o]ur investment in advertising is working."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

35.     The Class Period begins on July 30, 2019.  On that date, Grubhub issued a press release announcing its second quarter 2019 financial results.  The release stated that the Company had achieved $325.1 million in revenues and $54.7 million in adjusted EBITDA for the quarter.  The release also stated that Grubhub had 20.3 million active diners and 488,900 DAGs during the quarter, and that the Company was on track to achieve $1.34 billion to $1.39 billion in revenues and $235 million to $250 million in adjusted EBITDA for the year.  Defendant Maloney was quoted in the release as stating that Grubhub had "'continued executing in the second quarter'" by growing its active diner base and was on an "'exit[ing] . . . trajectory . . . both in terms of geographic diversity and depth in individual markets.'"

36.     Defendant DeWitt, meanwhile, highlighted the purportedly improving economics of the Company's diner base and the "'profitability'" of "'smaller and less dense markets,'" stating in pertinent part:

> "Our Adjusted EBITDA per order increased by $0.14 from the first quarter to $1.23 despite the headwind of the seasonally slower second quarter.  This sequential improvement was primarily driven by increasing delivery efficiency, especially in our quickly ramping recently launched markets . . . .  *We have achieved this profitability improvement while extending our delivery business into smaller and less dense markets, setting us up for continued unit economic improvement as we head into our seasonally stronger months at the end of the year*."

37.     That same day, Grubhub hosted an earnings call led by defendants Maloney and DeWitt.  In his prepared remarks, defendant Maloney explained that Grubhub's growth in active diners and its restaurant network positioned Grubhub especially well for its historically strong second half, stating in pertinent part:

> During the second quarter, we generated 489,000 DAGs, up 16% year-over-year.  As expected, DAG growth slowed a bit from the first quarter because the first quarter included the large-scale Taco Bell co-marketing TV campaign paired with free delivery.  *Active diners grew 30% year-over-year to 20.3 million.  Sequentially, we*

- 12 -

*added 1 million net active diners. Our strong order and diner growth translated to net revenue of $325 million for the quarter, up 36% year-over-year.*

Adjusted EBITDA for the second quarter was $55 million, this is $4 million higher than the $51 million in the first quarter despite the sequential seasonal slowdown in orders because of the operating leverage we said we would realize as newer markets scale.

Adjusted EBITDA per order was $1.23, up from $1.09 in the first quarter. In these *newer delivery markets, we had another quarter of strong momentum and DAG growth with the added restaurant inventory helping these markets scale*. As Adam will touch on in his remarks, we expect the continued improvement in driver efficiency through the balance of the year.

*This trajectory underscores our confidence that we will return the economic parity between Grubhub Delivery and self delivery orders*. This time we're operating at a much larger scale and in a much broader and more diverse geographic footprint.

38.    Defendant DeWitt also emphasized the growth in active diners and Grubhub's restaurant network as portending sustained earnings growth. He represented that a dip in orders per active diners was explained by the strength with which the Company was adding active diners and that these newer diners were maturing on their way to becoming more frequent users in subsequent quarters. He claimed investors could rest assured that these newer users would generate additional revenues over time for at least two reasons: First, diners added during a quarter became active users for the entirety of subsequent quarters. Second, diners consistently used Grubhub's platform more frequently over time. He stated in pertinent part:

*Active diners grew 30% year-over-year to 20.3 million in the second quarter as we added 1 million net new active diners during the quarter compared to 500,000 net additions during the same period last year. Our strong active diner growth is a result of our ever-improving restaurant network, efficient advertising and broad delivery coverage*. Calculated orders per active diner was lower than last year as it has been in past quarters. But as a reminder, this isn't really a fair way to measure the activity of our individual diners for 2 reasons: first, we continue to mix shift away from New York in corporate diners where diners have a materially higher frequency than any other markets in the U.S.; and second, and perhaps slightly more nuanced, we stepped up net diner additions in recent quarters.

*Having a higher percentage of new diners distorts the frequency calculation because they have not been on the platform for the entire quarter, and they also continue to increase frequency in future years*.

39.     Defendant DeWitt continued by stating that Grubhub was "scaling quickly" in new markets, "resulting in improving driver efficiency and . . . lower per order delivery cost." He also represented that, with respect to new Grubhub delivery markets:

> [A]s expected, *diners in these markets are behaving a lot like diners do in other markets*. Specifically, the order frequency of diners increases with the introduction of Grubhub Delivery, which improves restaurant inventory in a market and the average order values in these newer delivery markets regardless of population size or density in the market, are in line with other more established Grubhub markets.

He continued, stating: "We are encouraged by this sign of behavior and it further reinforces our view that we have a formula that leads to economically sustainable growth in all types of markets."

40.     Defendant DeWitt also stated that Grubhub's sales and marketing expenses would follow "typical seasonality for the remainder of the year" and claimed that the Company's marketing efforts were economically attracting "high-quality diners." He stated in pertinent part:

> *We are still finding plenty of opportunities to acquire diners at a reasonable cost as evidenced by our 1 million net active diner additions during the quarter*. Our advertising channel mix hasn't changed dramatically over the last several quarters, but *that doesn't mean we aren't testing and investing capital to find the best opportunities to acquire high-quality diners*. These opportunities can take many forms beyond traditional advertising like promotions, pricing, product offers and delivery levers to name a few.

41.     Later, in response to analyst questions, defendant DeWitt stated that Grubhub was on track to achieve $1.50 EBITDA per order by the end of the year, which represented a significant improvement in diner profitability over the $1.23 per order in the second quarter of 2019, and which he claimed "could easily be closer to $2.50" but-for the Company's strategic investments. He stated that the "story hasn't changed there at all" in terms of profitability, and Grubhub was achieving significant diner additions at a reasonable cost. Defendant DeWitt stated in pertinent part:

> We're still taking a view of hey, overall – *based on the behavior that we see, based on profitability of the orders that we have and based on our infrastructure and*

*everything else, what the value is over time*. And we're finding a lot of opportunities to deploy capital to do that. And frankly, *we're doing it – a better job of it now than we were a year ago or 18 months ago, as you can see in the diner growth. Actually, sales and marketing dipped during the quarter sequentially, but we still had strong net new diner adds. So we feel good about that and the framework is made so that it evolves with what's going on in the marketplace*.

42.     Later on the call, in response to an analyst question regarding order growth and new diners, defendant DeWitt stated that the "trend hasn't changed" and diner economics were the same as the figures presented to investors in the prior quarter's supplemental disclosure slide deck detailed herein. He rejected the notion that "competitive intensity" had altered the equation, stating "we haven't seen a headwind on our ability to acquire new diners at similar cost as we have over the past several quarters." He later summarized: "Overall, we feel really good about the order forecast being very similar to what was baked into the forecast previously or baked into the guidance previously."

43.     Similarly, in response to an analyst question about whether the newer diner cohorts were similar in behavior to prior cohorts, defendant Dewitt stated that while there was some "structural headwind" outside of New York, "[a]s we look out into the farther markets, we are seeing good frequencies and ramps in frequencies over time." He again claimed that newer cohorts were ramping orders over time, "so just mathematically, when you have newer diners disproportionately in your active diner base, it's going to weigh on frequency a little bit," which "would go away over time if new diner growth doesn't stay at a super high level."

44.     When an analyst asked defendant Dewitt whether he had "seen any data that suggests your diners are using multiple different services or different apps over the course of a month? Or are they really sticking to a single platform," defendant DeWitt responded: "[W]e haven't seen it." Rather, he claimed "once a cohort becomes stable, we're still seeing really consistent behavior like what we showed you in the supplemental disclosure deck last quarter. . . . We're not seeing that change, and we didn't see a change last quarter and it didn't – it hasn't changed in an appreciable way this quarter either."

- 15 -

45.     During the call, defendant Maloney also reaffirmed the Company's commitment to its partnership business model, stating in pertinent part:

> [W]hen we look at our forward opportunity, we try to figure out our strategic differentiation, and *we've been very consistent that our business is founded on partnership,* working with the restaurants, understanding what the restaurants really need and trying to help them achieve their business goals in digital pickup.

46.     Defendant DeWitt similarly stated that "we have a very profitable model in terms of long-term sustainability, the breadth of restaurants, the combination of how we charge diners and what the restaurants pay us and the formula works."  He continued: "So it's – we feel great about the $1.50 number in the fourth quarter and there's a lot of – there's a natural tailwind in the business going forward."

47.     On August 6, 2019, Grubhub filed its quarterly report on Form 10-Q for the second quarter of 2019, which was signed and certified as accurate by defendants Maloney and DeWitt. The Form 10-Q contained the financial information and operational results provided in Grubhub's July 30, 2019 press release.  In addition, the Form 10-Q stated that Grubhub had "experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sales, during the three and six months ended June 30, 2019 as compared to the same periods in the prior year."  It also stated that this growth "was primarily attributable to increased product and brand awareness by diners largely as a result of marketing efforts and word-of-mouth referrals, better restaurant choices for diners in our markets and technology and product improvements."

48.     The statements referenced in ¶¶35-47 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Grubhub was suffering from declining DAGs on a sequential basis, despite the massive investments that Grubhub had made to spur demand;

(b)     that Grubhub's new customer additions were generating significantly lower revenues as compared to historic cohorts and had a materially lower long-term value because such customers were more prone to using competitor platforms;

(c)     that Grubhub's partnership-focused business plan had failed, and the Company needed to engage in the same aggressive non-partnered sales tactics embraced by its competitors to generate significant revenue growth;

(d)     that Grubhub was not generating the high return on its recent strategic investments as represented to investors, and needed to expend tens of millions of dollars in additional capital in order to grow revenues and retain market share, eviscerating the Company's profitability;

(e)     that Grubhub was tracking tens of millions of dollars below its 2019 revenue and earnings guidance; and

(f)     that, as a result of (a)-(e) above, the Company's financial projections were materially false and misleading and lacked any reasonable basis.

49.     Then, on October 28, 2019, Grubhub shocked the investing public when it issued a press release announcing its third quarter 2019 financial results. The release revealed that Grubhub had suffered a 6% decline in DAGs, a key customer demand metric, and the loss of a $100 million in gross food sales on a sequential basis despite adding nearly a million active diners during the quarter. The release also slashed revenue projections by approximately $70 million and earnings projections by approximately $60 million for the year.

50.     That same day, defendant Maloney took the unusual step of releasing a Shareholder Letter that belatedly acknowledged the deep and troubling problems facing the Company. The letter

stated that Grubhub's newest diner cohorts were exhibiting lower frequency and retention rates as compared to the Company's earlier cohorts. Defendant Maloney blamed the deteriorating diner quality on the fact that diners had become "more promiscuous" and less loyal to the Grubhub platform, as well as the fact that new diners tended to be in markets already served by competing products. His letter also stated that relatively easy industry growth levers had "played out" and Grubhub had entered a period of significantly lower growth without "easy wins." Most surprising of all, defendant Maloney stated that Grubhub had effectively abandoned its historic focus on restaurant partnerships and would instead seek to rapidly expand offerings for non-partnered restaurants. As a result of the diner order declines and need to expend significant capital, defendant Maloney acknowledged that adjusted EBITDA per order would "meaningfully" fall in the fourth quarter of 2019 and that the Company only expected to achieve $100 million in adjusted EBITDA for 2020, **70% below** market consensus expectations.

51. Analysts reacted with disbelief. Defendants had effectively reversed course on Grubhub's primary selling point – the supposed strategic advantage of its partner-focused business model – and revealed horrendous customer and demand trends completely at odds with their Class Period statements. One analyst literally laughed out loud on the third quarter 2019 earnings call when defendant Maloney claimed that Grubhub's partnered options were still viable despite the about-face.

52. Analysts slashed price targets en masse and several downgraded the stock. As an October 30, 2019 Benchmark analyst report summarized: "Grubhub pulled a 180 and announced they would adopt the DoorDash strategy of filling out restaurant penetration by adding non-partner inventory, an extremely low profit channel." It stated that "with numbers getting demolished across the board," Grubhub lacked "any evidence that there is even a shred of underlying, sustainable profitability" that could help sustain the stock price.

53.     On this news, the price of Grubhub stock plummeted more than 40%, to close at just $33.11 on October 29, 2019, on exceptionally high volume of over 46 million shares traded.

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, Grubhub and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or acted with a reckless disregard of a substantial risk that their statements were false and misleading.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Grubhub, their control over, and/or receipt and/or modification of Grubhub's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Grubhub, participated in the fraudulent scheme alleged herein.

55.     Defendants also had reason to conceal this adverse information from the investing public.  Indeed, Grubhub's misleading statements about its growth prospects and market penetration made it an attractive party for exclusive or integrated delivery service partnerships with several restaurant groups before and during the Class Period.  Most notably, Grubhub had entered into a critical business relationship with Yum!, pursuant to which Yum! had purchased $200 million worth of Grubhub common stock.  However, once the truth was revealed, Yum! was forced to write down its Grubhub investment by $60 million.  Yum! has stated that its Grubhub investment had negatively impacted its earnings growth by ($0.37) per share.  Other recent deals, such as the Company's partnership with Shake Shack, have similarly exhibited significant strains, making it increasingly difficult for the Company to attract new enterprise partnerships.

56.     In addition, defendants have acknowledged that the problematic new diner cohorts were first added in 2018, ***more than six months before*** the start of the Class Period.  Given this prolonged period, defendants' laser-like focus on consumer demand and user trends confirms that

they either knew of the false and misleading nature of their statements, or were reckless in not knowing. Indeed, the Individual Defendants held themselves out to the investing public as the persons most knowledgeable about these topics and repeatedly discussed diner quality in detail on earnings calls and in discussions with investors and analysts.

57. Multiple analysts have likewise suggested that the Individual Defendants knew of the adverse facts detailed herein, but failed to disclose these facts to investors. For example, a November 8, 2019 Deutsche Bank report states that apparently the "company had been preparing for this eventuality for some time now," pointing to the fact that Grubhub had conducted a $500 million private note offering in June 2019 and the "only rational explanation" was that they did so in order to provide the financial flexibility to implement the drastic strategic initiatives announced at the end of the Class Period. The Deutsche Bank report also noted defendants' subtle shift in tone at the start of the Class Period, which began to highlight independent restaurants, and the earlier testing of non-partnered relationships. As a Wedbush analyst report observed, "management will face a steep climb in an effort to regain Street credibility."

## LOSS CAUSATION/ECONOMIC LOSS

58. During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Grubhub common stock and operated as a fraud or deceit on Class Period purchasers of Grubhub common stock by misrepresenting the value of the Company's business and prospects by overstating the quality of new diner growth and concealing worsening demand and consumer trends. As the defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Grubhub stock fell precipitously as the prior artificial inflation came out of the stock's price. As a result of their purchases of Grubhub common stock during the Class Period,

plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

59.    Grubhub's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principle they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

60.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Grubhub who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE

61.    The market for Grubhub common stock was open, well developed, and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions set forth above, Grubhub common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Grubhub common stock relying upon the integrity of the market price of Grubhub common stock and market information relating to Grubhub, and have been damaged thereby.

62.     At all relevant times, the market for Grubhub common stock was efficient for the following reasons, among others:

(a)     Grubhub stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q, filed on November 7, 2019, the Company had over 91 million shares of common stock outstanding as of November 1, 2019, demonstrating a very active and broad market for Grubhub common stock;

(c)     as a regulated issuer, Grubhub filed periodic public reports with the SEC;

(d)     Grubhub regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Grubhub was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

63.     As a result of the foregoing, the market for Grubhub common stock promptly digested current information regarding Grubhub from publicly available sources and reflected such information in Grubhub's stock price.  Under these circumstances, all purchasers of Grubhub common stock during the Class Period suffered similar injury through their purchase of Grubhub common stock at artificially inflated prices and a presumption of reliance applies.

64.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Grubhub's business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Grubhub common stock during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Grubhub common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Grubhub or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- 23 -

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and financial results of Grubhub; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

71.     Plaintiff incorporates ¶¶1-70 by reference.

72.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Grubhub common stock during the Class Period.

- 24 -

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Grubhub common stock. Plaintiff and the Class would not have purchased Grubhub common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

75.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Grubhub common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

77.     Plaintiff incorporates ¶¶1-76 by reference.

78.     During the Class Period, the Individual Defendants acted as controlling persons of Grubhub within the meaning of §20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions, and their culpable participation in the fraudulent scheme, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends were false and misleading as detailed herein.

79.     The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants

had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

80. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 20, 2019        ROBBINS GELLER RUDMAN
       & DOWD LLP
       BRIAN E. COCHRAN (IL Bar # 6329016)

       BRIAN E. COCHRAN

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ADEMI & O'REILLY LLP
GURI ADEMI
JESSE FRUCHTER
3620 East Layton Avenue
Cudahy, WI  53110
Telephone:  414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com
jfruchter@ademilaw.com

Attorneys for Plaintiff

## PLAINTIFF'S CERTIFICATE

I, Roei Azar ("Plaintiff"), declare, as to the claims asserted under the Federal Securities laws, that:

1. Plaintiff has reviewed the complaint against **Grubhub Inc.**, and certain other defendants, and authorizes its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including acting as a Lead Plaintiff and providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that s/he is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. In addition, Plaintiff has made no transaction(s) during the Class Period in the securities of **Grubhub Inc.**, except as set forth in Exhibit A hereto.

7. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed as follows: Yes on Yelp stock after earnings report

I declare under penalty of perjury, under the laws of the United States, this 30th day of October, 2019 that the information above is accurate.

Roei Azar

Drafted by:
Ademi & O'Reilly, LLP
3620 East Layton Ave.
Cudahy, WI 53110

**EXHIBIT A**

| Purchases | | |
|---|---|---|
| **Date(s)** | **Number Of Shares** | **Price($)** |
| 2019-05-23 | 450 | 66.33 |
| 2019-07-31 | 2,370 | 67.68 |
| 2019-08-16 | 1,350 | 59.05 |
| 2019-08-13 | 10 | 65.38 |
| 2019-08-06 | 750 | 68.54 |
| 2019-08-01 | 35 | 66.32 |

| Sales | | |
|---|---|---|
| **Date(s)** | **Number Of Shares** | **Price($)** |
| 2019-08-05 | 2,855 | 69.40 |