UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:19-cv-07665 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | Judge Charles R. Norgle Sr. |
| vs. | ) ) | |
| GRUBHUB INC., et al., | ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

Lead Plaintiff City of Pontiac General Employees' Retirement System and City of Pontiac Police & Fire Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys. This investigation included, among other things: review and analysis of Securities and Exchange Commission ("SEC") filings by Grubhub Inc. ("Grubhub" or the "Company"), Company conference call transcripts and press releases, public information regarding Grubhub including information posted on the Company website, and analyst reports and media reports about the Company and the industry. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This securities class action is brought on behalf of all purchasers of Grubhub common stock between April 25, 2019 and October 28, 2019, inclusive (the "Class Period"). The claims are alleged against Grubhub, its Chief Executive Officer ("CEO") Matthew Maloney ("Maloney"), and its Chief Financial Officer ("CFO") and President Adam DeWitt ("DeWitt") (collectively, "Defendants") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Grubhub is an online food ordering and delivery company. Its business centers on an online platform that contains menus for restaurants in the areas Grubhub serves throughout the country. Grubhub's customers (diners) can search the listed restaurants, place an order through the Grubhub platform, and the food will be delivered to the diner.

3.      In general, food delivery businesses followed either a partnered or non-partnered model (or a combination of the two). Grubhub followed an exclusively partnered model, which focused on entering into agreements with "partner" restaurants that paid a commission to have their

menus listed on Grubhub's platform. Grubhub claimed that its partnered model was more profitable because it was able to charge a commission, claimed that customers benefitted from a better ordering experience, and claimed that the partnered restaurants benefited from Grubhub's dominant market position and superior service and data offerings, which would boost demand for the partnered restaurants. If a restaurant was not partnered with Grubhub, it would not be on the platform.

4.      This business model was different from models used by certain of Grubhub's competitors, which listed restaurants' menus on the platforms without requiring an agreement with the restaurants or charging a commission. Under this non-partnered model, customers could simply order from any listed restaurant, a driver would go to the restaurant, pay for and pick up the order, and then deliver the order to the customer without the restaurant necessarily knowing about the delivery transaction.

5.      As discussed below (¶¶40-43), Defendants touted the superiority of Grubhub's business model as being the only profitable and sustainable model due to the additional revenue earned from commissions charged to partner restaurants. Grubhub's ability to charge a commission depended upon having diners order from Grubhub's platform rather than from competitors, and Grubhub evaluated the quality of diners by tracking their loyalty through reports that tracked ordering behavior, *e.g.*, whether diners ordered again within 7, 14, and 30 days.

6.      As noted by Defendants and industry analysts (*see, e.g.*, ¶¶39, 84, 87), diner ordering frequency was driven by the quantity of restaurants offered on a platform, referred to as "restaurant density." If a platform did not have strong restaurant density, diners would turn to a competitor with more restaurant choices, and having done so, might not return and therefore be less valuable. Whereas Grubhub had strong restaurant density in big cities where it had been operating the longest and had a track record of profitable operations, Grubhub and its competitors were looking to expand into new markets across the country. When expanding into new markets, it took Grubhub time to

- 2 -

sign up individual partnered restaurants.  In contrast, when non-partnered competitors entered new markets, they could quickly place restaurants on their platforms and have a large selection of available restaurants on day one.

7.     More specifically, since Grubhub was an early mover, it succeeded with its partnered model for many years because it had restaurant density in its established markets and held market share around 70% well into 2015.  However, beginning in 2016, the competition became more aggressive in expanding into new markets so Grubhub's overall market share began to decline.  Grubhub initially claimed that market share declines were irrelevant because all online food ordering businesses were expanding and acquiring new diners, rather than reflecting that Grubhub's market share was declining due to losing customers to competitors.  Grubhub continued to claim that more important than market share was that Grubhub was using a partnered model and charging commissions for providing restaurants with superior service, systems, and data, which Grubhub claimed made it the only profitable and sustainable company in the market, while its competitors were engaging in loss-leading tactics of offering steep discounts in an unsustainable race to the bottom.

8.     In 2018, Grubhub's market share fell even further, dropping to below 50% and then to below 35% by the start of the Class Period.  As a result, Grubhub decided to get more aggressive in expanding into new markets to combat the market share declines.  In order to do so, Grubhub announced a partnership with Yum! Brands ("Yum!"), which owns Taco Bell and Kentucky Fried Chicken ("KFC"), to help the Company enter new markets and pursue new diners.  Grubhub explained that it would utilize partnerships with large national restaurant chains (which Grubhub called "enterprise" brands) to serve as "anchor tenants" in new markets, providing Grubhub a foothold to then build out its restaurant inventory.  However, it was important for Grubhub to quickly add the smaller to mid-sized "independent" restaurants in these new markets because, as

- 3 -

Grubhub would disclose after the Class Period, orders through enterprise brands serving as "anchor tenants" were not nearly as profitable, or even zero-profit orders.

9.     In October 2018, Grubhub announced it was drastically increasing its marketing spending by millions of dollars, which it continued in 2019, to accelerate its expansion into approximately 200 new markets.  However, as Grubhub was adding new diners in these new markets and increasing revenues, its customer mix shifted from high-quality diners to low quality, less loyal diners and diners ordering from national chains, which resulted in little or no profit to Grubhub.  In addition, because Grubhub's business model of signing up partnered restaurants took longer to achieve restaurant density, when Grubhub entered the new markets it had a smaller selection of restaurants than the competitors, and even the new customers that ordered from the more profitable, partnered restaurants were not as loyal to Grubhub and instead were fleeing to competitors and ordering less frequently than Grubhub's historical customer base.

10.    Throughout the Class Period, Defendants carefully tracked the buying patterns of the new diners on a regular basis, for example, looking at the frequency with which customers ordered, which Defendants used as an indication of whether diners were high or low quality.

11.    This case arises because, during the Class Period, Defendants concealed from investors that as Grubhub's costs were increasing from its increased marketing spend, the Company's customer mix was shifting from high-quality profitable diners toward low-quality diners, as it was adding lower-quality and less-profitable new diners in the new markets, which would negatively impact Grubhub's profitability and growth prospects.  Rather than disclose the negative trends to investors, Defendants made false and misleading statements assuring investors that the increased spending was succeeding in attracting high-quality customers and that Grubhub was maintaining its position as the only profitable and sustainable business in the market.  For example, during the Class Period, Defendants claimed that: Grubhub's "*[d]iner quality [was] improving even*

- 4 -

*with increased investment*," the "*returns on our investments have been great, high-quality growth*," Grubhub had "*been able to acquire high-quality new diners in older and newer markets alike even as we've dramatically increased marketing spend*," the "*diners in these [new] markets are behaving a lot like diners do in other markets*," Defendants were "*seeing good frequencies and ramps in frequencies over time*," and Grubhub had "*a very profitable model in terms of long-term sustainability [and] the breadth of restaurants*," adding that "*the formula works*."

12.     However, the truth that Grubhub was spending more to attract lower-quality diners that were not loyal to Grubhub was revealed on October 28-29, 2019, when Grubhub reported disappointing financial results revealing the negative business trends and showing that it was growing through low-quality diners and it was being negatively impacted in new markets by its lack of restaurant density.  As a result of these negative trends, Defendants reduced their full-year earnings guidance by more than 25%, from $242.5 million to $179.5 million, and indicated they expected 2020 earnings of around $100 million, which was 70% below market expectations of $341 million.  Contrary to their Class Period statements, Defendants revealed that the value of new diners acquired at the end of 2018 and first half of 2019 was "not as high as it has been in the past," that the newer diners "were not driving as many orders as we expected," and that the newer diners "weren't fresh, clean, brand-new cohorts [but] were stolen diners, who had a history of ordering on other platforms" with better restaurant selection.  Remarkably, after having criticized the non-partnered model as unprofitable, inferior, and unsustainable, Defendants disclosed that Grubhub had also begun using the non-partnered model.

13.     Investors and analysts were stunned by these admissions, and Grubhub's stock price lost almost half of its value, declining by 43%.  Financial analysts characterized the October 28-29, 2019 disclosures as, among other things, "a shocker," a "surprise," and "particularly troubling."

And, reflecting the view that management had not been candid, analysts said that "management will face a steep climb in an effort to regain Street credibility."

14.     As a result of the negative news, Grubhub's stock price plummeted from $58 per share on October 28, 2019 to $33 per share on October 29, 2019, eliminating more than $2 billion in market capitalization and revealing significant economic loss to Class members who purchased Grubhub stock at artificially inflated prices during the Class Period.

15.     As further evidence of the negative trend, after having made a small profit in the first three quarters of 2019, Grubhub reported a fourth quarter 2019 net loss of $27.7 million, which was 300% larger than the cumulative profits of the prior 3 quarters.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Grubhub maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Lead Plaintiff City of Pontiac General Employees' Retirement System and City of Pontiac Police & Fire Retirement System purchased shares of Grubhub common stock during the Class Period and was damaged thereby.  *See* ECF No. 18-2.

21.     Defendant Grubhub is headquartered in Chicago, Illinois.  The Company's common stock is listed on the NYSE under the ticker symbol "GRUB."

22.     Defendant Maloney was a founder of Grubhub and served as its CEO throughout the Class Period.

23.     Defendant DeWitt served as Grubhub's President and CFO throughout the Class Period.

## FACTUAL BACKGROUND

**Grubhub's Business**

24.     Founded in 2004, Grubhub is in the online food ordering business.  It maintains an online platform of restaurants in the areas it serves throughout the country.  A diner interested in ordering food can search the listed restaurants (on Grubhub's website or mobile apps), place an order through Grubhub, and then the food will be delivered.

25.     Grubhub generates revenue primarily through partnerships with restaurants.  These partnered restaurants agree to have their menus placed on the Grubhub platform and pay a commission, usually a percentage of the transaction, on orders processed through Grubhub.  A partnered restaurant can choose to pay a higher commission to increase its prominence and exposure to diners on the platform.

26.     Historically, Grubhub's business focused on a "Self-Delivery" model, meaning the restaurants provided their own delivery services.  For example, when the diner placed an order

- 7 -

through Grubhub's platform, Grubhub would transmit the order and payment (less the commission) to the restaurant, which would utilize its own driver to complete the delivery.

27.     Grubhub thrived for years using this model. Through expansion into various cities and several acquisitions, Grubhub grew to having more than 28,000 partnered restaurants on its platform by the end of 2013, generating $137 million in 2013 revenue and $6.7 million of net income. In April 2014, Grubhub went public, raising nearly $200 million by issuing 7.4 million shares of common stock on the NYSE at a price of $26 per share.

28.     In 2015, Grubhub expanded its business to include "Grubhub Delivery," which offered delivery services for restaurants that had no delivery operations of their own. Under this model, Grubhub processed orders in the same way as its Self-Delivery model, but Grubhub would also arrange for a driver to pick up the food from the restaurant and deliver it to the diner. For Grubhub Delivery, Grubhub shared the cost of delivery among the restaurant and diner by increasing the amount of the commission paid by the restaurant and adding a delivery fee to the invoice paid by the diner.

29.     Accordingly, the Grubhub Delivery model resulted in higher revenue per order, but because of the increased costs of delivery, it did not result in more profit. Grubhub has provided the following illustrative graphic showing that even with revenue and profits being the same under the Self-Delivery and Grubhub Delivery models, the profit margin was much higher for Self-Delivery:

| Business Model: | Self-Delivery | Grubhub Delivery |
|---|---|---|
| Average Order Size | $30.00 | $30.00 |
| *Commission Paid by Restaurant* | *15.0%* | *30.0%* |
| Commission | $4.50 | $9.00 |
| Delivery Fee Paid to Grubhub by Diner | $0.00 | $2.00 |
| **Grubhub Revenue per Order** | **$4.50** | **$11.00** |
| Credit Card & Care Expenses | $1.10 | $1.10 |
| Payment to Delivery Partner | $0.00 | $6.50 |
| **Grubhub Profit per Order** | **$3.40** | **$3.40** |
| *Profit Margin* | *76%* | *31%* |

30.     Grubhub's revenue and profits continued to rise following the launch of Grubhub Delivery, and it reported $493 million in revenue and $50 million of net income for 2016.

**Grubhub's Performance Metrics**

31.     Since going public in 2014, Grubhub and analysts have tracked various metrics to measure Grubhub's business performance. Grubhub reports traditional metrics such as quarterly revenue, net income, and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"), which purportedly reflects recurring profitability.

32.     Grubhub also reports industry-centric metrics, including the following:

(a)     "Gross food sales" or "GFS": the total value of food, beverages, taxes, prepaid gratuities, and any delivery fees processed through Grubhub's platform.

(b)     "Daily average grubs" or "DAGs": the number of orders placed on the Grubhub platform divided by the number of days in the quarter or year. DAGs is a primary metric that the Company and analysts use to track and assess Grubhub's growth.

(c)     "Active diners": the number of unique diner accounts from which an order had been placed in the past twelve months through the Grubhub platform.

(d)     "Orders-per-active-diner": the result of dividing total orders in a quarter or year by active diners.

33.     Adding active diners does not necessarily demonstrate that the Company is growing or becoming more profitable, so Defendants and investors have always paid close attention to the "quality" of new diners.  Maloney has explained that "higher-quality diners" are "defined by the diners that are ordering more frequently" and therefore provide repeat revenue.  Similarly, during a February 2017 conference call, DeWitt stated, "when we talk about the higher-quality diners, I think we're seeing it mostly in that orders-per-active diner metric."  This loyalty to Grubhub, as reflected in frequent ordering behavior, ensured that Grubhub could continue to charge commissions that drove its profitability.

34.     When tracking new diners added to the Grubhub platform, Maloney and Dewitt looked at, for example, the diners' ordering activity on 7-day, 14-day, and 30-day increments.  In August 2017, DeWitt noted that these ordering patterns allowed them to "fairly accurately predict what a diner's going to do over its life after watching it for 30 days or so."  DeWitt re-emphasized in February 2019 that Defendants monitor "7-day behavior, then 14-day behavior and, ultimately, a full month of behavior to understand the quality of the new diners," and that Defendants "are constantly pushing and testing" and "looking at things like the 7-day repeat rate, the 14-day repeat rate and the 30-day repeat rate" to assess the quality of their new diners.

35.     Defendants monitor and test frequency trends on a regular basis to determine how markets are developing and to manage the business.  For example, during an April 2017 conference call, Maloney stated that "we're just constantly looking through both product and advertising to how do we increase the lifetime value, increase the conversion, [and] increase the frequency of diners. And that's – we're constantly testing."  And in July 2018, DeWitt stated, "we see activity rates or frequency rates in a given market increase over time as the number of restaurant options goes up. And we've seen that in pretty much every single market that we've been in."

- 10 -

**The Impact of Marketing on the Quality of New Diners Obtained**

36.     Defendants can also predict the quality of new diners obtained based on the marketing tactics used to acquire new diners.  Three marketing tactics relevant to this case are promotions, general marketing, and increased restaurant density.

37.     First, using promotions (such as free delivery or free food) to obtain new diners tends to attract lower-quality, opportunistic buyers.  As Maloney has stated, "if you're doing a lot of promotions you have a very low-quality diner because they're looking for the free food, whereas if you get someone on the merits of your product and the values of what you bring, they're much more likely to stay with you for a while."  DeWitt has likewise acknowledged that promotions result in "really, low-quality diners," which "try us and never come back," so the Company is "sensitive about depending on large promotions to acquire those diners."

38.     Second, simply increasing general and non-targeted sales and marketing spending can have the same effects as promotions and primarily attract lower-quality diners.  For example, in July 2016 DeWitt reported that the Company's sales and marketing expense declined 12% because the Company was "focusing more on high-quality diner acquisition."  DeWitt explained that the more targeted spending was working, as the Company had "[t]he smallest year-over-year decline in frequency since we've been public."  In October 2016, DeWitt reported another reduction in sales and marketing expense and that the more targeted efforts resulted in "30-day orders per ending active diner actually increas[ing] 6% year on year, the first year-over-year increase in that metric since we have been public."  Maloney later added that the "smarter approach to marketing spend has enabled us to acquire more higher-quality diners."

39.     Third, in contrast to promotions or general marketing, increasing the number of restaurants to choose from, or increasing "restaurant density," attracts higher-quality new diners.  As explained by Defendants, "the single biggest determinant of diners' usage on marketplaces is

- 11 -

whether it has the restaurants that the diner wants." *See* ¶¶84, 87. A new diner using Grubhub's platform is more likely to use the platform again if the restaurants it wants to order from are also on the platform. Thus, Maloney said in October 2017, "as we've seen in the past when Grubhub diners have a better selection, their order frequency and retention increase."

## EVENTS LEADING UP TO THE CLASS PERIOD

**Grubhub's Purportedly Superior and More Profitable Partnership Model**

40.     By historically using only a partnered strategy, it took Grubhub longer to build restaurant density in new markets because Grubhub had to convince restaurants one-by-one of the value in partnering with Grubhub and paying commissions. Only after a restaurant entered into an agreement did Grubhub then place the restaurant's menu on the platform and process the restaurant's orders. By contrast, Grubhub's competitors had immediate restaurant density in new markets because they added restaurants' menus to their platforms without any partnership. As noted, the non-partnered restaurants pay no commissions and may not even know that an order was placed through a delivery service, as opposed to directly from a diner.

41.     Defendants dismissed the non-partnered strategy as unprofitable and unsustainable, and claimed that the Grubhub partnered model was superior because it generated more revenue, which allowed Grubhub to operate profitably, and also claimed that it was more beneficial to restaurants and diners by providing the best ordering and delivery experience. For example, Defendants emphasized the services Grubhub could provide to restaurants that non-partnered platforms could not, such as: (i) integrated point of sale ("POS") systems that allowed orders processed through Grubhub to appear directly in the restaurant's kitchen and back-office systems (rather than placed by phone); (ii) development of branded or "white label" apps that would appear to customers to be the restaurant's delivery app but allow the orders to be processed through Grubhub's systems; (iii) sharing of customer transactional data to allow the partnered restaurants to

- 12 -

engage in targeted marketing; and (iv) use of Grubhub's own customer relationship management ("CRM") systems that purportedly allowed the Company to better "predict diner tastes, preferences and behavior" resulting in "more orders to our restaurant partners." Defendants also maintained that diners paid lower prices through Grubhub because the partnered restaurants subsidized part of the delivery costs through commissions rather than those costs being paid fully by the diner.

42. Defendants claimed that these superior offerings meant that Grubhub generated increased demand for delivered food, resulting in long-term value for the partnered restaurant and an increased likelihood of attracting high-quality diners, in contrast to its competitors, which operated merely as logistics companies. Maloney emphasized that Grubhub would not "cut rate just to match a deal" because it had the "best products," the "deepest integrations," and the "most competitive platform" to support growth.

43. Grubhub maintained that its superior service and increased demand added value that not only justified the commissions charged to partnered restaurants, but also incentivized restaurants to direct their customers to Grubhub for delivery, rather than to the competition. As stated by Maloney, Grubhub's "point-of-sale systems" and "CRM tools" made it "more likely for restaurants to want to channel their orders through our platform" and restaurants "will always prefer to spend their marketing dollars building a diner base on platforms that share their customer data with them," *i.e.*, Grubhub. He has also added that "if we can be the most integrated, the most partnered, the most supportive and the most valued, we are going to get all the money from [the restaurants'] marketing budgets that we can take for the DemandGen [demand generation] we can generate."

**Grubhub Loses Market Share to Competitors**

44. After going public, Grubhub rapidly grew from $79 million in adjusted EBITDA in 2014 to more than $230 million in adjusted EBITDA in 2018:

- 13 -



45.     Given this positive trend and the purportedly untapped $200 billion market that Grubhub and its competitors were expanding into, analysts viewed Grubhub as a growth business and expected Grubhub's earnings to continue to grow on a similar upward trajectory.

46.     Grubhub's position as the dominant player was assisted by its early entrance into the online food ordering and delivery market.  In fact, Grubhub had around 70% of the national market in 2015.  Despite increased competition causing market share declines by February 2017, Maloney stated that "we don't feel like anyone's taking business from us in any market," and "[c]ompetitors in our space have historically had minimal impact on our business."  In August 2017, he reiterated, "I think that we've proven that we have the staying power and we're not afraid of any competition right now."  In fact, Maloney claimed in October 2017 that the potential market of "$200 billion in annual domestic gross food sales," compared to Grubhub's roughly $4 billion in GFS annually, was so great that competition would benefit Grubhub by "adding new restaurants and . . . bringing awareness to more diners than we could have done alone," resulting in business "expanding for everyone."

47.     However, several well-funded competitors began quickly taking up market share in 2017 and 2018.  The largest, DoorDash, launched in 2013 and over the next several years raised $2

- 14 -

billion in private capital to fund its growth. In 2016, the massive ride-share company Uber launched its food delivery app, Uber Eats. The considerable financial resources of these competitors – DoorDash from private capital and Uber Eats from Uber's ride-share revenue streams – allowed them to engage in aggressive marketing campaigns to add customers. The deep discounting and promotions provided by these competitors, which has included low or even zero delivery fees, has been described as a "price war" by market analysts.

48. In addition to using deep discounting to enter markets, DoorDash and other competitors did not limit their business to a partnered strategy and instead placed non-partnered restaurants on their platforms, foregoing revenue from restaurant commissions to increase restaurant density. As a result of their significant spending and/or non-partnered strategies, DoorDash and Uber Eats grew rapidly. While Grubhub had around 70% of the market in 2015, its market share fell to approximately 53% in 2017 and to 38% by the end of 2018. In 2018, DoorDash had increased its share to 25% of the market and Uber Eats had 22%. As noted, Defendants claimed to be unaffected by the market share loss as they purportedly continued to focus on their profitable partnered model that targeted the profitable segment of the business as opposed to chasing volume as their competitors did through an unprofitable model of delivering steeply-discounted orders.

**Grubhub Attempts to Acquire New Diners Through Its Enterprise Strategy**

49. For years, Grubhub's business had been succeeding in large cities, which Grubhub referred to as "Tier 1" markets. Grubhub had been operating in Tier 1 markets since before 2012 and had an established network of restaurants. As Grubhub sought to acquire new diners in smaller markets, its partnership model made it more difficult to achieve restaurant density in these smaller "Tier 2" and "Tier 3" markets. In addition, without a large presence in these markets, it would be difficult for Grubhub Delivery to have sufficient scale and efficiency to offset delivery costs and be profitable.

- 15 -

50.     To help solve this issue, in February 2018 Grubhub announced its most prominent restaurant partnership ever – teaming with Yum!, which owns Taco Bell, KFC, and Pizza Hut. Under the agreement with Yum!, Grubhub served as the "exclusive" online delivery provider for Taco Bell and KFC restaurants nationwide and Yum! acquired $200 million worth of Grubhub stock. During a February 2018 conference call, DeWitt explained that Yum!'s "embedded demand and awareness" in Tier 2 and Tier 3 markets, along with Yum! and Grubhub co-marketing campaigns, would allow Grubhub to better grow in the Tier 2 and Tier 3 markets where Grubhub had "lower overall awareness."

51.     Under this plan, Grubhub would expand into new markets by way of Taco Bell, KFC and other enterprise brands as "anchor tenants." Maloney stated during a May 2018 conference call that "by leveraging [Grubhub's] chain partnerships, where they have a lot of footprint and a lot of excitement where they can see more growth, we can kind of create those anchor tenants and then we fill out the mom-and-pops as we continue to expand our market coverage in these nascent markets."

52.     Although Defendants did not say so at the time, they later disclosed that orders through such "enterprise" partnerships generated little or no profit. This meant that growing the "mom-and-pop," *i.e.*, independent restaurant partners in the new markets, was key to profitability. The quality of new diner adds was also critical due to the magnitude of expansion into new markets. For example, with the announcement of the Yum! partnership, Grubhub stated that it expected to expand into 100 new markets in 2018, more than doubling the Company's 80 markets at the end of 2017.

**Grubhub Increases Costs Through Increased Marketing and Promotional Spending**

53.     In October 2018, Defendants announced that in addition to the Yum! strategy, they had increased marketing spending in the third quarter of 2018 ("3Q 2018") and would significantly

increase spending even further in the fourth quarter of 2018 ("4Q 2018") to add new diners in even more new markets throughout the country.

54.     Defendants claimed that the increased spending would allow Grubhub to expand into an additional 100 new markets in 4Q 2018 (beyond the 100 new markets announced at the time of the Yum! partnership), bringing the total number of new markets to 200 for 2018, a roughly 250% increase from 2017. According to DeWitt, the Company was expecting to increase marketing spend by up to 50% from the prior year, which the Company would "deploy . . . across many of [its] channels, including digital, TV and promotional offers."

55.     On February 7, 2019, Defendants said they would continue to "maintain [the] higher level of spend" on sales and marketing in the first quarter of 2019 ("1Q 2019") to acquire "new diners through increased advertising." In addition, Defendants revealed a national co-marketing campaign with Taco Bell that would require Grubhub to "fund[] free delivery for an extended period of time," which would cost around $5 million in promotional spending.

56.     Two months later, on April 25, 2019, Defendants said they would continue to increase sales and marketing spending in the second quarter of 2019 ("2Q 2019"), making it the third consecutive quarter of drastically increased sales and marketing expense, in an attempt to acquire new diners. The rising costs are reflected in the following chart:



Sales and Marketing Expense (mil)

**Defendants Assure Investors that Grubhub Is Acquiring High Quality and Profitable Diners**

57.     Given the increased spending, analysts looked to whether Grubhub's growth would negatively impact profitability and whether Grubhub was attracting high- or low-quality diners in the face of competition.  For example, throughout quarterly conference calls in 4Q 2018 and 1Q 2019, analysts asked about: "a lot of headlines" about the competition's "numbers and growth"; Grubhub's "market share declines"; competitors being "increasingly willing to sacrifice economics"; whether diners were "using multiple services"; and what performance indicators Defendants were "monitoring" in the new markets so investors could "have a higher degree of confidence that the incremental unit economics in these new markets are not going to be lower."

58.     With analysts focused on whether Grubhub's customer mix would shift to lower quality and less profitable business, Defendants assured the analysts that the increased marketing spending and the enterprise anchor-tenant strategy reflected in the Yum! partnership would attract high-quality customers that would not negatively impact profitability.  In fact, Defendants stated that although the increased spending and inefficiencies in Grubhub Delivery in the new markets caused

- 18 -

adjusted EBITDA per order to fall from $1.57 per order in 3Q 2018 to $0.98 per order in 4Q 2018, the investments would pay off and the Company would return "much closer to [the] third quarter 2018 rate of $1.57" by 4Q 2019. Defendants provided primarily three reasons for their assured outlook.

59. First, Defendants claimed that the growth of the competition was neither preventing Grubhub from growing nor negatively impacting the Company's retention of customers. For example, Maloney stated on October 25, 2018 that Defendants "still haven't seen the entry of any competitor impact our growth in any of our markets." Then on February 7, 2019, he added, "I don't really worry about market share per se. We have not seen anyone else. We've not seen our churn rates accelerate because of competition. We've not seen the ability to grow, to be hindered, because of competition. . . . I have said many times that, while unsustainable business models may be working in the short term, I don't think that they will work in the long term." DeWitt likewise insisted that "it's not a case where we're fighting for a share of stomach or we haven't seen that in our customer behavior where we're fighting for share of stomach so to speak with other apps."

60. Second, Defendants continued to claim that Grubhub's partnered model was superior at succeeding in the long run by attracting higher-quality customers, being profitable, and providing restaurants with differentiating value that would allow Grubhub to outlast the competition. On February 7, 2019 Maloney stated, "I fundamentally believe that partnership with restaurants is the right way to build a quality experience for diners," and emphasized that "[w]e partner with restaurants for growth. We're not just a logistics company that delivers from one place to another." During a television interview on April 5, 2019, Maloney said, "everyone else in [the] industry is a logistics company which has razor-thin margins," and claimed that only Grubhub's partnership business model operated profitably.

61. And third, Defendants assured investors that they were closely monitoring the ordering behavior of the new diners acquired at the end of 2018 and the beginning of 2019, and assured investors that their customer mix was not changing as the new diners were high-quality diners with frequency rates that matched existing diners. For example, on October 25, 2018 DeWitt claimed Defendants were "really encouraged" that the new diners were "very stable" and "really high-value." He added that Defendants' decisions on marketing spend "depend[ed] on the data we are seeing." During the next quarterly conference call on February 7, 2019, DeWitt stated, "[w]e've now had a full month to observe repeat behavior of all the new fourth quarter diners and the percentage of diners returning to order a second time was just as high as in our earlier cohorts even though we dramatically increased our spend. Based on these reorder rates, we expect these new diners to have lifetime values significantly in excess of the cost to acquire them." Maloney also touted the new diners during the call, saying, "our cohorts are absolutely rock solid . . . . The new cohorts are looking fantastic."

**Defendants Internally Identify Negative Trends in New Diners and Change Strategy**

62. Despite the external assurances, Grubhub's new diners were shifting toward less-profitable enterprise diners and less-loyal diners whose frequency was declining due to the lack of restaurant density in new markets. That negative trend in customer mix combined with declining market share. For example, media reported that, in May 2019, DoorDash had overtaken Grubhub in U.S. monthly sales:[1]

---

[1] Data is from Second Measure, as reported in Rani Molla, "Grubhub sale rumors highlight the state of the struggling food-delivery industry," VOX Recode (Jan. 9, 2020), https://www.vox.com/recode/2020/1/9/ 21058674/grubhub-sale-food-delivery-struggling-industry. Companies in the "other" category include Postmates, which was later acquired by Uber, and Caviar, which was later acquired by Door Dash. Second Measure collects anonymized consumer information from billions of transactions. Financial analysts following Grubhub cited and provided data from Second Measure in reports regarding Grubhub and the food delivery industry.



63.     Unbeknownst to investors, competitors' non-partnered strategy allowed them to offer superior restaurant density, and resulted in Grubhub's new diners being less loyal, ordering less frequently, and thus being lower-quality additions. *See, e.g.*, ¶¶83-89.

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

64.     The Class Period begins on April 25, 2019.  At that time, Grubhub was more than six months into its strategy of increased marketing spending and a year into its Yum! partnership. During that time Grubhub was capturing the 7-day, 14-day, and 30-day patterns of ordering activity for the newly-acquired diners, and continuing to monitor the frequency of orders from the new diners over time.  Although Defendants admitted at the end of the Class Period that the new diners were low quality, *see* ¶¶83-89, during the Class Period Defendants made the following false and misleading statements that concealed those negative trends and assured investors that they were succeeding in maintaining their customer mix by attracting high-quality and profitable diners.

Cases\4820-0197-1908.v1-7/24/20

**April and May 2019 False and Misleading Statements**

65.     On April 25, 2019, Grubhub issued a release announcing 1Q 2019 financial results and posted a "Supplemental Information" presentation on its investor relations website.  The presentation contained the following statements:

(a)     The first slide of the Supplemental Information presentation was titled "***Net active diner adds have increased dramatically while CPA*** [cost per acquisition] ***has remained relatively flat over multiple years***[2]" and provided the following chart:



(b)     The second slide was titled "***Diner quality improving even with increased investment; retention rates higher than historical cohorts***," and provided the following unscaled charts:

---

[2]     Emphasis has been added to identify the statements alleged to be false and misleading.



66. On April 25, 2019, defendants Maloney and DeWitt held a conference call to discuss the 1Q 2019 results and the Supplemental Information presentation, and made the following statements:

(a) Regarding the 1Q 2019 results, Maloney stated that

*We added 1.6 million active diners in the first quarter, another record*, and finished the quarter with 19.3 million active diners, up 28% from the prior year. *As we will highlight later, these new diners have repeat rates just as high, if not higher than diners we acquired a year ago*.

In summary, *early returns on our investments have been great, high-quality growth and already improving per order economics*.

(b) Discussing the Taco Bell advertising and free delivery campaign in February and March, Maloney stated,

As you can tell by the strong growth in active diners during the quarter, the campaign attracted many new diners in the marketplace.

*Diners that place[d] their first order with Taco Bell during the free delivery period are returning to Grubhub at the same or better rates as a typical diner even after we ended the free delivery campaign*. Some come back and order Taco Bell again, but the majority are trying other restaurants on the platform as well.

(c) DeWitt added,

- 23 -

We believe that in aggregate, the Taco Bell campaign contributed an incremental few hundred thousand new diners and 100 to 150 basis points of incremental DAG growth during the quarter. ***These new diners are high quality returning just as frequently as newly acquired diners from other channels*** and they return to Taco Bell, but also engage with other restaurants on the marketplace at a high rate.

(d)     Referring to the Supplemental Information, Maloney stated:

Given the significant investments and associated dramatic ramp in diner growth, we thought it was a good time to update you in terms of the value of our diners.

Over the years, we've noted over and over again that ***our disciplined approach to diner acquisition, our broad and deep restaurant network and our ever-improving user experience create incredibly sticky diner cohorts that should bring value to Grubhub for years to come***.

We've also noted more recently that because of all the improvements in our platform and marketing, ***we've been able to acquire high-quality new diners in*** older and ***newer markets*** alike ***even as we've dramatically increased marketing spend and new diner volume***.

(e)     Also referring to the Supplemental Information slides, DeWitt said that,

[g]iven the ramp in our investment pace in the fourth quarter, ***we thought this was a good time to share additional metrics that help illustrate the stickiness of our marketplace, our ability to attract high-quality diners and reinforce our decision to be more aggressive in marketing and with delivery market launches***.

(f)     In response to an analyst question about Grubhub's competitors "spending more and taking [market]share," DeWitt answered, "I can't speak to their economics. All I can point you to is our numbers, which show you that we've been able to acquire a lot more diners" and "***you're seeing the diners improve in quality over time*** . . . I don't know if you've [had] a chance to read through the supplemental deck, ***but the repeat rates on our January and February 2019 diners are higher across all of our markets than they were in 2018 or 2017. So the quality is going up. We're spending more money and the cost isn't increasing. And so the formula is working for us***," adding that "***the underlying growth in our business is stronger now than it has been in any point in the last two years***."

- 24 -

(g)     And when asked about "the types of economics that are being talked about" with enterprise brands and whether those large chains are "looking for the lowest price take rate," Maloney responded:

> In terms of fees, while major brands do have more leverage than local restaurants, *we are not as impacted in the pricing conversation because we actually bring real value and we're helping brands build a long-term and profitable business. So we're paid fairly for our services, which then allows us to achieve long-term sustainable economics*, which I think you also know is rather unique in our industry.

67.     The statements set forth in ¶¶66(a)-(g) above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     Defendants' statements claiming that diner quality was improving through the new diner additions, such as the "[n]et active diner adds have increased dramatically while CPA has remained relatively flat," the "[d]iner quality improving," Grubhub has "been able to acquire high-quality new diners" and "attract high-quality diners," Grubhub was "seeing the diners improve in quality over time," and the "return" rates of Taco Bell diners and the one-month "retention rates" and "repeat rates" of new diners acquired in January 2019 and February 2019 were just as high as other diners, were misleading because they omitted to disclose the negative trend that new diners acquired in 4Q 2018, 1Q 2019, and April 2019 were lower-quality and less-profitable diners that were not ordering on Grubhub at the same frequency as diners in the past;

(b)     Contrary to Defendants' statements that their "dramatically increased marketing spend," "increased investment," "decision to be more aggressive in marketing," and "spending more money" was resulting in the acquisition of "high quality" new diners that "improv[e] in quality," and underlying growth that "is stronger now than it has been in any point in the last 2 years," Defendants were actually spending drastically more and acquiring lower-quality, less-frequent diners;

- 25 -

(c)     Defendants' statements that their purported "broad and deep restaurant network and our ever-improving user experience create incredibly sticky diner cohorts that should bring value to Grubhub for years to come" and about the "stickiness of [their] marketplace" were misleading because they omitted to disclose that Grubhub's lack of restaurant density in new markets from its failing partnered model was resulting in the acquisition of less loyal diners that were ordering less frequently from Grubhub and using other non-partnered platforms with better restaurant density; and

(d)     Defendants' statement that they were "not as impacted in the pricing conversation" with enterprise brands "because we actually bring value" and "we're paid fairly for our services" was misleading because it omitted to disclose that enterprise brands were weighing on profitability as they resulted in zero-profit orders for Grubhub.

68.     Analysts reacted favorably to Defendants' false and misleading statements concealing the negative trends in new diner buying patterns and touting the purported high-quality acquisitions, the value of the additional marketing spend, and Grubhub's restaurant density.  For example, on April 26, 2019, analysts from Credit Suisse stated that Defendants' "[i]ncremental disclosure around stable retention trends across regions/cohorts offered yet another point of proof that recent investments are from a position of strength and entirely justified."  The same day, analysts from Cowen stated that the "overall implication" of Defendants' statements was that "despite the rapid growth and scale of competitors GRUB's customer growth and quality remains solid."  And on April 29, 2019, analysts from Wedbush noted that "[w]hile investors are clearly still skeptical of Grubhub's ability to maintain its leadership position, we think Grubhub has executed well in the face of increasing competition and believe over time will prove their ability to be key a player in this strong-growth consumer segment."

69.     On <u>May 10, 2019</u>, Grubhub filed its quarterly report on Form 10-Q for 1Q 2019 (the "1Q 2019 10-Q").  The 1Q 2019 10-Q was signed by defendants Maloney and DeWitt and contained the following false and misleading statement:

> ***The Company experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sales***, during the three [and six months] ended March 31, 2019 as compared to the same period in the prior year.  ***Growth in all metrics was primarily attributable to*** increased product and brand awareness by diners largely as a result of marketing efforts and word-of-mouth referrals, ***better restaurant choices for diners in our markets*** and technology and product improvements.

70.     The statement set forth in ¶69 above was false and misleading when made.  The true facts, which Defendants knew or recklessly disregarded, were: rather than having "better restaurant choices for diners" that was spurring "growth in all metrics," Grubhub's lack of restaurant density in new markets from its failing partnered model was resulting in the acquisition of less loyal diners that were ordering less frequently from Grubhub and using other non-partnered platforms with superior restaurant density.

**July and August 2019 False and Misleading Statements**

71.     <u>On July 30, 2019</u>, Grubhub issued a release announcing 2Q 2019 financial results ("2Q 2019 Release").  As reflected in the following chart, despite a 30% year-over-year increase in active diners, from 15.6 million to 20.3 million, the 2Q 2019 Release reported reduced growth in DAGs and GFS:





72.     On a sequential basis, Grubhub reported quarter-to-quarter DAG and GFS declines, with DAGs falling by around 6% from 521,000 in 1Q 2019 to 488,900 in 2Q 2019, and GFS falling by nearly 3% from $1.502 billion to $1.459 billion.

73.     These metrics suggested that Grubhub's large increases in sales and marketing expense of 54%, 61%, and 60% in 4Q 2018, 1Q 2019, and 2Q 2019, respectively, were not succeeding in attracting high quality, frequent diners.  Moreover, analysts calculated that Grubhub's orders-per-active diner – which is representative of frequency – declined on both a year-over-year and sequential basis.  Nevertheless, Defendants concealed the negative trends and their causes and magnitude, making additional false and misleading statements.

74.     On July 30, 2019, defendants Maloney and DeWitt held a conference call to discuss the 2Q 2019 results and made the following statements:

(a)     Maloney and DeWitt stated that "*[a]ctive diners grew 30% year-over-year to 20.3 million*," and DeWitt claimed that the 6% sequential decline in DAGs from 1Q 2019 to 2Q 2019 "*was a bit exaggerated this year by the Taco Bell national television and free delivery campaign in the first quarter* that Matt referenced as *well as the timing of the Easter holiday*, which we mentioned last quarter."

(b)     Addressing new markets, Maloney stated that "*[i]n these newer delivery markets, we had another quarter of strong* momentum and *DAG growth with the added restaurant inventory helping these markets scale*."

(c)     Similarly, in emphasizing Grubhub's reported 30% year-over-year active diner growth, DeWitt stated that "*[o]ur strong active diner growth is a result of our ever-improving restaurant network,* efficient advertising and broad delivery coverage."

(d)     With regard to orders per active diner, DeWitt claimed:

*Calculated orders per active diner was lower than last year* as it has been in past quarters. *But as a reminder, this isn't really a fair way to measure the activity of our individual diners for 2 reasons: first, we continue to mix shift away from New York in corporate diners where diners have a materially higher frequency than any other market in the U.S.*; and second, and perhaps slightly more nuanced, *we stepped up net diner additions in recent quarters*.

*Having a higher percentage of new diners distorts the frequency calculation because they have not been on the platform for the entire quarter, and they also continue to increase frequency in future years*.

(e)     When asked whether newly-added diners are "similar in behavior to previous cohorts of diners that you've taken," DeWitt responded:

I talked a little bit about frequency and what is weighing on frequency. And I think that is a structural headwind as opposed to an ephemeral headwind because the diners in New York and the diners in corporate are going to – are always going to order more than the newest diners outside of New York and corporate. *As we look out into the farther markets, we are seeing good frequencies and ramps in frequencies over time*. I think the other thing that – *the other impact that will go away over time that's weighing on frequency a little bit is that we've gone through this period of really strong new diner acquisition*. And so just mathematically, when you have newer diners disproportionately in your active diner base, it's going to weigh on frequency a little bit. *So that impact should go – would go away over time* if new diner growth doesn't stay at a super high level, but the other kind of structural difference will be there forever.

(f)     Further addressing new diner behavior, DeWitt claimed that:

[w]e have now operated in these new Grubhub Delivery markets for a couple of quarters and *as expected, diners in these markets are behaving a lot like diners do in other markets*. Specifically, *the order frequency of diners increases with the*

- 29 -

*introduction of Grubhub Delivery, which improves restaurant inventory in a market and the average order values in these newer delivery markets regardless of population size or density in the market, are in line with other more established Grubhub markets.*

(g)     DeWitt also claimed that the increased marketing spending was working and they were getting better at acquiring valuable customers stating, "***We are still finding plenty of opportunities to acquire diners at a reasonable cost***," and later adding:

> . . . let's say, look, it costs us $100 to acquire a new diner but there's no way we think that the diner's ever going to be worth a total of $50, ***we're not going to go out and make that trade off***. ***We're still taking a view of hey, overall – based on the behavior that we see, based on profitability of the orders that we have and based on our infrastructure and everything else, what the value is over time***. And we're finding a lot of opportunities to deploy capital to do that. And frankly, ***we're doing it -- a better job of it now than we were a year ago or 18 months ago, as you can see in the diner growth***.

(h)     Later in the call, an analyst asked about the growth lagging the increased spending, noting "total order growth in the quarter . . . was up 16%" but "[s]ales and marketing per order [was] up nearly 40%" and asked, "are you seeing any change in the competitive intensity in a particular region going forward?" DeWitt responded:

> [T]he way to think about sales and marketing expense. We've always talked about as being 95% plus related to new diner acquisition, and we have – the number that we disclosed is net active diners, not gross new diners. And so ***last quarter***, ***we had a supplemental disclosure where we showed you guys what that gross CPA*** [cost per acquisition] ***looked like over time and what I'd say is that trend hasn't changed. We're still seeing plenty of opportunities to acquire new diners at a reasonable cost and that has not increased the cost there, whether it's competitive or running out of runway or not launching***. Whatever it is, ***we haven't seen a headwind on our ability to acquire new diners at similar cost as we have over the past several quarters***.

(i)     Another analyst asked, "And one further clarification on this. Have you seen any indication – I know you said in the past that you're not fighting for share of stomach in marketing. But have you seen any data that suggests your diners are using multiple different

- 30 -

services or different apps over the course of a month?  Or are they really sticking to a single platform?"  DeWitt responded:

> Yes, *we haven't seen it*.  I mean what I can tell you is once a cohort becomes stable, *we're still seeing really consistent behavior like what we showed you in the supplemental disclosure deck last quarter*.  So I can't remember what year it was.  It was '15, '16 or '17 cohort.  *We're not seeing that change, and we didn't see a change last quarter and it didn't – it hasn't changed in an appreciable way this quarter either*.  So *if it's happening, it's happening in addition, as opposed to substitutive*.

(j)      Later in the call, Maloney stated "*[t]here are a lot of players right now, making a lot of poor business decisions*" and emphasized Grubhub's "strategic differentiation," stating that "*we've been very consistent that our business is founded on partnership, working with restaurants, understanding what the restaurants really need and trying to help them achieve their business goals in digital pickup*";

(k)      DeWitt stated, "*we have a very profitable model in terms of long-term sustainability, the breadth of restaurants, the combination of how we charge diners and what the restaurants pay us and the formula works*."

75.      The statements set forth in ¶¶74(a)-(k) above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)      Defendants' statements touting the purported high quality of new diner additions such as "we are seeing good frequencies," "diners in these [new] markets are behaving a lot like diners do in other markets," and the "order frequency of diners increases" in new delivery markets were misleading because they omitted to disclose the negative trend that new diners acquired in 4Q 2018, 1Q 2019, 2Q 2019, and July 2019 were lower-quality and less-profitable diners that were not ordering on Grubhub at the same frequency as diners in the past;

(b)      Defendants' statements that they were "still finding plenty of opportunities to acquire diners at a reasonable cost" based on "the behavior that [Defendants] see" and the

- 31 -

"profitability of the orders," the CPA trend for new diners "hasn't changed," and Defendants had not "seen a headwind on our ability to acquire new diners at similar cost as we have over the past several quarters" were misleading because they omitted to disclose that Grubhub's increased spending was acquiring lower-quality, less-frequent diners;

(c) Contrary to Defendants' claims that they "haven't seen" and were "not seeing" any data suggesting that Grubhub's diners were using multiple platforms and that if diners were using multiple platforms "it's happening in addition, as opposed to substitutive," Grubhub's new diners acquired in 4Q 2018, 1Q 2019, 2Q 2019, and July 2019, were using other platforms and not ordering on Grubhub at the same frequency as diners in the past;

(d) Defendants' statements that Grubhub's "strong active diner growth" and "strong" DAG growth were driven by Grubhub's "added restaurant inventory" and "ever-improving restaurant network" were misleading because they omitted to disclose that Grubhub's lack of restaurant density in new markets from its failing partnered model was resulting in the acquisition of less loyal diners that were ordering less frequently from Grubhub and using other non-partnered platforms with better restaurant density;

(e) Defendants' statements that declines in DAGs and orders per active diners were due to the "Taco Bell national television and free delivery campaign in the first quarter," the "timing of the Easter holiday," and the "shift away from New York" were false and misleading because they omitted to disclose that the negative trends were being driven in substantial part by lower quality new diner additions that were not ordering on Grubhub at the same frequency as diners in the past; and

(f) Defendants' statements emphasizing Grubhub's "very profitable model" that was "founded on partnership" and superior to competitors' models built on "poor business decisions," were false and misleading because they omitted to disclose that Grubhub's partnered

- 32 -

model was failing, in that Grubhub had poor restaurant density in the new markets, causing reduced frequency rates and negatively impacting Grubhub's ability to achieve scale in the new markets, which had led Defendants to begin piloting the addition of non-partnered restaurants to the Grubhub platform.

76.    Analysts again reacted favorably to these positive statements, despite the underperforming financial results.  For example, on July 31, 2019, analysts from Credit Suisse reiterated an "Outperform" rating for Grubhub stock and issued a price target of $122 per share (compared to its $69 trading price), noting that Defendants "reiterated recent commentary around stable retention/improving repeat orders across cohorts/regions," and stating that "[w]e continue to believe recent marketing/driver capacity investments were from a position of strength and entirely justified given the consistently stable LTV [long term value]/CAC [customer acquisition cost] and high advertising ROIs [return on investments]."  The same day, analysts from JMP reiterated their "market outperform" rating for Grubhub stock and issued a price target of $95 per share.  The JMP analysts took particular comfort in the fact that "Grubhub added 1M+ net Active Diners in 2Q19, growing 30% Y/Y to 20.3M, supported by an improving restaurant network, continued efficient advertising spend and deployment, and increased delivery coverage."  Unaware that the new active diners were low-quality diners using competitor platforms, the analysts stated that "we continue to believe Grubhub can sustain mid-teens DAG growth in 2020 and beyond as new Active Diners mature, restaurant density improves order frequency, and consumers continue to shift to online ordering."

77.    Analysts from Wedbush likewise issued a report on July 31, 2019 reiterating their "Outperform" rating for Grubhub stock and issuing a price target of $90 per share.  The analysts stated that "there was nothing structurally in Grubhub's print that changed our view that it is still the

best positioned to capture this significant market opportunity over the long-term." And, keeping

with Defendants' talking points, the analysts added,

> We see Grubhub as differentiated as it is the only one among its peers capable of
> helping restaurants with delivery logistics, marketplace, branded apps/mobile
> ordering for pickup, POS integration, and CRM/loyalty, which we think ultimately
> helps support take rates and restaurant relationships. We think this gets Grubhub
> through a period of hyper competitiveness and well positioned to be a strong partner
> for both chain restaurants and local independents.

78.    On <u>August 6, 2019</u>, Grubhub filed its quarterly report on Form 10-Q for 2Q 2019 (the

"2Q 2019 10-Q"). The 2Q 2019 10-Q was signed by defendants Maloney and DeWitt and contained

the following false and misleading statement:

> ***The Company experienced significant growth across all of its key business
> metrics, Active Diners, Daily Average Grubs and Gross Food Sales***, during the
> three and six months ended June 30, 2019 as compared to the same period in the
> prior year. ***Growth in all metrics was primarily attributable to*** increased product
> and brand awareness by diners largely as a result of marketing efforts and word-of-
> mouth referrals, ***better restaurant choices for diners in our markets*** and technology
> and product improvements.

79.    The statement set forth in ¶78 above was false and misleading when made. The true

facts, which Defendants knew or recklessly disregarded, were: rather than having "better restaurant

choices for diners" that was spurring "growth in all metrics," Grubhub's lack of restaurant density in

new markets from its failing partnered model was resulting in the acquisition of less loyal diners that

were ordering less frequently from Grubhub and using other non-partnered platforms with superior

restaurant density.

## THE TRUTH BEGINS TO EMERGE

80.    After the market closed on <u>October 28, 2019</u>, Defendants issued a release reporting

3Q 2019 results. Grubhub shocked investors by reporting disappointing financial results reflecting

that, contrary to Defendants' Class Period statements, the declines in the 2Q 2019 results were not

temporary and not the result of the reasons provided, but reflected previously-undisclosed negative

trends due to Grubhub's partnership model failing to achieve restaurant density and attract high-quality new diners in the new markets, causing Defendants to shift to a non-partnered model and causing significant erosion in Grubhub's DAGs, GFS, and profitability.

81.    Despite recording a third consecutive quarter of around 30% year-over-year growth in active diners, and having the most active diners in the Company's history (21.2 million), the release reported that Grubhub suffered its second consecutive 6% sequential decline in DAGs.  The release also reported substantial declines in DAG, GFS, and revenue growth rates, and reported 3Q 2019 adjusted EBITDA of $53.8 million, which was lower than analyst consensus expectations and represented a decline from the prior quarter adjusted EBITDA.  Further reflecting the magnitude of the negative trends, Defendants were forced to lower full year 2019 adjusted EBITDA guidance from $242.5 million to just $179.5 million, a more than 25% reduction from the guidance issued just months earlier.[3]

82.    Defendants also disclosed that the negative trends in 2Q 2019 had accelerated in 3Q 2019 as reflected in the following chart:

---

[3]    Notably, Defendants affirmed the $242.5 million EBITDA guidance after reporting adjusted EBITDA of $50.9 million in 1Q 2019 and $54.7 million in 2Q 2019, and projected 3Q 2019 guidance of $56.5 million, and therefore effectively guided to $80.4 million in 4Q 2019.  When the truth was revealed, Defendants lowered 4Q 2019 guidance from $80.4 million to $20 million, reflecting a 75% decline.



GFS and DAGs Growth
(year-over-year)

83.     That same evening, October 28, 2019, Defendants took the unusual step of releasing a shareholder letter prior to the 3Q 2019 earnings call.  The letter disclosed that Grubhub's partnered model was impeding its ability to achieve restaurant density and attract high-quality customers in the new markets and that the Company had decided to adopt the non-partnered strategy it had routinely criticized as unprofitable and based on "poor" business decisions.  Contrary to Defendants' Class Period statements, the letter disclosed that "the value of our newer diners is not as high as it has been in the past due to newer cohorts' lower frequencies" and that "our newer diners, particularly those in our newer markets, were not driving as many orders as we expected."  The letter stated that these frequency trends had caused "noticeably lower" DAG growth by August 2019 and also admitted that the lower frequency trends were "more pronounced" for those diners acquired "at the end of 2018 and the first half of 2019," thereby admitting that the negative trends had been reflected in Grubhub's regularly monitored frequency data prior to the start of the Class Period.  In addition, the letter also disclosed that "the retention rates, not just the frequency rates, of our newest diners (those acquired late in the second quarter), were slightly lower than prior cohorts."  In clear terms, the letter

disclosed that "the value of our new diners is not as high as it has been in the past due to . . . lower frequencies."

84.     The letter disclosed that "DAG growth this quarter . . . was at the lower end of our expectations" and acknowledged that "it may be at the lower end of your expectations as well." Contrary to prior claims that their increased marketing spend was succeeding in acquiring high quality diners in the new markets, the October 28, 2019 shareholder letter also belatedly disclosed that the "the easy wins in our industry are now a lot harder to find," and that Grubhub's growth was being hindered by "multiple players all competing for the same new diners and order growth." Contrary to their Class Period claims regarding the depth of Grubhub's restaurant network, the letter conceded that Grubhub's competitors had better restaurant density where "new potential diners find more restaurants" which is "the single biggest determinant of diners usage on marketplaces." The letter blamed Grubhub's partnered strategy for failing to add restaurants fast enough, saying that the strategy "takes longer to build," whereas its non-partnered competitors "have generated strong diner and order growth." Thus, Grubhub disclosed that its diners were less loyal and instead becoming "more promiscuous" and "increasingly ordering from multiple platforms."

85.     In addition, refuting Defendants' Class Period claims that Grubhub's partner model was superior as it offered additional value for diners and increased demand for restaurants, the letter stated that "the biggest enterprise brands don't need Grubhub to bring them new diners" and "we need to give new diners more reasons to try Grubhub" while also trying to "stop our existing diners from looking elsewhere." In a dramatic reversal of business strategy, the letter disclosed that Grubhub had actually been piloting "putting non-partnered restaurants on the platform" and that Grubhub would continue the strategy shift because "it is extremely efficient and cheap to add non-partnered inventory to our platform and it can at least ensure that all of our current and potential new diners have the option to order from any of their favorite restaurants now."

- 37 -

86.     As a result of the low quality diner additions, Defendants lowered their outlook for 2019 and stated that the Company expected to achieve adjusted EBITDA for 2020 of "at least $100 million," which was 70% below market consensus expectations of $341 million:



87.     Before the market opened on <u>October 29, 2019</u>, Maloney and DeWitt hosted a conference call to discuss the 3Q 2019 results and the shareholder letter.  During the call, Maloney admitted that Grubhub was losing customers to competitors with greater restaurant density and that "closing the restaurant gap is so important."  Moreover, after months of denigrating the competitors' models as "unsustainable" and based on "poor business decisions," Defendants disclosed that they had made the decision to shift to a non-partnered strategy "months" earlier.  For example, Maloney stated that Grubhub had "been piloting this for months" and had "tens of thousands of non-partnered restaurants already listed" on its platform.  He further stated, "[w]e've been piloting for a while," and "[w]e have already made the call to scale this out, we're just announcing it right now."

88.     In describing the low quality diners acquired in late 2018 and early 2019, Maloney stated:

> [H]ere we are in the most aggressive markets where we told all of you guys a year ago, we were going to grow as fast as we could.  Here we are stealing share, and the share that we were stealing was less valuable than we expected it to be, but that's

because these weren't fresh, clean, brand-new cohorts.  These were stolen diners, who had a history of ordering on other platforms, and we didn't have the same-restaurant network in many of these communities that they were expected to.  And so the fact that they're performing a little bit less, I think, is pretty logical.

89.     Maloney also disclosed orders through enterprise brands were not profitable, stating that with enterprise brands "definitely, we're not getting paid for demand gen[eration]" and "[d]emand gen[eration] is where we make our profits."  He reiterated that enterprise brands "only pay us for delivery and they don't need us for demand generation."

90.     After the disclosures, the price of Grubhub stock plummeted by 43%, from a close of $58 on October 28, 2019 to a close of just $33 on October 29, 2019, on exceptionally high volume of over 46 million shares traded.

91.     Analysts were stunned by the disclosures, criticized management's credibility, and reacted negatively to Defendants' disclosures.  For example, on October 28-30, 2019:

(a)     Analysts from Wedbush Securities Inc. downgraded Grubhub from "outperform" to "neutral" and slashed their price target from $90 to $30, noting that "the LTV [long term value] of Grubhub's diners, particularly newer ones, are now fundamentally lower."  The analysts made clear that "management will face a steep climb in an effort to regain [s]treet credibility."  The analysts described Grubhub's reduced guidance was "a full-on kitchen sink moment" and that the poor ordering behavior of new diners acquired in late 2018 and the first half of 2019 was "particularly troubling as that is when Grubhub stepped into its . . . marketing investment phase."

(b)     Analysts from BTIG downgraded Grubhub from "buy" to "neutral" and withdrew their price target, stating, "this recent slowdown has caught us by surprise."  The analysts noted that that "Grubhub is chasing deals with large chains that are not leading to profit," and "new diners, particularly in newer markets, were not ordering as frequently as previous cohorts."  The

- 39 -

analysts said that "[w]hile the stock has certainly been punished accordingly, we can't maintain a positive view with any degree of confidence amid this uncertain strategy."

(c)     Analysts from Barclays slashed their Grubhub price target from $51 to $27, noting that 3Q 2019 was "a washout across the board" and stating that "order growth is now falling off the cliff (DAG +6% in 4Q19E vs. +19% in 1Q19) without incremental marketing dollars for diner acquisition/retention and GRUB is forced to explore new initiatives." The analysts added that "[s]hares have traded down 43% today but we struggle to see any support until mid $20s, where valuation can be somewhat justified by the asset value of GRUB's stable corporate and likely declining NYC customer businesses." Further, the analysts questioned Defendants' explanation for the negative results and trends, stating that "the company's hypothesis on slowing industry growth for this sudden mid-year erosion is not convincing."

(d)     Analysts from Stephens Inc. slashed their Grubhub price target from $110 to $42, stating "GRUB printed a shocker last night as it reversed course on previous comments to stay above the aggressive discounting and loss-leading tactics of its peers." The analysts said the shift to a non-partnered strategy "may make GRUB 'dead money' in the near term" and said the strategy "is clearly an about-face from the arrows shot at competitor strategies on prior conference calls."

(e)     Analysts from Morningstar reduced their value estimate of Grubhub stock by 46%, noting that "the limited number of restaurant options available on [Grubhub's] app compared with other players has hurt its user retention as the firm has focused mainly on listing its restaurant partners which use Grubhub's proprietary ordering, advertising, and/or delivery logistics and billing systems." The analysts added that "while Grubhub boasts about working with large enterprise brands such as KFC, McDonald's, Panera Bread, and Taco Bell, it appears the firm does not have much pricing or negotiating leverage with those clients."

- 40 -

(f)     Analysts from The Benchmark Company LLC cut their Grubhub price target more than 50%, from $90 to $42, similarly noting that "Grubhub pulled a 180" and announced it would adopt its competitors' strategy "of filling out restaurant penetration by adding non-partner inventory, an extremely low profit channel."

(g)     Analysts from Guggenheim Securities LLC downgraded Grubhub from "buy" to "neutral," stating, "both top and bottom line growth outlooks are under significantly greater pressure than we had previously assumed."  After summarizing the shareholder letter's disclosures on "lower frequency from diners in newer markets" and increased competition, the analysts stated, "we believe management should have forecasted that entering a market with larger incumbent delivery providers with greater restaurant inventory and driver networks would be a meaningful headwind."  In a follow-up report dated November 4, 2019, Guggenheim analysts noted that Grubhub "management's response/tactics to address greater competition contradicts its prior strategies by increasing investment in channels or services that have historically shown to yield lower (no) profits and returns for peers," and observed that Grubhub's "aggressive change in strategy somewhat validates competitors' business models."

(h)     Analysts from Exane BNP Paribas downgraded Grubhub from "outperform" to "neutral" and highlighted the drastic shift to a non-partnered strategy, stating, "Grubhub was often quick to flag the 'irrational' behaviour of competitors, in particular delivery from restaurants with no revenue share. . . . Grubhub's decision now is to do something similar to ramp up choice for shoppers. It's a major shift with unclear profit impact."

(i)     Analysts from Cowen cut their Grubhub price target from $86 to $36 and downgraded Grubhub from "outperform" to "market perform," stating they were "uncertain whether this stock can work as unit economics are deteriorating" and highlighting that "GRUB drastically

lowered revenue/EBITDA guidance for 4Q and FY19. EBITDA guidance for 2020 was reset to 'at least $100MM,' versus our forecast for $332MM into the print (Consensus $341MM)."

(j) Analysts from Jefferies slashed their Grubhub price target from $78 to $45, and observed that "[f]or the first time, GRUB conceded that competition has impacted expected growth rates." The analysts further noted that under Grubhub's new strategy, "[t]he operating model turns upside down."

92. On February 6, 2020, Defendants issued another letter to shareholders repeating that the new diners acquired through Grubhub's enterprise "anchor tenants" were lower-quality and low-profit diners, stating that orders through enterprise brands "are not a path to profitability" and providing "illustrative Grubhub economics" for Grubhub orders, which confirmed that even partnered enterprise "quick serve restaurants" (or "QSR") orders provide $0 in contribution profit per order:



| | Partnered Independent Restaurant Order | Partnered QSR Restaurant Order | Non-Partnered Restaurant Order |
|---|---|---|---|
| Commission from restaurant | $6 - $8 | $2 - $4 | $0 |
| Delivery & service fee from diner | $4 | $5 | $11 |
| **Grubhub revenue** | **$11** | **$8** | **$11** |
| Credit card & care contact costs | $1 | $1 | $2 |
| Delivery costs | $6 | $7 | $8 |
| **Variable order costs** | **$7** | **$8** | **$10** |
| **Contribution profit per order** | **$4** | **$0** | **$1** |

93. Grubhub explained that for the enterprise QSR orders, revenue is "significantly lower because the commission rate is lower AND the order size is smaller." Grubhub's letter stated that

"Overhead per order" is approximately $2.50, meaning that if subtracted from the $0 profit, the $0 profit orders resulted in a large loss.

## ADDITIONAL SCIENTER ALLEGATIONS

**Defendants Controlled the Company's Messaging to the Investing Public**

94.     Maloney and DeWitt have long controlled the Company's strategies, decisions, and messaging to the investing public. Maloney founded Grubhub in 2004 and has served as the Company's only CEO since going public in 2014. DeWitt has similarly served as the Company's only CFO since going public. Whereas CEOs and CFOs of public companies often delegate aspects of management of day-to-day operations to other executives such as a Chief Operating Officer ("COO") and President, Maloney and DeWitt did not do so and instead eliminated the role of COO and DeWitt also serves as President.

95.     On October 25, 2018, Grubhub announced that its then COO was resigning. Rather than hire a new COO, Maloney and DeWitt announced that they were eliminating the position of COO, further consolidating their ultimate authority and responsibility for monitoring and analyzing the Company's operations and trends.

96.     Moreover, in their respective roles as CEO (Maloney) and CFO and President (DeWitt), Maloney and DeWitt were able to, and did, determine the content of the SEC filings and public statements pertaining to the Company during the Class Period. Since going public in 2014, Maloney and DeWitt are the only Grubhub employees to have signed every annual and quarterly report filed with the SEC. Maloney and DeWitt are also the only Grubhub employees that answer analyst questions on behalf of the Company during quarterly earnings calls.

97.     Further, Maloney and DeWitt participated in the drafting, preparation and/or approval of the conference call scripts and SEC filings, made or were provided with copies of the statements alleged herein to be false and misleading, and had the ability and/or opportunity to prevent their

- 43 -

issuance or cause them to be corrected. Accordingly, Maloney and DeWitt were responsible for ensuring the accuracy of the public statements detailed herein and for verifying that the facts supported the statements and that there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

98.     As the most senior executive officers of Grubhub, Maloney and DeWitt were privy to confidential and proprietary information concerning Grubhub, its diners' ordering behavior, restaurant density, key operating metrics, business trends, strategies, and the competitive landscape of the mobile food-ordering and delivery business. Each of them also had access to internal corporate documents, had conversations with corporate officers and employees, attended management and Board meetings and committees thereof, and reviewed reports and other information provided to them in connection therewith. Because of their possession of, and access to, such information, Maloney and DeWitt knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**Defendants Closely Monitored New Diner Ordering Behavior, Which Was Critical to Grubhub's Business**

99.     In their roles as CEO (Maloney) and CFO and President (DeWitt), Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Grubhub's non-management directors apprised of the state of the Company's business, operations, and trends.

100.     As discussed above, ¶¶33-35, monitoring the quality of diners was critical to Grubhub's operations and growth because high-quality diners (as opposed to lower-frequency diners) were key to repeat business that sustained long term revenues and profitability. Recognizing that diner quality was essential information to the market, Defendants discussed new diner quality during every quarterly earnings call leading up to, and throughout, the Class Period. ¶¶57-61.

- 44 -

101.    As the leaders of Grubhub, Maloney and DeWitt determined business strategy and made and approved the decision to increase marketing spending and spend millions of dollars on promotions to add new diners in new markets.  In their roles, Maloney and DeWitt understood the importance of monitoring and reporting on new diner quality to track the effectiveness of those strategies in 4Q 2018, 1Q 2019, and 2Q 2019.  In fact, prior to and during the Class Period, Defendants reassured investors that they were closely monitoring new diner behavior to ensure that the new diners were high quality and that the costs of the strategies were worth the spend.  ¶¶57-61, 65-66(a)-(f), 74(e)-(h).

102.    As further example, on October 25, 2018, when an analyst asked about the "behavior of the new diners coming in," DeWitt made clear Defendants were monitoring the behavior when he answered that "we're obviously really encouraged" and stated that Defendants were increasing their sales and marketing spend "because we see the value or the quality of the diners being very stable." When further asked "what metrics or KPIs [key performance indicators] are you monitoring," DeWitt made clear that Defendants closely monitored diner activity when he answered:

> . . . we're also looking at how those [new] diners perform over a short to medium time horizon to get an idea of their LTV [long term value].  And to be just a little more specific, we get a pretty good read on cohort of diners even after 7 days, and we get an even better view of those diners after 15 days and we think we're pretty good at projecting out, based on the repeat behavior that we're seeing in those time periods, what their LTVs are going to look like.

103.    Defendants also made clear that their historical experience had shown they were able to determine the quality of new diner additions by comparing their activity to prior diners.  For example, on February 7, 2019, DeWitt stated:

> Last quarter, we talked about using 7-day behavior, then 14-day behavior and, ultimately, a full month of behavior to understand the quality of the new diners. We've now had a full month to observe repeat behavior of all the new fourth quarter diners and the percentage of diners returning to order a second time was just as high as in our earlier cohorts even though we dramatically increased our spend.  Based on

- 45 -

these reorder rates, we expect these new diners to have lifetime values significantly in excess of the cost to acquire them.

104. Later in the call, DeWitt again explained that Defendants "constantly" analyzed the ordering behavior of new diners to inform their decisions on marketing and promotion expenses, stating, "we are constantly pushing and testing to see where the optimal spend number is, and we're looking at things like the 7-day repeat rate, the 14-day repeat rate and the 30-day repeat rate."

105. Defendants not only admitted to closely monitoring new diner activity generally, but also specifically with regard to the Yum! partnership. For example, in discussing the Yum! partnership, Maloney assured investors that he and DeWitt were closely monitoring diners acquired through the promotional spending (¶61), and even provided a Supplemental Investor presentation reflecting the fact that that Defendants were closely monitoring new diner behavior (¶65). Defendants also tested frequency trends "constantly" and tracked the "frequency rates" in "every single market." (¶¶34-35.)

106. Defendants' admissions that they closely monitored 7-day, 14-day, and 30-day trends and the frequency rates of diners over time makes clear that, by the start of the Class Period on April 25, 2019, Defendants had several months of data regarding the dining patterns of customers acquired as a result of the increased spending in 4Q 2018 and 1Q 2019. In addition, by the start of the Class Period, Defendants would have had nearly 2.5 months of data related to the dining patterns of customers acquired through the Yum! partnership Taco Bell promotional campaign that began in February 2019.

107. More specifically, by April 25, 2019, Defendants had access to frequency and retention rates for new diners acquired in October, November, and December 2018 (4Q 2018), and January, February, March (1Q19), and even early to mid-April 2019. By July 30, 2019, Defendants had access to nearly four additional months (April to July) of frequency and retention rates for the

new diners acquired in 4Q 2018 and 1Q 2019, as well as one to three months of data regarding the new diners acquired in April, May, and June 2019.  Defendants knew of or recklessly disregarded the lower frequency ordering behavior and retention rates of these new diners, which they belatedly admitted show that the newly acquired diners were low-quality additions.  ¶¶83-89.

**Defendants' Public Statements Support a Strong Inference of Scienter**

108.    Maloney and Dewitt held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, Grubhub's business strategy, growth, new diners, and competition.  Their repeated statements to the investing public leading up to and during the Class Period demonstrate knowledge of the topics on which they directly spoke, including the profitability of Grubhub's partnered strategy (*e.g.*, ¶¶41-43, 60, 74(j)-(k)); the causes of increases or decreases in Grubhub orders, DAGs, GFS, revenue, and frequency rates (*e.g.*, ¶¶32-39, 66(d)-(f), 74(a)-(f), (i)); Grubhub's use of marketing, promotional offers, and expansion into new markets to acquire new diners (*e.g.*, ¶¶37-38, 50-51, 53-56, 61, 65-66(a)-(f), 74(a)-(b), (d)-(h)); the frequency ordering behavior of new Grubhub diners in all markets (*e.g.*, ¶¶34-35, 37-39, 61, 65-66(a)-(c), (f), 74(a), (d)-(i)); the quality of new Grubhub diners (*e.g.*, ¶¶34-35, 61, 65-66(a)-(f), 74(e)-(h)); Grubhub's and its competitors' restaurant density and restaurant networks (*e.g.*, ¶¶39, 66(d), 69, 74(b)-(c), 78); and the competitive landscape and impact of competition in new and existing Grubhub markets (*e.g.*, ¶¶46, 59, 74(h)).

109.    Defendants' repeated statements regarding the trends in diner quality and the impact of increased marketing on new diner acquisition, and their direct involvement in the decisions impacting new diner behavior, supports an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded the facts that rendered their statements false and misleading.

- 47 -

110.    Defendants' changed behavior with regard to the disclosure of industry metrics further supports an inference of scienter.  For example, before the Class Period, on February 7, 2019, Defendants provided a specific update on the "7-day repeat rate, the 14-day repeat rate and the 30-day repeat rate" of all new diners acquired in 4Q 2018, stating "[w]e've now had a full month to observe repeat behavior of all the new fourth quarter diners and the percentage of diners returning to order a second time was just as high as in our earlier cohorts."  Moreover, Defendants later provided unscaled graphs suggesting that diners acquired in January 2019 and February 2019 had the same or better one-month "retention" rates as diners acquired in January 2018 and February 2018.  However, during the July 30, 2019 conference call, Defendants did not reference the "repeat rates" of any diners acquired in 4Q 2018, 1Q 2019, 2Q 2019, or July 2019.  At the end of the Class Period, Defendants admitted that even retention rates had fallen in 2Q19.

111.    Defendants' decision to make positive statements about diner quality while omitting to disclose the negative trends in frequency and retention rates supports an inference that they made such statements knowingly or in reckless disregard of the negative trends in new diner additions.

**The Scope and Severity of the Negative Trends Supports a Strong Inference of Scienter**

112.    Defendants knew that the key to sustained profitability was maintaining a high percentage of high-quality diners.  Defendants also knew that having strong restaurant density attracted and retained high-quality diners.  ¶39.  Simply put, diner trends were the most critical metric to managing the business and making decisions.  As a result, Defendants closely monitored new diner trends and utilized those trends in directing Grubhub's business.  ¶¶33-35, 61.

113.    But the new diners Grubhub added in late 2018 and the first half of 2019 were of such low-quality, as reflected by the negative ordering frequency rates monitored by Defendants before and during the Class Period, that they quickly converted Grubhub from a business that had three straight quarters of profitability to one that, by 4Q 2019, had recorded a $27.7 million net loss, which

- 48 -

was the largest reported net loss in the Company's history and larger than the cumulative net income from the prior 3 quarters. The negative trends in new diner behavior were material because they turned Grubhub from a profitable to unprofitable business. *See, e.g.*, ¶¶80-89.

114. Demonstrating the magnitude of the negative trends in new diner behavior, they caused Defendants to undertake a dramatic reversal in business strategy, shifting from Grubhub's partnered strategy of more than 15 years to a non-partnered model which Defendants had long maintained was unprofitable. Defendants have repeatedly claimed that the partnered strategy is "the right way to build a quality experience for diners," a "very profitable model in terms of long-term sustainability," and "the only profitable model operating at scale in the United States," while describing the non-partnered model as "the wrong long-term answer for diners, restaurants and shareholders," "expensive for everyone," "rife with operational challenges," "unsustainable," and akin to merely operating as a "logistics companies" all of which was based on "making a lot of poor business decisions."

115. Yet, the negative trends in new diner additions were so severe that Defendants abandoned their long-touted partnered strategy in favor of the "wrong," "expensive," and "unsustainable" strategy of adding non-partnered restaurants. Analysts observed that this was "an about face from the arrows shot at competitor strategies [in] prior [quarters]" that resulted in Grubhub chasing the same "low profit" business that had "historically shown to yield lower (no) profits," which even "the company itself describes as bad for the long-term" and made an investment in Grubhub "dead money."

**Defendants' Conduct Supports a Strong Inference of Scienter**

116. Defendants' decision to shift to a non-partnered strategy "months" before disclosing that fact to investors and while touting the purported high quality new diner additions supports an inference of scienter. Upon disclosure of the negative trends in new diner additions from 4Q18,

- 49 -

1Q19, and 2Q19, analysts commented that "management will face a steep climb in an effort to regain Street credibility."

117.    In contrast to unexpected events that would not reflect on Defendants' credibility, the negative trends were known or recklessly disregarded for months as shown by Defendants' admissions and conduct.  For example, Defendants admitted that they had been adding non-partnered restaurants to the Grubhub platform "for months" before the October 2019 disclosures.  By that time, Defendants admitted that the Company had already added "tens of thousands of non-partnered restaurants" to its platform, and Defendants had previously "made the call" to scale out adding non-partnered restaurants, but were "just announcing it right now."  In addition, analysts from Deutsche Bank reported on November 8, 2019 that "[w]e understand Grubhub had been doing – previously undisclosed – pilot tests with non-partnered restaurants for almost a year, and currently has 'tens of thousands of non-partnered restaurants already listed.'"

118.    Given Defendants' repeated claims that a non-partner model was unprofitable, their admission that they had "months" earlier shifted to such a strategy in order to increase restaurant density to offset the negative trends in new diner additions, including low frequency, supports a strong inference of scienter.  While secretly shifting to a non-partnered strategy to combat the negative new diner trends, during the Class Period, Defendants continued to tout the high quality of new diner additions, the return on increased marketing spend, the breadth of their restaurant offerings, and the purported superiority of their partnered business model.  ¶¶65-66, 69, 74, 78, 85, 87, 117.

119.    In addition, in June 2019, Defendants refinanced debt to provide the Company with more capital and flexibility.  For example, by conducting a $500 million notes offering in June 2019 to refinance existing debt, Defendants reportedly increased their cash on hand and reduced the minimum adjusted EBITDA they would have to maintain to comply with debt covenants.  After the

- 50 -

truth was revealed, analysts connected the dots and noted that Defendants must have been aware of the negative trends and strategy change well before the October 2019 disclosures. For example, on November 8, 2019 analysts from Deutsche Bank stated, "[w]e think the company had been preparing for this eventuality for some time now," pointing to the $500 million note offering in June 2019. The analysts noted that the Company "had just refinanced" its existing debt before June, so "they just didn't need the incremental cash" at that time. Thus, the "only rational explanation could be that they did this for the flexibility."

**Motive**

120.     Defendants had reason to conceal the negative trends because they were aggressively seeking to add partnered restaurants to build restaurant density in newer markets. In order to convince restaurants to pay a commission to join Grubhub's partnered platform, Defendants had publicly claimed that their business model provided more than just delivery (logistics) and instead increased demand at the partnered restaurants. *See*, *e.g.*, ¶¶40-43. However, the negative trends in new diner additions, which showed lower frequency of orders, and their admission that they needed to shift to a non-partnered model to boost demand, undermined the purported value of the partner model.

121.     When Defendants belatedly disclosed that negative trends in diner behavior had caused Grubhub to pursue a non-partnered model, many analysts questioned what value, if any, would remain for restaurants to stay within a partnered model. For example, in reports following the October 2019 disclosures, analysts from Deutsche Bank noted that the new strategy "could lead to existing partner-restaurants attempting to delist from the platform (and result in higher restaurant churn)." Analysts from Guggenheim observed that the strategy shift posed "brand risk for GRUB with both its partnered restaurants and its diner base," and analysts from Stephens stated that the

- 51 -

Company's decision to add non-partnered restaurants to its platform "degrades value to current partners."

122.    Defendants also had reason to conceal the negative trends as they were seeking to enter into "exclusive" integrated delivery service partnerships with national enterprise restaurant chains before and during the Class Period. Such exclusive relationships were seen as particularly beneficial for Grubhub because, as a May 2019 International Business Times article explained, if Grubhub "win[s] more exclusive partnerships, it can widen its moat against DoorDash and maintain its market share."

123.    Grubhub made clear that its most prominent and important exclusive partnership was with Yum!, and that Grubhub would use that partnership to expand into new markets and as validation of its model to convince additional national brands to partner exclusively with Grubhub. ¶¶49-51. Analysts confirmed the Yum! deal's strategic significance to Grubhub's growth, with a Credit Suisse analyst commenting that the partnership "opens the door for other partnerships" and a Morgan Stanley analyst noting that "endorsement" by Yum "is positive for GRUB and it could act as a catalyst for other large chains to sign up with GRUB." In fact, as part of the deal, Yum! had purchased $200 million worth of stock. Once the truth was revealed, Yum! was forced to write down its investment in Grubhub by $60 million which made enterprise relationships much less attractive to other national brands.

124.    As further example, Shake Shack signed an "exclusive" agreement with Grubhub in August 2019 just before the truth was revealed and then Shake Shack later announced it was abandoning the exclusive arrangement with Grubhub to begin using Uber Eats, DoorDash, Postmates, and Caviar. Since the negative disclosures in October 2019, Grubhub has not announced a single exclusive partnership with any restaurant.

- 52 -

125.     Defendants were also incentivized to conceal the negative trends because they were seeking to acquire other companies or be acquired.  In the quarters leading up to the Class Period, the food delivery industry had been rapidly consolidating, with the largest players like Grubhub, Uber Eats, and DoorDash regularly acquiring smaller companies to gain market share.  In 2017 and 2018, Grubhub spent over $800 million in acquiring five different companies: LevelUp ($390 million), Tapingo ($150 million), Yelp's Eat24 ($281.4 million), Groupon's OrderUp ($20.1 million), and Foodler ($51 million), leading a Cowen analyst to describe Grubhub in September 2019 as "a serial and effective acquiror historically."

126.     The race to boost market share via acquisition was continuing in 2019.  For example, in May 2019, analysts from Jeffries reported that one of Grubhub's competitors, Uber Eats, "did admit that future consolidation is likely."  The analysts added:

> Over time, consolidation will be a likely theme as the companies compete over marketshare.  Grubhub alone has completed 10 acquisitions in the past five years for an excess of ~$1B. The theme has generally been to aggregate smaller players and increase scale, but we wouldn't be surprised to see larger scale M&A in the future.

127.     On June 17, 2019, analysts from JMP likewise stated that "we believe the industry is likely to consolidate around those services with national size and scale, and with 19.3 million active diners and 115,000+ restaurant partners, we believe Grubhub is well positioned overall."  During the July 30, 2019 earnings call, Maloney also said, "I think the conditions are favorable for consolidation."  And in an analyst report the same day, Jefferies analysts commented that "[w]e expect consolidation in the delivery space."

128.     To fund additional transactions, Grubhub could use Company stock and cash.  But analysts noted that Grubhub could not raise cash as easily as its competitors, who were also aggressively pursuing acquisitions.  Analysts from Morningstar, for example, stated in an October 25, 2018 report that as Grubhub lost market share it would "likely take the acquisition route to

- 53 -

maintain its leadership position" but the Company "faces competition in that area too, as some players in the space have access to more capital to complete timely mergers and acquisitions" and "[f]ierce competition during the consolidation phase could raise acquisition prices too high for Grubhub." Thus, with restriction on cash, Defendants had an incentive to increase (or at least maintain) the price of Grubhub shares to be able to afford acquisitions more cheaply because the higher Grubhub's stock price, the less cash would be required to fund additional acquisitions.

129. On the flip side, Grubhub was also a potential acquisition target during the Class Period. A BTIG analyst noted on July 30, 2019 the possibility that Grubhub could be acquired "by a larger tech company like an Amazon (AMZN, Not Rated) to complement its on-demand delivery business," and a Stephens analyst described Grubhub on July 31, 2019 as a "top acquisition target."

130. In addition, the acquisition of Grubhub could result in premiums being paid to Maloney and DeWitt for their significant Grubhub holdings, and according to Grubhub's proxy statement filed in April 2020, Defendants' employment agreement provided for potential additional payments of an estimated $6.6 million to Maloney and $4.2 million to DeWitt if they were terminated in connection with an acquisition in 2019.

## LOSS CAUSATION AND ECONOMIC LOSS

131. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Grubhub common stock and operated as a fraud or deceit on Class Period purchasers of Grubhub common stock by misrepresenting the acquisition and quality of new diners, the profitability and sustainability of Grubhub's business, and Grubhub's restaurant density and growth, and omitting to disclose negative trends in diner quality, restaurant density, and profitability.

132.     Defendants' false and misleading statements had their intended effect and directly and proximately caused Grubhub common stock to trade at artificially inflated levels, reaching a Class Period high of $79.73 per share.

133.     As a result of Defendants' fraudulent conduct as alleged herein, the price at which Grubhub common stock traded was artificially inflated throughout the Class Period.  When Plaintiff and other members of the Class purchased their Grubhub common stock, the true value of such common stock was substantially lower than the prices actually paid.  As a result of purchasing Grubhub common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

134.     As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Defendants, Plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Grubhub common stock at artificially inflated prices during the Class Period.  Had Plaintiff and other members of the Class known the truth, they would not have taken such actions.

135.     When the misrepresentations and omissions that Defendants had concealed from the market were revealed on October 28-29, 2019, the price of Grubhub common stock fell dramatically, causing substantial losses to investors.

136.     After the market closed on October 28, 2019, Grubhub revealed that the new diners added in late 2018 and early 2019 were low-quality diners that were causing significant negative declines in Grubhub's DAGs, revenue, and profits; that Grubhub's partnered model had failed and Grubhub could not increase restaurant selection under its partnered model to compete with the non-partnered models of competitors who were attracting high-quality diners; and that as a result of the foregoing Grubhub's exceptional growth trajectory had reversed, and rather than being the only

- 55 -

profitable business in the market, Grubhub would sustain substantial losses. As a result, Grubhub's stock price dropped from a close of $58.39 on October 28, 2019 to a close of $33.11 on October 29, 2019, and analysts cut their ratings and targets. ¶¶90-91.

137.     The timing and magnitude of the decline in the price of Grubhub common stock negates any inference that losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. From the close of trading on October 28, 2019 through the close of trading on October 29, 2019, during which time Grubhub's stock price fell 43% as a result of Defendants' fraud being revealed, the New York Stock Exchange Composite Index rose by 0.2%, and the Standard & Poor's Mid Cap 400 Index, comprising public corporations in Grubhub's peer group, rose 0.2%, as illustrated in the following chart:

Grubhub, Inc. vs. NYSE Composite and S&P 400 Mid Cap
October 25, 2019 – November 1, 2019



138.     Analyst reports reflected that the revelation of the previously undisclosed information was responsible for the stock decline. *See* ¶91.

- 56 -

139.    As a result of their purchases of Grubhub common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PRESUMPTION OF RELIANCE

140.    At all relevant times, the market for Grubhub common stock was an efficient market for the following reasons, among others:

(a)    Grubhub common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    According to the Company's 2Q 2019 10-Q, the Company had more than 91 million shares of common stock outstanding as of August 2, 2019, demonstrating a very active and broad market for Grubhub common stock;

(c)    As a regulated issuer, Grubhub filed periodic public reports with the SEC;

(d)    Grubhub regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    Grubhub was followed by numerous securities analysts employed by major brokerage firms, such as Guggenheim Securities, LLC, Deutsche Bank Securities Inc., Credit Suisse, Barclays, William Blair & Company, Wells Fargo Securities, LLC, Cowen and Company, BTIG, Morningstar, and Morgan Stanley, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

141.    As a result of the foregoing, the market for Grubhub common stock promptly digested current information regarding Grubhub from publicly available sources and reflected such

- 57 -

information in Grubhub's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Grubhub common stock.

142. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Grubhub's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

143. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Grubhub's Class Period filings and oral disclaimers.

144. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-

looking statement was authorized and approved by an executive officer of Grubhub who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Grubhub common stock during the Class Period.  Excluded from the Class are: Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

146.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Grubhub common stock was actively traded on the NYSE.  According to the Company's 1Q 2019 10-Q, the Company had more than 91 million shares of common stock outstanding as of August 2, 2019.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

147.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

148.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- 59 -

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)     Whether the price of Grubhub common stock was artificially inflated during the Class Period; and

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

150.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiff is not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Grubhub, Maloney, and Dewitt

151.     Plaintiff incorporates the foregoing paragraphs by reference.

152.     During the Class Period, Grubhub, Maloney, and Dewitt disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 60 -

153.     These defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Grubhub common stock.

154.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases of Grubhub common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiff and other members of the Class paid artificially inflated prices for Grubhub common stock and experienced losses when the artificial inflation was released from Grubhub common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiff and other members of the Class would not have purchased Grubhub common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements.

155.     By virtue of the foregoing, Grubhub, Maloney, and DeWitt have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

### COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Maloney and DeWitt

156.     Plaintiff incorporates the foregoing paragraphs by reference.

- 61 -

157.    Maloney and DeWitt acted as controlling persons of Grubhub within the meaning of §20(a) of the Exchange Act.

158.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and business model, Maloney and DeWitt had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading. Maloney and DeWitt were provided with, or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159.    As set forth above, Grubhub violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Maloney and DeWitt are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying City of Pontiac General Employees' Retirement System and City of Pontiac Police & Fire Retirement System as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: July 24, 2020
ROBBINS GELLER RUDMAN
 & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
BRIAN E. COCHRAN (IL Bar # 6329016)
FRANK A. RICHTER (IL Bar # 6310011)
WILLIAM J. EDELMAN (IL Bar # 6332368)
GINA M. BUSCHATZKE (IL Bar # 6332510)

s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
bcochran@rgrdlaw.com
frichter@rgrdlaw.com
wedelman@rgrdlaw.com
gbuschatzke@rgrdlaw.com

- 63 -

Lead Counsel for Lead Plaintiff

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
MATTHEW I. HENZI
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Telephone: 248/746-2710
248/747-2809 (fax)
cbdunn@asherkellylaw.com

Additional Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 24, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
   & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

E-mail: jbarz@rgrdlaw.com

# Mailing Information for a Case 1:19-cv-07665 Azar v. Grubhub Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stefan Howard Atkinson**
  stefan.atkinson@kirkland.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com,kjohnson@rgrdlaw.com

- **Sandra C Goldstein**
  sandra.goldstein@kirkland.com,sandra-goldstein-3843@ecf.pacerpro.com,kenymanagingclerk@kirkland.com,michelle.denny@kirkland.com

- **John F. Hartmann**
  jhartmann@kirkland.com,meghan.guzaitis@kirkland.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)