## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROEI AZAR, *Individually and on Behalf of All Others Similarly Situated*, <br><br> Plaintiff, <br><br> v. <br><br> GRUBHUB INC., et al., <br><br> Defendants. | Case No. 1:19-cv-07665 <br><br> Hon. Charles R. Norgle, Sr. |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

John F. Hartmann, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: 312/862-2000
312/862-2200 (fax)
john.hartmann@kirkland.com

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Madelyn A. Morris (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: 212/446-4800
212/446-4900 (fax)
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
madelyn.morris@kirkland.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

    A.    Grubhub Launches Its Strategic Plan................................................................... 2

    B.    Grubhub's Strategic Plan Shows Promising Preliminary Returns......................... 3

    C.    Grubhub Acknowledges Shortcomings in the 2018 Strategic Plan. ...................... 4

    D.    Grubhub Discloses Third Quarter Results and Issues the Shareholder Letter.
    ........................................................................................................................... 5

ARGUMENT ............................................................................................................................... 5

I.    THE COMPLAINT FAILS TO PLEAD FALSITY............................................................ 6

    A.    None of the Challenged Statements Were False When Made and Therefore
    Grubhub Was Under No Duty to Disclose Anything More.................................... 6

    B.    Several of the Alleged Misstatements Are Opinions That Were Sincerely
    Held...................................................................................................................... 9

    C.    Statements of Corporate Optimism Are Not Actionable. .................................... 10

II.    THE COMPLAINT FAILS TO PLEAD SCIENTER. ..................................................... 11

CONCLUSION.......................................................................................................................... 15

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| "2018 Q3 Earnings Call" | Transcript of Grubhub, Inc.'s Third Quarter 2018 Earnings Conference Call, dated Oct. 25, 2018 (Ex. 1) |
| "2019 Q1 Earnings Call" | Transcript of Grubhub, Inc.'s First Quarter 2019 Earnings Conference Call, dated Apr. 25, 2019 (Ex. 2) |
| "2019 Q2 Earnings Call" | Transcript of Grubhub, Inc.'s Second Quarter 2019 Earnings Conference Call, dated July 30, 2019 (Ex. 5) |
| "Complaint" or "Compl." | Lead Plaintiff's Complaint for Violations of the Federal Securities Laws, dated July 24, 2020 [Dkt. #36] |
| "Defendants" | Grubhub, Inc., Matthew Maloney, and Adam DeWitt |
| "DeWitt" | Defendant Adam DeWitt, Chief Financial Officer and President, Grubhub, Inc. |
| "Ex. __" | Exhibits to the Declaration of Stefan Atkinson in Support of Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws |
| "Grubhub" or the "Company" | Grubhub, Inc. |
| "Maloney" | Defendant Matthew Maloney, Chief Executive Officer, Grubhub Inc. |
| "PSLRA" | The Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 |
| "Rule 10b-5" | 17 C.F.R. § 240.10b-5 |
| Section 10(b) | Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j |
| Section 20(a) | Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) |
| "Shareholder Letter" | Letter from Matthew Maloney to Shareholders of Grubhub, Inc., dated Oct. 28, 2019 (Ex. 7) |
| "Supplemental Information Presentation" | Supplemental Information Presentation Accompanying Grubhub, Inc.'s First Quarter 2019 Quarterly Report, dated Apr. 25, 2019 (Ex. 3) |

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ......................................................................................10

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006).......................................................12, 13

*Canfield v. Rapp & Son, Inc.*,
654 F.2d 459 (7th Cir. 1981) ....................................................................................10

*In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
390 F. Supp. 3d 916 (N.D. Ill. 2019) ........................................................................12

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan. 23, 2012)..................................................................8

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................14, 15

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ......................................................................................8

*In re Exxon Mobil Corp. Sec. Litig.*,
387 F. Supp. 2d 407 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007)............................12, 13

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ....................................................................................11

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) ...........................................................6, 7, 9, 13

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..........................................................8, 14

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ....................................................................................12

*Greer v. Advanced Equities, Inc.*,
683 F. Supp. 2d 761 (N.D. Ill. 2010) ........................................................................11

*Heartland Fin. USA, Inc. v. Fin. Institutions Capital Appreciation Partners, I, L.P.*,
2002 WL 31819008 (N.D. Ill. Dec. 12, 2002).........................................................15

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...............................................................................8, 11

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ...................................................................................13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)......................9, 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ...................................................................................11

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ................................................................................10

*In re MCI Worldcom, Inc. Sec. Litig.*,
191 F. Supp. 2d 778 (S.D. Miss. 2002) ....................................................................15

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ......................................................................11

*Neca-Ibew Pension Fund v. N. Tr. Corp.*,
2013 WL 1290202 (N.D. Ill. Mar. 28, 2013).............................................................8

*In re Newell Rubbermaid Inc. Sec. Litig.*,
2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .............................................................2

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).................................................................................................9

*Ong v. Chipotle Mexican Grill, Inc.*,
2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) .............................................................7, 8

*Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ................................................................................5, 15

*Pierrelouis v. Gogo, Inc.*,
414 F. Supp. 3d 1164 (N.D. Ill. 2019) ...................................................................7, 14

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) ...................................................................................14

*Stransky v. Cummins Engine Co., Inc.*,
51 F.3d 1329 (7th Cir. 1995) .....................................................................................1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................2

iv

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
2020 WL 6118605 (N.D. Il Oct. 15, 2020)....................................................................9

*Zerger v. Midway Games, Inc.*,
2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)................................................................7

**Statutes & Rules**

15 U.S.C. § 78u-4 .................................................................................................1, 5, 10

15 U.S.C. § 78t(a) .........................................................................................................15

17 C.F.R. § 240.10b-5..................................................................................................5, 8

Fed. R. Civ. P. 9(b) ....................................................................................................1, 5

## PRELIMINARY STATEMENT

Plaintiff's Complaint relies on the flawed theory that, because the strategic plan Grubhub launched in late 2018 to try to acquire new customers ultimately yielded some disappointing results, Grubhub must have known (and concealed from investors) that the plan would fail all along. But Plaintiff alleges no facts suggesting that Defendants had any information that rendered any of their statements false or misleading *at the time they were made*. Instead, Plaintiff relies on the Shareholder Letter—issued months *after* the challenged statements—in which Grubhub transparently and responsibly reported its discovery that, over the long term, Grubhub's newly acquired diners were not ordering with the same frequency as the Company's existing diners. This theory is not just legally flawed, it makes no sense: Plaintiff fails to allege how Grubhub could possibly have disclosed the long-term habits of its newly-acquired diners more quickly, that is, without having seen how those diners acted over time. Plaintiff's claims rely on hindsight and fail as a matter of law. *See, e.g.*, *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 (7th Cir. 1995) ("[T]he securities laws typically do not act as Monday Morning Quarterback. 'The securities laws approach matters from an ex ante perspective . . . '").

The Complaint fails to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA and should be dismissed with prejudice for two independent reasons. *First*, the Complaint does not identify any statement or omission that was false or misleading at the time it was made. Instead, Plaintiff seeks to rely on an impermissible theory of "fraud by hindsight," under which it seeks to impose liability on Grubhub for certain statements that may have *turned out* to be wrong (but were not wrong when said) or for statements of opinion or corporate optimism that courts have long held do not constitute securities fraud.

*Second*, Plaintiff fails to plead scienter because its allegations do not support any inference—let alone a strong inference—that Defendants acted recklessly or with intent to defraud.

Plaintiff grounds its scienter allegations in claims about Grubhub's CEO and CFO that could be made in any case—that they were knowledgeable, controlled messaging, and hoped that Grubhub would be profitable and have liquidity. But this is a far cry from the particularized facts needed to create a strong inference that Defendants acted with scienter. Indeed, Plaintiff's scienter allegations suffer from the same key defect as its falsity allegations: they rely on an assumption that Defendants must have been aware of so-called "negative trends" related to ordering frequency and therefore acted with scienter to conceal them. But Plaintiff fails to explain how Grubhub could have discovered any "trend" in the face of promising initial returns and without the benefit of time. Nothing in the Complaint supports an inference that Defendants intentionally or recklessly lied to Grubhub's investors. The Complaint should be dismissed in full and with prejudice.

## BACKGROUND

### A.      Grubhub Launches Its Strategic Plan.

Grubhub, one of the first companies to offer online and mobile food ordering, held 70% of the third-party online and mobile food ordering business in 2015. (Compl. ¶ 46.) But, as new competitors entered the space, Grubhub's market share fell to 38% in 2018. (Compl. ¶ 48.) Recognizing that the new competitive landscape would require a new strategy, Grubhub announced in Q3 2019 that it would invest in delivery market expansion, new diner advertising, and accelerated brand sales efforts in the fourth quarter of 2018.[1] (Compl. ¶ 53; Ex. 1 at 9.) Grubhub was transparent that this strategy would require significant increased costs and that short-

---

[1]      "Courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Exhibits 1-7 to the accompanying Declaration of Stefan Atkinson are excerpts of documents cited and incorporated by reference in the Complaint. These documents "are considered part of the pleadings" because "they are referred to in the plaintiff's complaint and are central to [its] claim." *In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *3 n.1 (N.D. Ill. Nov. 14, 2000).

term performance would likely suffer. For example, during its 2018 Q3 Earnings Call, Grubhub disclosed that its profitability would likely decrease in the fourth quarter of 2018 but that it expected profitability to improve over time as the Company scaled in new markets. (Ex. 1 at 9.) Consistent with that guidance, adjusted EBITDA per order decreased in the fourth quarter. (Compl. ¶ 58.) Then, during the 2019 Q1 Earnings Call, Maloney further disclosed that Grubhub implemented its strategic plan with the understanding that it would "weigh on our profitability during the fourth quarter and to some degree throughout 2019." (Ex. 2 at 5.)

### B. Grubhub's Strategic Plan Shows Promising Preliminary Returns.

In the first quarter of 2019, Grubhub's strategic plan appeared to be working. To track the plan's success, including Grubhub's growth and profitability, Grubhub relied on traditional metrics (such as quarterly revenue, net income, and EBITDA), as well as what Grubhub calls "Key Business Metrics" (like "active diners" and "Daily Average Grubs"[2]), which the Company had reported to investors for years. (Compl. ¶¶ 31–32.) Outside of its Key Business Metrics, Grubhub also monitored the "quality" of new diners by looking at, among other things, how often they used the platform and tracking various metrics like repeat rates (the frequency with which diners were ordering during a given period) and orders per active diner. Among other traits, high-quality diners frequently return to and place orders on the Grubhub platform. (Compl. ¶ 33; Ex. 2 at 7.) In the first quarter of 2019, preliminary returns on the plan showed promise across a number of these metrics, as Grubhub disclosed in the Supplemental Information Presentation (Compl. ¶ 65):

---

[2]      "Active diners" reflects "the number of unique diner accounts from which an order has been placed in the past twelve months through the Grubhub platform." (Compl. ¶ 32(c).) "Daily Average Grubs" reflects "the number of orders placed on the Grubhub platform divided by the number of days in the quarter or year." (Compl. ¶ 32(b).)

- **More people were joining the platform.**  Grubhub was experiencing record-setting active diner growth, adding 1.6 million active diners in the first quarter of 2019 and finishing the quarter with 19.3 million active diners, up 28% from the prior year.  (Ex. 2 at 5; Ex. 3 at 3.)

- **Marketing costs were steady.**  Grubhub was acquiring more high-quality (*i.e.*, repeat) diners, while spending per new diner remained relatively steady.  (Ex. 2 at 5, 8; Ex. 3 at 3.)

- **Orders were up.**  Grubhub generated 521,000 Daily Average Grubs in the first quarter of 2019, up 19% from the prior year.  (Ex. 2 at 5.)

- **Diners were spending more.**  Diners who first ordered from the Grubhub platform in the first quarter of 2015 were spending just as much, if not more, in the first quarter of 2019 than they were in 2018 and 2017.  (Ex. 3 at 5.)

- **Diner "quality" appeared strong.**  Repeat rates in January and February 2019 were higher across all markets than they were in 2018 or 2017, suggesting that overall diner quality was improving.  (Ex. 2 at 12.)

### C.     Grubhub Acknowledges Shortcomings in the 2018 Strategic Plan.

In the second quarter of 2019, however, Grubhub disclosed that the frequency of orders per active diner was beginning to suffer.  For example, during the 2019 Q2 Earnings Call, DeWitt disclosed that "[c]alculated orders per active diner [were] lower than last year."  (Compl. ¶ 74(d).)  As Grubhub explained, this decline in frequency could be attributed to one permanent factor—diners outside the New York market (traditionally Grubhub's largest market) had never ordered with the same frequency as diners in New York—and another, more temporary one—new diners took time to increase their ordering frequency.  (*Id.*)  Given the increase in new diners and the fact that new diners typically took time to warm up to the platform, the fact that orders per active diner were down was to be expected and was consistent with the growing pains Grubhub expected (and disclosed (*id.*)) with respect to new diners.

Grubhub disclosed in that same 2019 Q2 Earnings Call that diner ordering frequency was not the only problem.  Grubhub's Daily Average Grubs were down 6% from the prior quarter.  (Ex. 5 at 8.)  As noted, Grubhub had previously disclosed that short-term performance would likely suffer given the significant costs of the plan.  (Ex. 2 at 5.)  But other metrics appeared strong, with

active diners growing 30% year-over-year and costs to acquire those diners remaining steady. (Compl. ¶ 74(c).)

> **D.      Grubhub Discloses Third Quarter Results and Issues the Shareholder Letter.**

In the third quarter of 2019, Grubhub disclosed disappointing results and lowered its outlook for the year, telling investors that it expected to achieve adjusted EBITDA for 2020 of at least $100 million. (Ex. 7 at 9.) In an effort to provide investors with additional transparency, Grubhub also issued a Shareholder Letter with its Q3 Results. (*Id.* at 1.) In it, Maloney spoke directly to investors, explaining that in August 2019, despite the explosion of new diners, daily average orders were below expectations, prompting Grubhub to look for the cause. (*Id.*) After digging into the data, Grubhub discovered that the problem was with its newly acquired diners: (i) these new diners' order frequency was not "maturing" (*i.e.*, they were not ordering with the same frequency as earlier diners); (ii) retention rates of diners acquired late in the second quarter of 2019 were lower than for previous diner cohorts; and (iii) its newest diners were increasingly ordering from multiple platforms, not just Grubhub. (*Id.*)

## ARGUMENT

The securities laws do not punish companies for being forthcoming with their investors. Rather, to state a claim under Section 10(b) and Rule 10b-5, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (emphasis omitted). Because this is a case for securities fraud, it is subject to Rule 9(b) and the PSLRA, under which Plaintiff must plead its claims with particularity—that is, it must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and

(2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020). Plaintiff meets neither standard.

## I. THE COMPLAINT FAILS TO PLEAD FALSITY.

Not a single one of Plaintiff's 22 challenged statements is actionable. All of them were true when made—meaning there was no duty to disclose any further information to make them true—and many of the statements were either (or both) statements of opinion that are protected because they are not alleged to have been lies or immaterial statements of puffery.[3]

### A. None of the Challenged Statements Were False When Made and Therefore Grubhub Was Under No Duty to Disclose Anything More.

Plaintiff alleges that all of the alleged misstatements (which all related to Grubhub's performance in the first two quarters of 2019 (*see* App'x at 1–22)) were false because Grubhub's performance a quarter later was disappointing. For example, Plaintiff takes issue with Grubhub's statements that Grubhub "added 1.6 million active diners in the first quarter," that "[t]hese new diners are high quality [and] returning just as frequently as newly acquired diners from other channels," and that "[a]ctive diners grew 30% year-over-year to 20.3 million." (App'x at 3, 5, 11.) Plaintiff alleges that these statements were false because they did not include any disclosure of Grubhub's conclusion—*months later (in the third quarter)*—that while "retention of these newer diners was good, their ordering frequency wasn't 'maturing' at the same level as earlier cohorts." (Ex. 7 at 4; *see* Compl. ¶¶ 67(a)-(d), 75(a)-(f).)

This theory fails because Plaintiff alleges that Grubhub reported negative results as they occurred (*see* Background, Section C) and because Plaintiff does *not* allege that, at the time the

---

[3]      Enclosed as Appendix A is a summary document intended to assist the Court in evaluating the 22 statements quoted and challenged in the Complaint.

6

challenged statements were made, Grubhub had any data indicating that its newly acquired diners were not "maturing" at the expected rate. *See Fryman*, 462 F. Supp. 3d at 901 (rejecting omission claim based on plaintiff's failure to plead facts that defendants "were aware of a negative trend" that contradicted their disclosures); *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *9 (N.D. Ill. Oct. 19, 2009) ("Plaintiffs' bald allegation does [not] show that the financial consequences of that decision were known, or could have been known, at the time those guidances were issued."); *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1174 (N.D. Ill. 2019) ("Merely alleging that (a) Gogo could and did track service outages [and] (b) defendants had access to outage reports . . . does not provide sufficiently specific and particularized information about when the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary.").

Plaintiff's allegations that the statements were false because Grubhub looked at immediate performance of diners, tracking 7-day, 14-day, or 30-day performance, fare no better. (Compl. ¶ 34.) Plaintiff alleges that Grubhub promptly disclosed problems with short-term ordering frequency as they occurred (*see* Background, Section C), but that does not mean that Grubhub knew that its diners' performance would continue to decline over the long run. Rather, Plaintiff's argument—that Grubhub's statements about its "early returns" were false because results *later* turned out to be disappointing (App'x at 3)—depends on an impermissible theory of "fraud by hindsight" that courts in this Circuit and elsewhere have repeatedly found insufficient as a matter of law. "'Corporate officials need not [be] clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017). "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice

7

to make out a claim of securities fraud." *Id.*; *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) ("There is no 'fraud by hindsight.'"); *Neca-Ibew Pension Fund v. N. Tr. Corp.*, 2013 WL 1290202, at *5 (N.D. Ill. Mar. 28, 2013) ("[T]he Seventh Circuit has rejected attempts to plead fraud by hindsight."); *see also Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *20 (N.D. Ill. Mar. 31, 2011) ("Plaintiffs must allege facts that show with sufficient particularity that Anixter made statements that were false when made.").[4]

Because there was nothing false or misleading about the challenged statements at the time they were made, there was no duty to disclose anything further so as to make the statements true. "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose all material information." *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *3 (N.D. Ill. Jan. 23, 2012). Rather, "[d]isclosure is required under [Section 10(b) and Rule 10b-5] only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Neca-Ibew Pension Fund v. N. Tr. Corp.*, 2013 WL 1290202, at *10 (N.D. Ill. Mar. 28, 2013). Because Defendants said nothing misleading, there was nothing else they had to say.[5]

---

[4]    For example, while Plaintiff claims that Grubhub should have disclosed certain "pilot tests" (adding non-partner restaurants in addition to partner restaurants) sooner than it did (*i.e.* sooner than the third quarter of 2019), Plaintiff does not allege that Grubhub was conducting pilot tests before that quarter, and Plaintiff cannot show that Grubhub had any duty to disclose any information in between quarters. "The securities laws create a system of periodic rather than continual disclosures." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007).

[5]    In actuality, Plaintiff's allegations show not that Grubhub hid necessary detail from its investors, but that the Company transparently reported negative results quarterly as it observed them. In the second quarter of 2019, for example, Grubhub disclosed that, while active diners continued to grow, diner frequency was down 6% from the prior quarter, telling investors that some of the factors "weighing" on frequency were "structural," while some "should go—would go away over time." (Compl. ¶ 74(e).) At the same time, Grubhub told investors that "[c]alculated orders per active diner was lower than last year" (Compl. ¶ 74(d)), providing the market with information about the ordering behavior of all diners, including those added in prior quarters.

**B.** **Several of the Alleged Misstatements Are Opinions That Were Sincerely Held.**

Plaintiff claims that Defendants misled investors by falsely assuring them about the strength of Grubhub's business. (*See* App'x at 6, 8, 9, 12, 13, 16, 20, 22.) But statements that Grubhub believed its business model was "sustainable" and that its approach to diner acquisition was "disciplined" (App'x at 6, 9) are statements of opinion, not fact. And these opinions cannot form the basis of a fraud claim unless Plaintiff alleges that they were "not truly believed" or were "not supported by the available facts." *See Fryman*, 462 F. Supp. 3d at 897; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (granting motion to dismiss where plaintiff did not sufficiently allege that opinion statements were "both objectively false and disbelieved by the defendant at the time [they] were expressed"). The Complaint does not make this showing. To the contrary, the Complaint suggests that Defendants believed in the success of Grubhub's strategic investment and believed that the plan was working. (*See* Compl.¶ 66(a) (quoting Maloney as saying that "early returns on our investments have been great, high-quality growth and already improving per order economics").) Furthermore, the Complaint demonstrates that a number of business metrics supported this belief. In the first two quarters of 2019, for example, diners were joining the platform at record-setting rates (Compl. ¶ 66(a); Ex. 2 at 7), marketing cost per diner was relatively flat compared to prior years (Compl. ¶ 65(a)), and average orders were up compared to the same period in the prior year (Compl. ¶¶ 69, 78). Grubhub believed what it said, and it had good reason for that belief.

Next, Plaintiff claims that Defendants misled investors by opining that certain factors weighing on ordering frequency would be temporary. (App'x at 9, 15.) But these, again, are opinions. *See, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *16 (N.D. Il Oct. 15, 2020) (holding that "predictions about the merger's success

9

and effects were statements of opinion, not fact"); *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) (finding that "expressions of optimism" and "projections about the future" are "quintessential opinion statements"); *Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 467 (7th Cir. 1981).  And, again, these opinions cannot form the basis of a fraud claim because Plaintiff does not allege that Defendants did not believe the opinions or that the opinions were not supported by the available facts.  *See Lululemon*, 14 F. Supp. 3d at 578.[6]

Statements about the "quality" of Grubhub's diners are likewise opinions that Plaintiff fails to allege were either not believed or were contradicted by material facts available at the time. (App'x at 2, 3, 5, 6, 7, 8.)  For example, Plaintiff alleges that with regard to Grubhub's Taco Bell campaign, Defendants' opinion that those diners were "high quality [and] returning just as frequently as newly acquired diners from other channels" was false.  (Compl. ¶ 66(c).)  But that opinion is supported by contemporaneous statements that Plaintiff does not challenge: that these same diners "contributed an incremental few thousand new diners and 100 to 150 basis points of incremental [Daily Average Grubs] growth during the quarter."  (*Id.*)  Thus, it cannot form the basis of a fraud claim.

### C.    Statements of Corporate Optimism Are Not Actionable.

Plaintiff claims that Maloney's and DeWitt's generalized optimistic statements about Grubhub's business model were fraudulent.  (App'x at 8, 9, 12, 13, 16, 20, 22.)  For example, Plaintiff alleges that statements that Grubhub was "helping brands build a long-term and profitable

---

[6]    Grubhub's statements predicting what would happen with diner frequency (*see* App'x at 6, 8, 15) are also forward-looking statements protected by the PSLRA safe harbor.  *See Arazie v. Mullane*, 2 F.3d 1456, 1466 (7th Cir. 1993) ("A company's predictions of future performance are protected so long as they have a reasonable basis in fact—a poor prediction will not automatically subject a company to suits under the securities laws.").  Each one of the challenged statements was accompanied by meaningful cautionary language.  (*See* Ex. 3 at 2, Ex. 2 at 4, Ex. 4 at 28, Ex. 5 at 4, Ex. 6 at 31.)

business" or that its "business is founded on partnership, working with restaurants, understanding what the restaurants really need and trying to help them achieve their business goals in digital pickup" are actionable. (App'x at 9, 20.) But "[c]ourts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated on other grounds*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *see also In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004). These statements are statements of "vague aspiration" or "unspecific puffery" and therefore are immaterial and not actionable as a matter of law. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570–71 (6th Cir. 2004) ("Courts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace . . .'").

## II. THE COMPLAINT FAILS TO PLEAD SCIENTER.

The Complaint should be dismissed for a second, independent reason, which is that it does not sufficiently allege that Defendants acted with scienter. For "each act or omission alleged to violate" the securities laws, Plaintiff must plead *particularized facts* giving rise to a *strong inference* that Defendants acted either with intent to deceive or with "reckless disregard of a substantial risk" that the statement was false. *Higginbotham*, 495 F.3d at 756. To plead scienter, "the inference must be more than merely 'reasonable' or 'permissible,' it must be 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 773 (N.D. Ill. 2010) (quoting *Tellabs*, 551 U.S. at 324). None of Plaintiff's allegations raises any inference—let alone the PSLRA-required strong inference—of scienter. To the contrary, the most cogent and compelling inference that may be

11

drawn from Plaintiff's Complaint is that Grubhub and its executives sincerely believed that their strategic investments would pay off and transparently reported to stockholders data that developed over time that could be said to cut in the other direction. Unsurprisingly, the securities laws do not punish companies for being forthcoming with their investors.

**(1) Allegations concerning Defendants' purported motive to conceal negative trends do not plead scienter.** Plaintiff alleges that "Defendants had reason to conceal" the so-called "negative trends" because they wanted to (i) ensure Grubhub's continued success (Compl. ¶¶ 120, 122, 125) and (ii) receive "premiums" in a future potential acquisition of Grubhub (Compl. ¶¶ 125, 130). But "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006); *see also In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 933–34 (N.D. Ill. 2019) ("A generalized motive common to all corporate executives, such as the motive to pretend nothing is wrong to avoid a loss, does not create a strong inference of scienter."). Likewise, courts have consistently held that "evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient to raise a strong inference of scienter." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008); *see also Bally*, 2006 WL 3714708, at *9; *see also In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 430 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007). Neither allegation pleads scienter.

**(2) Allegations concerning Maloney and DeWitt's access to information do not plead scienter.** Plaintiff also alleges that, in their respective roles as Grubhub's CEO and CFO, Maloney and DeWitt had access to confidential information about the Company and "participated in the drafting, preparation, and/or approval" of the materials that contained the alleged misstatements. (Compl. ¶¶ 94-98.) But scienter "may not rest on the inference that defendants must have been

12

aware of a misstatement based simply on their positions within the company." *Bally*, 2006 WL 3714708, at *8; *see also Fryman*, 462 F. Supp. 3d at 902 (holding that plaintiffs failed to plead scienter because "they [did] not state with particularity the information to which Defendants had access"); *Exxon*, 387 F. Supp. 2d at 430. At most, the Complaint suggests that Maloney and DeWitt had a "hands-on" management style, which is insufficient. *See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (holding that officer's "hands-on" "management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter").

**(3) Allegations that Grubhub experienced "negative trends" do not plead scienter.** Plaintiff next alleges that Defendants must have acted with scienter because Grubhub experienced "negative trends in new diner behavior" in the last quarter of 2018 and the first two quarters of 2019. (Compl. ¶¶ 99–109, 112–15.) But the Complaint ignores that the Shareholder Letter—on which Plaintiff relies—clearly indicates that Grubhub was *not* suffering negative trends at the time of the challenged statements. (*See, e.g.*, Ex. 7 at 3 ("We set records for active diner growth, we accelerated organic DAG growth in the fourth quarter of 2018 and then again in the first quarter of 2019, and, as stated above, we made outstanding progress with enterprise brands.").) To the contrary (and as Grubhub disclosed), the Company's strategic investment in late 2018 in marketing and delivery expansion was showing positive initial returns across nearly every key metric, including record-setting active-diner growth, accelerated organic Daily Average Grubs in the fourth quarter of 2018 and the first quarter of 2019, and substantive progress with enterprise brands. (Ex. 7 at 3.) Furthermore, even as other metrics started to wane, Grubhub reported increased adjusted EBITDA per order every quarter from the start of the strategic investment through the third quarter of 2019. (*Id.* at 2.) Plaintiff fails to allege that Grubhub had sufficient

13

data of any trends—and how could it, when a trend takes time to reveal itself?—to know that its newly acquired diners were not behaving like its older diners before the third quarter, when it disclosed that fact.

Plaintiff's argument that the "magnitude of the negative trends" supports an inference of scienter is wrong for the same reason: Plaintiff fails to allege that Defendants had information about the magnitude of any long-term decline in ordering frequency in the first two quarters of 2019, when the challenged statements were made.[7]   *See, e.g.*, *Gogo*, 414 F. Supp. 3d at 1176 ("Because plaintiffs have not alleged that, before or during the class period, defendants were presented with any specific information that demonstrated the scope and magnitude of the de-icing problem, the inference that defendants recklessly disregarded a serious problem in omitting to disclose it to investors is not 'cogent and compelling' in light of opposing, nonfraudulent inferences.").[8]

Finally, Plaintiff's conclusory allegation that, during one conference call, Defendants "changed behavior" by not disclosing certain "negative" industry metrics does not establish

---

[7]   Even if Plaintiff's conclusory allegation that Grubhub had experienced "negative trends" at the time of its challenged statements was supported by any facts (it is not), "[t]here is no duty of total corporate transparency—no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time,' forming a running commentary, a baring of the corporate innards, day and night." *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). Rather, as explained above (*see* Section I.A), a duty to disclose material information arises only "when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."

[8]   Plaintiff's allegation that Defendants "recklessly disregarded" the falsity of the alleged misstatements (*e.g.*, Compl. ¶¶ 67, 70, 75, 79, 98, 107, 109, 111, 152) also fails. Recklessness must be "so severe that it is the functional equivalent of intent." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). The Complaint does not meet this searching standard. And, because Plaintiff has failed to plead falsity (*see* Section I), it likewise has failed to plead facts supporting a strong inference that Defendants made any statements with knowledge or reckless disregard of their falsity. *See Anixter*, 2011 WL 1303387, at *28 ("Plaintiffs could hardly allege that Defendants made false statements with the requisite state of mind" if statements were not false or misleading).

14

scienter. (Compl. ¶ 110–11.) In fact, Plaintiff fails to allege that Grubhub omitted any Key Business Metric or other routine disclosure in the two quarters in which the alleged misstatements were made. (*Id.*) Plaintiff pleads no facts suggesting that the omission of "negative trends" from a conference call reflects "an intent to deceive or a reckless indifference to whether the statements were misleading." *Pension Tr. Fund*, 895 F.3d 933, 937 (7th Cir. 2018).[9]

**(4) The Shareholder Letter does not plead scienter.** Plaintiff also claims that Defendants must have acted with scienter because Grubhub disclosed in its Shareholder Letter that it had decided to add non-partner restaurants to its platform, suggesting that Grubhub must have known its partnership-based business model was faulty all along. (Compl. ¶¶ 116–19.) But "[t]here is no securities fraud by hindsight." *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013). The fact that Defendants adjusted their strategy does not establish that Defendants knew, months earlier, that Grubhub's partner model was "failing" or that they were making false statements to investors.

**(5) The refinancing allegations do not plead scienter.** Finally, Plaintiff theorizes that Defendants must have acted with scienter because, in June 2019, "Defendants refinanced debt to provide the Company with more capital and flexibility." (Compl. ¶ 119.) But companies increase their liquidity for any number of good reasons, and there is no reason to suspect that a notes offering demonstrates fraud. *See, e.g. In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778, 793 (S.D. Miss. 2002) (allegations about refinancing of corporate debt did not establish scienter).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in full and with prejudice.

---

[9]     Because Plaintiff has failed to state a claim under Section 10(b) and Rule 10b-5, the Section 20(a) claim fails too. *See, e.g.*, *Heartland Fin. USA, Inc. v. Fin. Institutions Capital Appreciation Partners, I, L.P.*, 2002 WL 31819008, at *8 (N.D. Ill. Dec. 12, 2002).

Dated: November 11, 2020                    Respectfully submitted,

                                            */s/ John F. Hartmann*

                                            John F. Hartmann, P.C.
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle
                                            Chicago, IL 60654
                                            Telephone: 312/862-2000
                                            312/862-2200 (fax)
                                            john.hartmann@kirkland.com


                                            Sandra C. Goldstein, P.C.
                                            Stefan Atkinson, P.C.
                                            Madelyn A. Morris (*pro hac vice pending*)
                                            KIRKLAND & ELLIS LLP
                                            601 Lexington Avenue
                                            New York, New York 10022
                                            Telephone: 212/446-4800
                                            212/446-4900 (fax)
                                            sandra.goldstein@kirkland.com
                                            stefan.atkinson@kirkland.com
                                            madelyn.morris@kirkland.com

                                            *Attorneys for Defendants*

**Appendix A**
**Table of Challenged Statements**[10]

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 1 | 65(a) | April 25, 2019<br><br>(Supplemental Information Presentation to Q1 2019 financial results) | "Net active diner adds have increased dramatically while CPA [cost per acquisition] has remained relatively flat over multiple years."<br><br> | ✓ | | |

---

[10]     All emphasis appears as in the Complaint.

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 2 | 65(b) | April 25, 2019 (Supplemental Information Presentation to Q1 2019 financial results) | "Diner quality improving even with increased investment; retention rates higher than historical cohorts" | ✓ | ✓ | |
| 3 | 66(a) | April 25, 2019 (2019 Q1 Earnings Call) | "*We added 1.6 million active diners in the first quarter, another record*, and finished the quarter with 19.3 million active diners, up 28% from the prior year. *As we will highlight later, these new diners have repeat rates just as high, if not higher than diners we acquired a year ago.* In summary, *early returns on our investments have been great, high-quality growth and already improving per order economics*." (Maloney) | ✓ | ✓ | |

2

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 4 | 66(b) | April 25, 2019 (2019 Q1 Earnings Call) | *"Diners that place[d] their first order with Taco Bell during the free delivery period are returning to Grubhub at the same or better rates as a typical diner even after we ended the free delivery campaign.* Some come back and order Taco Bell again, but the majority are trying other restaurants on the platform as well." (Maloney) | ✓ | | |
| 5 | 66(c) | April 25, 2019 (2019 Q1 Earnings Call) | "We believe that in aggregate, the Taco Bell campaign contributed an incremental few hundred thousand new diners and 100 to 150 basis points of incremental DAG growth during the quarter. *These new diners are high quality returning just as frequently as newly acquired diners from other channels* and they return to Taco Bell, but also engage with other restaurants on the marketplace at a high rate." (DeWitt) | ✓ | ✓ | |

3

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 6 | 66(d) | April 25, 2019 <br><br> (2019 Q1 Earnings Call) | "Given the significant investments and associated dramatic ramp in diner growth, we thought it was a good time to update you in terms of the value of our diners. Over the years, we've noted over and over again that *our disciplined approach to diner acquisition, our broad and deep restaurant network and our ever-improving user experience create incredibly sticky diner cohorts that should bring value to Grubhub for years to come. We've also noted more recently that because of all the improvements in our platform and marketing, we've been able to acquire high-quality new diners in older and newer markets alike even as we've dramatically increased marketing spend and new diner volume.*" (Maloney) | ✓ | ✓ | |
| 7 | 66(e) | April 25, 2019 <br><br> (2019 Q1 Earnings Call) | "Given the ramp in our investment pace in the fourth quarter, *we thought this was a good time to share additional metrics that help illustrate the stickiness of our marketplace, our ability to attract high-quality diners and reinforce our decision to be more aggressive in marketing and with delivery market launches.*" (DeWitt) | ✓ | ✓ | |

4

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 8 | 66(f) | April 25, 2019 (2019 Q1 Earnings Call) | "I can't speak to their economics. All I can point you to is our numbers, which show you that we've been able to acquire a lot more diners . . . .*you're seeing the diners improve in quality over time* . . . I don't know if you've [had] a chance to read through the supplemental deck, *but the repeat rates on our January and February 2019 diners are higher across all of our markets than they were in 2018 or 2017. So the quality is going up. We're spending more money and the cost isn't increasing. And so the formula is working for us* . . . .*the underlying growth in our business is stronger now than it has been in any point in the last two years*." (DeWitt) | ✓ | ✓ | |
| 9 | 66(g) | April 25, 2019 (2019 Q1 Earnings Call) | "In terms of fees, while major brands do have more leverage than local restaurants, *we are not as impacted in the pricing conversation because we actually bring real value and we're helping brands build a long-term and profitable business. So we're paid fairly for our services, which then allows us to achieve long-term sustainable economics*, which I think you also know is rather unique in our industry." (Maloney) | ✓ | ✓ | ✓ |

5

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 10 | 69 | May 10, 2019 (2019 Q1 10-Q) | "*The Company experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sale*s, during the three [and six months] ended March 31, 2019 as compared to the same period in the prior year. *Growth in all metrics was primarily attributable to* increased product and brand awareness by diners largely as a result of marketing efforts and word-of- mouth referrals, *better restaurant choices for diners in our markets* and technology and product improvements." | ✓ | | ✓ |
| 11 | 74(a) | July 30, 2019 (2019 Q2 Earnings Call) | "*Active diners grew 30% year-over-year to 20.3 million*," and DeWitt claimed that the 6% sequential decline in DAGs from 1Q 2019 to 2Q 2019 "*was a bit exaggerated this year by the Taco Bell national television and free delivery campaign in the first quarter* that Matt referenced *as well as the timing of the Easter holiday*, which we mentioned last quarter." | ✓ | ✓ | |
| 12 | 74(b) | July 30, 2019 (2019 Q2 Earnings Call) | "*In these newer delivery markets, we had another quarter of strong momentum and DAG growth with the added restaurant inventory helping these markets scale*." (Maloney) | ✓ | ✓ | |

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 13 | 74(c) | July 30, 2019 (2019 Q2 Earnings Call) | "*Our strong active diner growth is a result of our ever-improving restaurant network*, efficient advertising and broad delivery coverage." (DeWitt) | ✓ | ✓ | |
| 14 | 74(d) | July 30, 2019 (2019 Q2 Earnings Call) | "*Calculated orders per active diner was lower than last year* as it has been in past quarters. *But as a reminder, this isn't really a fair way to measure the activity of our individual diners for 2 reasons: first, we continue to mix shift away from New York in corporate diners where diners have a materially higher frequency than any other market in the U.S.*; and second, and perhaps slightly more nuanced, *we stepped up net diner additions in recent quarters. Having a higher percentage of new diners distorts the frequency calculation because they have not been on the platform for the entire quarter, and they also continue to increase frequency in future years*." (DeWitt) | ✓ | ✓ | |

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 15 | 74(e) | July 30, 2019<br><br>(2019 Q2 Earnings Call) | "I talked a little bit about frequency and what is weighing on frequency. And I think that is a structural headwind as opposed to an ephemeral headwind because the diners in New York and the diners in corporate are going to – are always going to order more than the newest diners outside of New York and corporate. *As we look out into the farther markets, we are seeing good frequencies and ramps in frequencies over time.* I think the other thing that – *the other impact that will go away over time that's weighing on frequency a little bit is that we've gone through this period of really strong new diner acquisition*. And so just mathematically, when you have newer diners disproportionately in your active diner base, it's going to weigh on frequency a little bit. *So that impact should go – would go away over time* if new diner growth doesn't stay at a super high level, but the other kind of structural difference will be there forever." (DeWitt) | ✓ | ✓ | |

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 16 | 74(f) | July 30, 2019<br><br>(2019 Q2 Earnings Call) | "We have now operated in these new Grubhub Delivery markets for a couple of quarters and *as expected, diners in these markets are behaving a lot like diners do in other markets.* Specifically, *the order frequency of diners increases with the introduction of Grubhub Delivery, which improves restaurant inventory in a market and the average order values in these newer delivery markets regardless of population size or density in the market, are in line with other more established Grubhub markets.*" (DeWitt) | ✓ | ✓ | |
| 17 | 74(g) | July 30, 2019<br><br>(2019 Q2 Earnings Call) | "*We are still finding plenty of opportunities to acquire diners at a reasonable cost* . . . . let's say, look, it costs us $100 to acquire a new diner but there's no way we think that the diner's ever going to be worth a total of $50, *we're not going to go out and make that trade off. We're still taking a view of hey, overall – based on the behavior that we see, based on profitability of the orders that we have and based on our infrastructure and everything else, what the value is over time.* And we're finding a lot of opportunities to deploy capital to do that. And frankly, *we're doing it -- a better job of it now than we were a year ago or 18 months ago, as you can see in the diner growth.*" (DeWitt) | ✓ | ✓ | |

9

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 18 | 74(h) | July 30, 2019<br><br>(2019 Q2 Earnings Call) | "The way to think about sales and marketing expense. We've always talked about as being 95% plus related to new diner acquisition, and we have – the number that we disclosed is net active diners, not gross new diners. And so *last quarter, we had a supplemental disclosure where we showed you guys what that gross CPA* [cost per acquisition] *looked like over time and what I'd say is that trend hasn't changed. We're still seeing plenty of opportunities to acquire new diners at a reasonable cost and that has not increased the cost there, whether it's competitive or running out of runway or not launching.* Whatever it is, *we haven't seen a headwind on our ability to acquire new diners at similar cost as we have over the past several quarters.*" (DeWitt) | ✓ | ✓ | |
| 19 | 74(i) | July 30, 2019<br><br>(2019 Q2 Earnings Call) | "Yes, *we haven't seen it*. I mean what I can tell you is once a cohort becomes stable, *we're still seeing really consistent behavior like what we showed you in the supplemental disclosure deck last quarter*. So I can't remember what year it was. It was '15, '16 or '17 cohort. *We're not seeing that change, and we didn't see a change last quarter and it didn't – it hasn't changed in an appreciable way this quarter either.* So *if it's happening, it's happening in addition, as opposed to substitutive.*" (DeWitt) | ✓ | ✓ | |

| No. | Complaint ¶ | Date of Statement | Statement | Not False/Misleading | Inactionable Opinion | Immaterial Puffery |
|---|---|---|---|---|---|---|
| 20 | 74(j) | July 30, 2019 (2019 Q2 Earnings Call) | "*There are a lot of players right now, making a lot of poor business decisions . . . . We've been very consistent that our business is founded on partnership, working with restaurants, understanding what the restaurants really need and trying to help them achieve their business goals in digital pickup*[.]" (Maloney) | ✓ | | ✓ |
| 21 | 74(k) | July 30, 2019 (2019 Q2 Earnings Call) | "[*W*]*e have a very profitable model in terms of long-term sustainability, the breadth of restaurants, the combination of how we charge diners and what the restaurants pay us and the formula works*." (DeWitt) | ✓ | ✓ | ✓ |
| 22 | 78 | August 6, 2019 (2019 Q2 10-Q) | "*The Company experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sales*, during the three and six months ended June 30, 2019 as compared to the same period in the prior year. *Growth in all metrics was primarily attributable to* increased product and brand awareness by diners largely as a result of marketing efforts and word-of mouth referrals, *better restaurant choices for diners in our markets* and technology and product improvements." | ✓ | | |

11

**CERTIFICATE OF SERVICE**

I hereby certify that on November 11, 2020, I electronically filed Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws, Declaration of Stefan Atkinson in Support of Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws, and Exhibits 1-7 with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

*/s/ John F. Hartmann*