UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>    vs.<br><br>GRUBHUB INC., et al.,<br><br>                      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  1:19-cv-07665<br><br><u>CLASS ACTION</u><br><br>Judge Charles R. Norgle Sr.<br>Magistrate Judge Jeffrey Cole |

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4836-7410-3510.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND....................................................................................2

III. ARGUMENT ........................................................................................................5

    A. The Complaint Adequately Alleges False or Misleading Statements ....................5

        1. False and Misleading New Diner Quality Statements ................................5

        2. False and Misleading Restaurant Density Statements ...............................6

        3. False and Misleading Profitability Statements ...........................................7

        4. Defendants' Arguments Are Unavailing .....................................................7

            a. The Statements Were Not Subjective "Opinions" ...........................7

            b. The Statements Were Not "Immaterial Puffery" ............................9

            c. Defendants' Timing Argument Fails .............................................10

    B. The Complaint Adequately Alleges Scienter...........................................................11

        1. The Totality of Factors Supports a Strong Inference of Scienter .............11

        2. Defendants' Remaining Scienter Arguments Are Unavailing...................14

IV. CONCLUSION.....................................................................................................15

4836-7410-3510.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................................8

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ................................................. *passim*

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan. 23, 2012).....................................................5, 6, 13

*Crespo v. Colvin*,
824 F.3d 667 (7th Cir. 2016) .............................................................................8

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) ....................................................................14

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ..................................................................13

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...........................................................................10

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) .....................................................................8

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)........................................................8

*Hill v. State St. Corp.*,
2011 WL 3420439 (D. Mass. Aug. 3, 2011) ............................................................8

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ................................................. *passim*

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) .....................................................................9

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................12

*In re: Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)...........................................................15

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ...............................................................7, 9

- ii -

**Page**

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ...................................................................................................9

*In re Groupon, Inc. Sec. Litig.*,
  2013 WL 12284524 (N.D. Ill. Sept. 18, 2013) ...................................................................14, 15

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)
  *aff'd*, 604 F. App'x 62 (2d Cir. 2015).....................................................................................8

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) ...................................................................................14

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) .....................................................................................9

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) .................................................................................9, 12

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)....................................................................................................11

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ...............................................................................12, 13

*Kelsey v. Allin*,
  2016 WL 825236 (N.D. Ill. Mar. 2, 2016)................................................................................6

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*,
  551 U.S. 308 (2007)..................................................................................................................9

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...............................................................................................2, 8

*Neca-Ibew Pension Fund v. N. Tr. Corp.*,
  2013 WL 1290202 (N.D. Ill. Mar. 28, 2013)..........................................................................10

*Norfolk Cnty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009)...........................................................................11

*O'Driscoll v. Argosy Univ.*,
  2014 WL 714023 (N.D. Ill. Feb. 25, 2014) ............................................................................15

**Page**

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015) .................................................................................................... 7

*Pierrelouis v. Gogo, Inc.*,
　414 F. Supp. 3d 1164 (N.D. Ill. 2019) ........................................................................ 12

*Rehm v. Eagle Fin. Corp.*,
　954 F. Supp. 1246 (N.D. Ill. 1997) ............................................................................. 13

*Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
　711 F.3d 754 (7th Cir. 2013) ...................................................................................... 12

*Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
　2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ............................................................ 9, 10

*Ret. Sys. v. Anixter Int'l, Inc.*,
　2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) .............................................................. 10

*Ret. Sys. v. Hospira, Inc.*,
　2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ................................................................... 9

*Ross v. Career Educ. Corp.*,
　2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ...................................................... 5, 6, 14

*Rothman v. Gregor*,
　220 F.3d 81 (2d Cir. 2000) .......................................................................................... 14

*Solow v. Citigroup, Inc.*,
　827 F. Supp. 2d 280 (S.D.N.Y. 2011) .......................................................................... 12

*Susie Ong v. Chipotle Mexican Grill, Inc.*,
　2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) .................................................................. 10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
　§78u-5(c)(1)(A) .............................................................................................................. 8

Federal Rules of Civil Procedure
　Rule 9(b) ......................................................................................................................... 5
　Rule 10b-5 ....................................................................................................................... 6

4836-7410-3510.v1

## I. INTRODUCTION

Grubhub enjoyed dominant market share in the online food ordering and delivery industry for many years.[1]  ¶¶24, 46.  However, in 2017 and 2018, Grubhub began losing market share to increased competition, so Defendants decided to expand into new markets.  ¶¶46-48.  This case arises from Defendants' efforts to conceal that Grubhub's expansion was failing because of its inability to attract "high-quality" diners, which was hurting its profitability.  Rather than disclose this, throughout the Class Period, Defendants assured investors that Grubhub had "*acquire[d] high-quality new diners*" (¶66(d)) who were ordering just as frequently and "*behaving a lot like diners do in other markets*" (¶74(f)).  Defendants attributed the expansion's supposed success to Grubhub's broad restaurant selection ("restaurant density") in the new markets.  ¶66(d).  None of this was true.  At the end of the Class Period, Defendants admitted that, because Grubhub never had adequate restaurant density in the new markets, the new diners were low-quality – *i.e.*, opportunistic customers attracted to marketing discounts who were not loyal to Grubhub and ordered less frequently.  ¶¶83-88.  The new diners were of such low quality that Grubhub flipped from a profitable company to an unprofitable one, and abandoned its business model of 15 years.  ¶¶85, 113-115.  Analysts called the admissions "a shocker" and "particularly troubling."  ¶91.  As a result of the disclosures, Grubhub's stock collapsed by more than 40%.  ¶90.

In moving to dismiss, Defendants do not dispute that Grubhub lacked adequate restaurant density in the new markets.  Br. at 6-11.  Instead, Defendants claim they were unable to determine that the new diners were low "quality" until the very end of the Class Period.  *Id.* at 6-8.  That argument fails because if there was insufficient data to assess new diner quality during the Class Period, then Defendants had no basis to repeatedly tout the diners as "high quality" at the time.  Far

---

[1]   Citations to "¶__" are to the Complaint, ECF No. 36.  "Br." refers to Defendants' brief in support of their motion to dismiss, ECF No. 39.  Citations and quotations are omitted unless otherwise indicated.

4836-7410-3510.v1

from "fraud by hindsight," the Complaint details that Defendants had up to nine months of ordering patterns for the new diners, and Defendants admitted they could determine new diner quality with 7 to 30-day ordering patterns. ¶¶34, 102-107. Defendants' admissions are sufficient to infer that they knew or recklessly disregarded the falsity of their statements when made, particularly since "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"); *see also Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at \*5-\*6 (N.D. Ill. Feb. 27, 2018) (denying motion to dismiss where defendant "played an active role" in earnings calls and admitted that concealed negative trends had been "expected").

Defendants' remaining arguments – that their statements were "opinions" or "immaterial puffery" – also fail. Br. at 9-11. Arguments regarding materiality are generally premature at the motion to dismiss stage. *See* §III.A.4.b. In any event, Defendants' statements did not merely express subjective beliefs or vague optimism that investors would disregard. Rather, the statements conveyed, as fact, that the expansion into new markets was successfully attracting the same historic quality of diners to maintain profitability, which was demonstrably false. *See* §§III.A.4.a-b. Defendants' motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Grubhub's customers (diners) can search Grubhub's online platform of listed restaurants, place an order through Grubhub, and the food will be delivered. ¶24. Grubhub relied on a "partnered" business model, meaning Grubhub entered into agreements with restaurants before placing their menus on the Grubhub platform. ¶25. The benefit was that these partnered restaurants paid Grubhub a commission on orders made through Grubhub, in addition to delivery fees Grubhub collected from diners. ¶28. By contrast, Grubhub's competitors used a "non-partnered" model, under which they simply added any area restaurant menu to their platforms without any agreement.

- 2 -

4836-7410-3510.v1

¶40. But, in doing so, they did not earn any commissions, and only earned fees charged to the diner. *Id.* Defendants refused to add non-partnered restaurants to Grubhub's platform and criticized the strategy as "the wrong long-term answer for diners, restaurants and shareholders," "expensive for everyone," "rife with operational challenges," and "unsustainable." ¶¶41, 60, 114-115.

Under the partnered-strategy, it took Grubhub longer to enter new markets because it needed to sign up restaurants to add their menus to the platform. ¶40. On the other hand, Grubhub's competitors could quickly ramp up with a large offering of restaurants through their non-partnered strategy. *Id.* More restaurant choices attracted more customers, which helped spread out the costs of building out a delivery system. *See* ¶49. To try to overcome this disadvantage in new markets, in 2018, Grubhub partnered with large "enterprise" restaurants – such as Taco Bell and KFC – to use as "anchor" tenants in new markets, around which Grubhub would then try to build restaurant inventory. ¶¶50-56. But, as noted, expansion could only be profitable if it resulted in the acquisition of "high quality" diners. ¶¶57-61. As explained by Maloney, "high-quality" diners are "defined by the diners that are ordering more frequently." ¶33. The largest determinant of diner quality is restaurant density, as diners are not likely to return to the platform if their desired restaurants are unavailable. ¶39. The quality of new diners was a central focus of investors and discussed regularly during earnings calls. *See* ¶¶100-108.

By the start of the Class Period, Grubhub's partnered model was failing to add enough restaurants in the more than 200 new markets to compete with the non-partnered competition. ¶¶62-63, 83-88. Without restaurant density, the new diners that came to Grubhub for promotional discounts or the inexpensive enterprise restaurants were not nearly as profitable or loyal, and ordered less frequently, than Grubhub's historical diners. *Id.* Defendants saw these negative trends, as they constantly "observe[d]" and "test[ed]" new diner behavior and frequency. ¶¶34-35, 102-107. Seeing the negative trends of low-frequency ordering by diners in the new markets, Defendants

- 3 -

4836-7410-3510.v1

made the dramatic decision to shift to using the non-partnered strategy they had criticized for years. ¶¶117-119.  Defendants began adding non-partnered restaurants around early 2019 and refinanced Grubhub's debt in June 2019 to free up cash to engage in the non-partnered strategy.  ¶¶87, 117-119. If not for the existence of negative frequency trends, Grubhub had no reason to change its business model to add non-partnered restaurants or to refinance its debt.  *Id*.

But Defendants concealed the change in strategy, and more importantly the negative trends that caused it, by claiming Grubhub's expansion into new markets was a success.  For example, they claimed the new diners were "***high quality***" and even that "***diner quality was improving***."  ¶¶65-66. Defendants emphasized that the partnered model continued to be "***very profitable***" and "***sustainable***" thanks to Grubhub's "***breadth of restaurants***" and "***better restaurant choices***."  ¶¶69, 74(k), 78.  When reported metrics declined, Defendants blamed factors other than diner quality, such as the "***timing of the Easter Holiday***."  ¶74(a).  As a result of Defendants' false or misleading statements, Grubhub stock traded at inflated prices, up to $79 per share.  ¶132.

On October 28, 2019, after reporting two consecutive quarters of declining Daily Average Grub ("DAG") growth, Defendants belatedly admitted that the declines were a result of negative trends in new diner ordering frequency.  ¶¶80-84.  Defendants disclosed that "the value of our new diners is not as high as it has been in the past due to . . . lower [ordering] frequencies."  ¶83.  They explained that the lower frequencies were "more pronounced" for diners in the new markets, *i.e.*, those acquired "at the end of 2018 and the first half of 2019."  *Id.*  Defendants admitted that Grubhub's non-partnered competitors had superior restaurant density where "new potential diners find more restaurants."  ¶84.  Defendants also disclosed for the first time that Grubhub had been "putting non-partnered restaurants on the platform."  ¶85.  The next day, Maloney admitted that Grubhub had "been piloting this [non-partnered strategy] for months" and had "tens of thousands of non-partnered restaurants already listed."  ¶87.  Maloney admitted that the new diners acquired in

- 4 -

4836-7410-3510.v1

the new markets "were stolen diners, who had a history of ordering on other platforms, and we didn't have the same restaurant network in many of these communities . . . so the fact that they're performing a little bit less, I think, is pretty logical." ¶88. After the disclosures, Grubhub's stock crashed by 43%, from $58 to $33. ¶90. Reflecting the view that Defendants had not been candid, analysts said "management will face a steep climb in an effort to regain Street credibility." ¶91.

## III.     ARGUMENT

In moving to dismiss, Defendants have challenged only the first two elements of the §10(b) claim – falsity and scienter – conceding all other elements. Br. at 6-15.

### A.     The Complaint Adequately Alleges False or Misleading Statements

The Complaint need only allege a statement was false *or* misleading. *See, e.g.*, *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (holding that "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation"). At this stage, the Court need not "determine whether [the] statements were in fact misleading, rather this Court need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud." *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *3 (N.D. Ill. Jan. 23, 2012).

#### 1.     False and Misleading New Diner Quality Statements

The Complaint identifies the challenged statements, the date, and the defendant who made them, and explains how they were false or misleading. *See Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020) (denying motion to dismiss where plaintiffs adequately pled the """"who, what, where, when, and how"""" under Rule 9(b) and the PSLRA). The Complaint alleges that Defendants misrepresented the quality of Grubhub's new diners, including that "***we've been able to acquire high-quality new diners***." ¶66(d); *see also* ¶74(f) (stating new diners "***are behaving a lot like diners do in other markets***"); ¶74(i) (responding to question about "any data"

- 5 -

4836-7410-3510.v1

suggesting "diners are using multiple different services" by saying "*we haven't seen it*. . . . *we're still seeing really consistent behavior*").[2]  These statements were false and misleading because the new diners were low-quality diners, ordering less frequently and using multiple services.  *See* §II; ¶¶67, 75.  By choosing to speak about new-diner behavior, Defendants were required to "'speak the whole truth.'"  *Kelsey v. Allin*, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016) (denying motion to dismiss).  Relatedly, Defendants minimized declines in reported metrics, claiming they were the result of the "*timing of the Easter holiday*" or the mathematical effect of having "*really strong new diner acquisition*," which concealed that the negative trends were caused in large part by the acquisition of low-quality diners due to poor restaurant density.  *See* ¶¶74(a), (d)-(e); *Allstate*, 2018 WL 1071442, at *3 (holding statements attributing increased insurance claims to certain factors were misleading because they omitted the impact of the "reduction in underwriting standards").

### 2. False and Misleading Restaurant Density Statements

Adding to the misleading impression of a successful expansion, Defendants also made false and misleading statements regarding Grubhub's restaurant density.  For example, Defendants attributed the purportedly high-quality diner additions to "*our broad and deep restaurant network*" and emphasized that Grubhub's growth was "*primarily attributable to* . . . *better restaurant choices*."  ¶¶66(d), 69, 78.  In truth, as conceded at the end of the Class Period, Grubhub had failed to build adequate restaurant density in new markets, whereas its non-partnered competitors had "generated strong diner and order growth" with superior density.  ¶84; §II.

---

[2]    This brief provides examples of the false or misleading statements.  The additional statements for each category are set forth in Exhibit A.  If the Court finds that Plaintiff has plausibly alleged any false or misleading statement by each defendant, the falsity element has been met, and the Court need not rule on all statements.  *See Career Educ.*, 2012 WL 5363431, at *8 (holding "because plaintiffs have . . . met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category" of statements); *Baxter*, 2012 WL 607578, at *2-*3 (addressing categories of statements).

4836-7410-3510.v1

### 3.     False and Misleading Profitability Statements

Finally, reinforcing the falsehoods, Defendants made false and misleading statements regarding the profitability of Grubhub's enterprise and partnered model strategies.  For example, Maloney claimed "[i]n terms of fees, while major [enterprise] brands do have more leverage than local restaurants, *we are not as impacted in the pricing conversation . . . . we're paid fairly for our services*."  ¶66(g).  Maloney also criticized competitors' non-partnered models, saying "*a lot of players right now [are] making a lot of poor business decisions*" and "*our business is founded on partnership*."  ¶74(j).  In truth, as admitted at the end of the Class Period, the enterprise contracts were negatively impacting profitability, the partnered strategy was negatively impacting restaurant density, and Grubhub was forced to shift to the non-partnered model.  §II; ¶¶84-85, 91-92.

### 4.     Defendants' Arguments Are Unavailing

#### a.     The Statements Were Not Subjective "Opinions"

An "opinion is 'a belief, a view' or a 'sentiment'" conveying "uncertainty."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015) (emphasizing that words like "I think" or "I believe" convey opinion).  Here, the statements did not convey uncertainty about adding diners or diner behavior; they represented that high-quality diners had been added.  *See, e.g.*, ¶66(d) ("*we've been able to acquire high-quality new diners*"); ¶74(f) ("*diners in these [new] markets are behaving a lot like diners do in other markets*").[3]  Such statements are capable of falsity.  *See Omnicare*, 575 U.S. at 183 (noting "'the coffee is hot'" is not subjective opinion); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1231 (N.D. Ga. 2019) (holding

---

[3]     Similarly, the statements did not convey uncertainty about other key metrics, but represented that enterprise contracts did not negatively impact pricing, that Grubhub was increasing restaurant density, and that diner quality trends and behavior had not changed.  *See* ¶66(g) ("*we are not as impacted in the pricing conversation*"); ¶74(c) (growth "*is a result of our ever-improving restaurant network*"); ¶78 (growth was "*attributable to . . . better restaurant choices*"); ¶74(b) ("*we had another quarter . . . with the added restaurant inventory helping these [new] markets scale*"); ¶74(h) ("*that trend hasn't changed*"); 74(i) ("*seeing really consistent [diner] behavior*").

- 7 -

"Equifax employs strong data security" did "not constitute a subjective opinion"). For example, Defendants gave factual, albeit misleading, reasons for reported declines. *See* ¶74(a), (d)-(e); *Allstate*, 2018 WL 1071442, at *3-*4 (holding "statements regarding the reason for an increase in . . . claims frequency" could not be read as "uncertain or mere opinions"). And, in context, statements about the "quality" of new diners were not subjective but conveyed that the diners were loyal and high-frequency customers. *See* ¶33; *Hill v. State St. Corp.*, 2011 WL 3420439, at *23 (D. Mass. Aug. 3, 2011) ("[G]iven the context in which Defendants used the phrase 'high quality,' it is entirely plausible that the public would reasonably understand the statement to be a factual declaration."); *Allstate*, 2018 WL 1071442, at *3-*4 (finding "'we continue to be comfortable with the quality of . . . renewal business'" was actionable); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017) (holding "claims of quality" could not be "dismissed as matters of opinion" because plaintiff "did peg its [quality] claims to something concrete").[4]

Even if any of the challenged statements could be interpreted as opinions, which they cannot, they would still be actionable because "that understanding would have been based on incomplete information" due to the omitted facts regarding diner frequency, restaurant density, and profitability. *See Allstate*, 2018 WL 1071442, at *4; *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (reversing dismissal and holding that "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false").

---

[4] The cases Defendants cite are inapposite. *See, e.g.*, *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 897 (N.D. Ill. 2020) (holding "reserve estimates" were opinion); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014) (dismissing vague statement about clothing quality being the "highest in the industry" and another statement that was "a belief as to what third parties think") *aff'd*, 604 F. App'x 62 (2d Cir. 2015); Br. at 9-10 (citing cases treating "predictions" and "projections" as opinion). Further, Defendants' perfunctory footnote saying three statements are protected by the PSLRA safe harbor (Br. at 10 n.6) is waived. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "'perfunctory and undeveloped arguments . . . are waived'"). It is also without merit because the statements referred to present and historical fact, and Defendants cannot show any "meaningful" cautionary language. *See, e.g.*, ¶66(d) ("***we've been able to***"); ¶66(f) ("***are higher***"); ¶74(e) ("***we are seeing***"); *Tellabs III*, 513 F. 3d at 705 (holding that present portion of a "mixed present/future statement" is not entitled to safe harbor); 15 U.S.C. §78u-5(c)(1)(A).

- 8 -

4836-7410-3510.v1

### b.      The Statements Were Not "Immaterial Puffery"

Defendants argue that four statements were "immaterial puffery."  Br., App'x A at rows 9-10, 20-21.  But a determination of what investors would consider material is "'rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.'"  *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017).  The "fact that the price of the stock plummeted shortly after disclosure demonstrates" the concealed information was material to investors.  *In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009).  In addition, three of the statements were in response to analyst questions (¶¶66(g), 74(j)-(k)), the fourth discussed Grubhub's "key business metrics" in its quarterly SEC filing (¶69), and analysts reacted positively to the statements (¶¶68, 76-77), which spoke directly to key aspects of Grubhub's business, such as pricing, restaurant density, and Grubhub's business model.  In context, such statements were not puffery.  *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (holding "'Hospira believes that its facilities and equipment are in good operating condition'" was not puffery because it "refer[red] to the present condition" and appeared in "the context" of SEC filing); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *2 (N.D. Ill. Feb. 12, 2018) (holding integration team was "'doing all the work'" was not puffery because analysts reported on the statement and integration was significant to investors).[5]

---

[5]    *See also Equifax*, 357 F. Supp. 3d at 1224 (holding statements that company was "committed" to cybersecurity were not puffery because they "relate to a core aspect of [the] business" and "were made repeatedly to assure investors that [the] systems were secure"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (*Tellabs I*) (rejecting puffery for statements made in "direct response to an analyst's inquiry"), *vacated on other grounds*, 551 U.S. 308 (2007) (*Tellabs II*).  Defendants' cases are distinct, as they spoke to "feelings," "beliefs," and desires.  *See, e.g.*, *id.* (finding "feel[ing] very, very good about the robust growth" was puffery); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (finding "Midway believes" was "'the opinion[] of the speaker'"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (dismissing statements such as Ford "'want[s] to make customers' lives . . . safer'" and "'want[s] to be clear leaders in corporate citizenship'").

- 9 -

### c. Defendants' Timing Argument Fails

Defendants argue "fraud by hindsight," claiming that the negative new diner frequency trends arose only after the Class Period statements. Br. at 6-8. But Defendants admitted that the negative trends related to diners acquired in 4Q18 and 1Q19, which was many months *before* the statements were made. *See* ¶¶83, 106-107. Defendants also admitted that they closely monitored diner behavior on a 7-, 14-, and 30-day basis and that such data provided predictability of diner trends. ¶¶101-107. Defendants further admitted that from their experience it was "logical" that the new diners would be low quality due to Grubhub's lack of restaurant density. ¶88. In addition to their words, their actions show they were aware of the negative trends during the Class Period because before misleading statements were made, Defendants added non-partnered restaurants and refinanced debt, neither of which would be needed absent the negative trends. *See* ¶¶117-119. The most reasonable inference – and at this stage all "inferences must be drawn in Plaintiffs' favor" – is that those negative trends did not magically appear at the very end of the Class Period. *AbbVie*, 2020 WL 5235005, at *4 (noting defendants' arguments "may be revisited after discovery on a motion for summary judgment or at trial"); *see also Allstate*, 2018 WL 1071442, at *4, *6 (rejecting "hindsight" argument because defendant's "post-class statement does not merely indicate that [defendant's] assurances . . . were incorrect in retrospect; it suggests that they were incorrect when made"); §§III.B.1-2 (further refuting "hindsight" argument).[6]

---

[6] *See also TreeHouse*, 2018 WL 844420, at *3 (rejecting argument that plaintiff failed to allege statements were "false at the time they were made" because the PSLRA "requires no proof as opposed to plausible allegations"). Defendants rely on cases that lacked such allegations suggesting the existence of a negative trend during the class period. *See, e.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (noting "the complaint offers no information other than the differences between the two statements" before and after the class period); *Neca-Ibew Pension Fund v. N. Tr. Corp.*, 2013 WL 1290202, at *5-*6 (N.D. Ill. Mar. 28, 2013) (noting lack of allegations other than later reserves being higher than earlier reserves); *Susie Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017) (refusing to infer "awareness from the mere fact that the later events transpired"); *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *23 (N.D. Ill. Mar. 31, 2011) (refusing to find that already-disclosed "[w]eaknesses in one"

- 10 -

## B.      The Complaint Adequately Alleges Scienter

Defendants' scienter analysis is flawed.  First, they focus on direct evidence of knowledge, but scienter is adequately pled by circumstantial facts suggesting "'reckless disregard of a substantial risk that the statement is false.'" *AbbVie*, 2020 WL 5235005, at *4.  Second, they isolate allegations and then cite cases to argue that each fact, by itself, does not establish scienter.  But "courts must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs II*, 551 U.S. at 322-23 (emphasis in original); *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (holding argument that "'[t]he sum of several zeros . . . is still zero'" is wrong because the "inferential significance of any single allegation can be determined only by reference to all other allegations"); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (rejecting attempts at "'cherry picking' particular allegations that, standing alone, might not" be enough).

### 1.      The Totality of Factors Supports a Strong Inference of Scienter

Here, no single allegation must do the job alone.  The totality of allegations are sufficient to allege scienter, especially since the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324.

First, Defendants' admissions that (1) the low-quality diners were acquired before the misleading statements, from October 2018 through June 2019, (2) Defendants closely analyzed these diners on 7- to 30-day increments and therefore had up to nine months' worth of data when the statements were made, and (3) it was "logical" these new diners would be "less valuable" due to Grubhub's inadequate restaurant density support scienter.  *See* §III.A.4.c.; *Allstate,* 2018 WL

part of business would render untrue "statements about the business as a whole").  Because the Complaint adequately alleges falsity when made, Defendants' duty to update cases – Br. at 1, 8 n.4 – are inapplicable.

- 11 -

1071442, at *6 (finding scienter where defendant analyzed claim frequency during the class period and later admitted that increased frequency was "expected"); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding admission that CEO was "deeply involved" in company's lending process supported inference he was aware of related financial troubles).

Second, the fact that Grubhub never achieved adequate restaurant density in the new markets supports scienter. ¶¶85-88. Since Grubhub did not have the restaurant density to attract high-quality diners at the end of the Class Period, it could not have been acquiring the "high-quality" diners Defendants touted in the Class Period. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 330-32 (D. Mass. 2002) (denying motion to dismiss §10(b) claim where the "proof offered . . . that the product did not work at time 'x' is that, at time 'x+1,' the product did not work").

Third, Grubhub's decisions to (1) add non-partnered restaurants and (2) refinance its debt to do so occurred before challenged statements, supporting Defendants' awareness of the negative trends and, thus, scienter. *See* §II; §III.A.4.c; *Solow v. Citigroup, Inc*., 827 F. Supp. 2d 280, 288 (S.D.N.Y. 2011) (holding scienter pled where company touted "its 'strong' liquidity while not disclosing borrowings from a facility that was a 'back up source of liquidity'"). ¶117.[7]

---

[7] These actions were clearly in response to the negative frequency trends, showing Defendants' awareness. Defendants do not even attempt to provide an alternative explanation (*see* Br. at 15), and instead erroneously claim the Complaint does not allege non-partnered restaurants were added "before [3Q19]." Br. at 8 n.4; *see* ¶117 (alleging Grubhub had been adding "non-partnered restaurants for almost a year" as of November 2019). Also, Defendants made false statements as late as 30 or more days into 3Q19. *See* ¶¶74, 78; *Ulta,* 604 F. Supp. 2d at 1188 (holding defendants' "specific choice" to disclose positive information required disclosure of negative in-quarter information); *see also* ¶87 (Maloney admitting in October 2019 that Grubhub had been adding non-partnered restaurants "for months" but "just announcing it right now"). Unlike in *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013), where defendants had time to "digest" and resolve issues before the predicted date of the "first flight," Defendants here were already well into expansion and claiming the new diners were high quality, when they were not. Similarly, in *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1175 (N.D. Ill. 2019), the court noted that problems with a product may not have yet manifested, but here the problems not only manifested, Grubhub also began adding non-partnered restaurants and refinancing debt in response.

- 12 -

Fourth, Maloney and DeWitt controlled all aspects of the Company, had direct access to negative confidential information, and were directly involved in, and held themselves out as the most knowledgeable about, Grubhub's expansion, restaurant inventory, and new diners. ¶¶53-61, 94-111; *Allstate*, 2018 WL 1071442, at *4-*5 (finding scienter where defendant "had direct involvement" in the plan that resulted in increased claim frequency and "played an active role in earnings calls, during which he assured investors that the increased claims frequency was due to external factors"); *Baxter*, 2012 WL 607578, at *4 (holding that "by virtue of their positions the defendants had access to non-public and proprietary information concerning Baxter's operations, finances, and financial condition" and "controlled the content" of the statements and thus "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness"). Indeed, "Defendants' numerous statements regarding [diner quality], and the importance that Defendants placed on [diner quality] to [Grubhub's] growth and success constitute strong circumstantial evidence that Defendants had detailed information" regarding diner quality. *AbbVie*, 2020 WL 5235005, at *5. The inference of scienter for the July 30, 2019 call is further supported by "Defendants' reluctance to delve into the details." *Id.*; ¶110.

Fifth, diner quality and restaurant density were critical to Grubhub and investors. *See* ¶¶100-108; *Corus*, 701 F. Supp. 2d at 1028 ("'[O]fficers of a company can be assumed to know of facts critical to a business's core operations . . . that would affect a company's performance.'"); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue.").

Sixth, the negative frequency trends were so severe that they flipped Grubhub from profitable to unprofitable and caused Grubhub to reverse its long-standing business model, contradicting everything Defendants had emphasized since going public. ¶¶91, 113-115; *Rehm v. Eagle Fin.*

- 13 -

*Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants['] protests that they were completely unaware of [the truth] and the stronger is the inference that defendants must have known about the discrepancy."). Contrary to Defendants' argument (Br. at 14), Plaintiff is not required to specifically quantify the negative trends. *See In re Groupon, Inc. Sec. Litig.*, 2013 WL 12284524, at *2 (N.D. Ill. Sept. 18, 2013) ("At this early stage in the litigation and without the benefit of extensive discovery, Plaintiff need not plead the specific amounts by which he alleges Defendants inflated revenue.").

And seventh, motive is not needed to plead scienter (*Career Educ.*, 2012 WL 5363431, at *11), but Defendants had motive to inflate Grubhub's stock so they could more cheaply acquire companies (*see* ¶¶120-130; *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (reversing dismissal and stating "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter")). An increase in the stock price would increase a payout to Defendants upon an acquisition. *See, e.g.*, ¶130; *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 940 (N.D. Ill. 1999) (finding that the "'incentive to complete the lucrative sale of a business, and the personal pecuniary benefits associated therewith, can . . . raise an inference of scienter'"); *AbbVie*, 2020 WL 5235005, at *5 (finding scienter where defendants had "incentive" to inflate sales because "their compensation was tied directly to [the product's] sales").

### 2. Defendants' Remaining Scienter Arguments Are Unavailing

Defendants repeat their "fraud by hindsight" claim that the negative trends did not exist at the time of their statements. Br. at 11-15. But, as demonstrated above (§III.A.4; §III.B.1), that argument has no merit. The fact that the Complaint relies on post-Class Period admissions does not make it "fraud by hindsight," as courts recognize that "[f]raud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 799, 809 (C.D. Cal. 2011) (denying motions to

- 14 -

dismiss); *see also Allstate*, 2018 WL 1071442, at *4 (rejecting "hindsight" argument and finding scienter pled based on later admissions); *Groupon*, 2013 WL 12284524, at *2-*3 (finding scienter pled and rejecting argument that later admission "'suggests merely that Groupon made a mistake, . . . not that Groupon made the mistake intentionally'"); *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015) (holding that "'fraud-by-hindsight'" argument required "particularized analysis," which "'is not something that the Court is tasked with tackling at this stage, given the inferences owed to the Plaintiff'").

Defendants ask the Court to improperly draw inferences in their favor to assume the new diners acquired from October 2018 through June 2019 were frequently ordering, despite the lack of restaurant density, and then suddenly reversed to low frequency just after their last misleading statements on July 30 and August 6, 2019. Br. at 5-13. That defies logic and ignores the allegations regarding their admissions at the end of the Class Period, their actions during the Class Period to change strategies, the low restaurant density throughout the new markets, and the negative metrics reported during the Class Period (albeit misleadingly attributed to other causes). *See O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at *5 (N.D. Ill. Feb. 25, 2014) ("As the Seventh Circuit explained approximately 27 years ago, 'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations.'"). Defendants' competing innocent inference is not plausible, much less "more compelling or cogent" than the inference of scienter. *AbbVie*, 2020 WL 5235005, at *5.[8]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

---

[8]    Because the Complaint states a §10(b) claim, the §20(a) claim should also be upheld. *See* Br. at 15 n.9.

- 15 -

DATED: January 15, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
BRIAN E. COCHRAN (IL Bar # 6329016)
FRANK A. RICHTER (IL Bar # 6310011)
GINA M. BUSCHATZKE (IL Bar # 6332510)

s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
bcochran@rgrdlaw.com
frichter@rgrdlaw.com
gbuschatzke@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Telephone: 248/746-2710
248/747-2809 (fax)
cbdunn@asherkellylaw.com

Additional Counsel for [Proposed] Lead Plaintiff

- 16 -

4836-7410-3510.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 15, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

E-mail:  jbarz@rgrdlaw.com

4836-7410-3510.v1

Case: 1:19-cv-07665 Document #: 41 Filed: 01/15/21 Page 23 of 23 PageID #:482

# Mailing Information for a Case 1:19-cv-07665 Azar v. Grubhub Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stefan Howard Atkinson**
  stefan.atkinson@kirkland.com

- **James E Barz**
  jbarz@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com,kjohnson@rgrdlaw.com

- **Sandra C Goldstein**
  sandra.goldstein@kirkland.com,sandra-goldstein-3843@ecf.pacerpro.com,kenymanagingclerk@kirkland.com,michelle.denny@kirkland.com

- **John F. Hartmann**
  jhartmann@kirkland.com,meghan.guzaitis@kirkland.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Madelyn A. Morris**
  madelyn.morris@kirkland.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)