**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| ROEI AZAR, *Individually and on Behalf of All Others Similarly Situated*, <br><br> Plaintiff, <br><br> v. <br><br> GRUBHUB, INC., et al., <br><br> Defendants. | Case No. 1:19-cv-07665 <br><br> Hon. Charles R. Norgle, Sr. |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

John F. Hartmann, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  312/862-2000
312/862-2200 (fax)
john.hartmann@kirkland.com

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Madelyn A. Morris
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  212/446-4800
212/446-4900 (fax)
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
madelyn.morris@kirkland.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

I.      THE COMPLAINT FAILS TO PLEAD FALSITY........................................................ 2

II.     THE COMPLAINT FAILS TO PLEAD SCIENTER. ....................................................... 8

CONCLUSION.................................................................................................. 15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ....................................................................................11

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill.), *aff'd sub nom.*, *Gallagher v. Abbott Labs.*,
269 F.3d 806 (7th Cir. 2001) ..................................................................................................8

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021)...................................................................3, 13, 14

*In re Brightpoint, Inc. Sec. Litig.*,
2001 WL 395752 (S.D. Ind. Mar. 29, 2001).....................................................................4, 12

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .........................................................................10

*In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
435 F. Supp. 3d 845 (N.D. Ill. 2020) ....................................................................................15

*City of Lakeland Emps.' Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578, at *4 (N.D. Ill. Jan. 23, 2012) .................................................................10

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754, 758 (7th Cir. 2013) ..............................................................................3, 11, 15

*City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*,
2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011)..................................................................13

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805, at *25 (N.D. Ill. Feb. 13, 2013) .................................................................7

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .............................................................................................8, 12

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)....................................................................................................3

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ...................................................................................................3

*In re Frontier Commc'ns, Corp. Stockholders Litig.*,
2020 WL 1430019 (D. Conn. Mar. 24, 2020) .........................................................................6

*Fryman v. Atlas Fin. Holdings*, *Inc.*,
  462 F. Supp. 3d 888 (N.D. Ill. 2020) ...............................................................3, 5, 13

*Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
  675 F.3d 1047 (7th Cir. 2012) ........................................................................4

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) .........................................................................14

*In re Groupon, Inc. Sec. Litig.*,
  2013 WL 12284524 (N.D. Ill. Sept. 18, 2013) ........................................................14

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wis. 2009)..................................................................5

*Heartland Fin. USA, Inc. v. Fin. Institutions Capital Appreciation Partners, I,*
  *L.P.*,
  2002 WL 31819008 (N.D. Ill. Dec. 12, 2002).........................................................15

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .........................................................................3

*Hoffman v. Nationwide Mut. Ins. Co.*,
  2011 WL 3158708 (N.D. Ill. July 26, 2011)............................................................3

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .........................................................10

*Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*,
  455 F. Supp. 2d 788 (N.D. Ill. 2006) ................................................................11

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)...........................6

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007).......................7

*Martin v. Wendy's Int'l, Inc.*,
  183 F. Supp. 3d 925 (N.D. Ill. 2016) .................................................................7

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................................7

*Neca-Ibew Pension Fund v. N. Tr. Corp.*,
  2013 WL 1290202 (N.D. Ill. Mar. 28, 2013)............................................................3

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
  2017 WL 6039926 (N.D. Ill. Dec. 6, 2017)............................................................11

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
    572 F. App'x 713 (11th Cir. 2014) ................................................................................6

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) .......................................................................................3

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .............................................................................10

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
    2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ...............................................................4

*Saltzman v. Pella Corp.*,
    2007 WL 844883 (N.D. Ill. Mar. 20, 2007)................................................................7

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) .......................................................................................8

*Segerdahl Corp. v. Am. Litho, Inc.*,
    2019 WL 157924 (N.D. Ill. Jan. 10, 2019)................................................................7

*Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ............................................................3

*Solow v. Citigroup, Inc.*,
    827 F. Supp. 2d 280 (S.D.N.Y. 2011)........................................................................12

*Toussaint v. Care.com Inc.*,
    2020 WL 5751527 (D. Mass. Sept. 25, 2020) ...........................................................6

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    2020 WL 6118605 (N.D. Ill. Oct. 15, 2020)..............................................................6

*Zerger v. Midway Games, Inc.*,
    2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)..............................................................5

**Statutes**

The Private Securities Litigation Reform Act,
    15 U.S.C. § 78u-4 ("PSLRA").............................................................................3, 14

**PRELIMINARY STATEMENT**

The Complaint should be dismissed as an improper effort to hold corporate officers liable for failing to predict the future. Plaintiff does not allege that Grubhub misrepresented any aspect of the past or the present, and does not contest that Grubhub timely and transparently reported the same key business metrics—including the Company's developing problems with diner-ordering frequency—every quarter. Instead, Plaintiff alleges that Grubhub should more accurately have *predicted* how those business metrics might worsen *over time*. But the securities laws do not require executives to be prescient, and they do not impose liability for statements that (as here) were true at the time they were made. In fact, courts routinely dismiss complaints that are premised on prescience. Consequently, Plaintiff's theory of fraud by hindsight, which relies on later developments to question earlier, truthful disclosures, should be rejected.

*First*, Plaintiff's Complaint contains no specific allegation that, if true, would show that any of the challenged statements were false when they were made. To the contrary, Plaintiff alleges that Grubhub's "admission" in the third quarter of 2019 that "new diners were low-quality" means that Grubhub knew and concealed that these diners were "low-quality" all along. (Opp'n at 1.) But Grubhub's third quarter 2019 disclosure was not that new diners acquired in the prior two quarters were "low quality" from the start. It was that while new-diner metrics initially looked promising, their performance *over time* turned out to be disappointing. (*See* Ex. 7 at 3.) Of course, it was not possible until some time had passed to know how newly acquired diners might act over time. And, although Plaintiff alleges that Grubhub could "determine new diner quality with 7- to 30-day ordering patterns" (Opp'n at 2), Plaintiff nowhere alleges that such data in any way contradicted Grubhub's contemporaneous statements. To the contrary, Grubhub disclosed in the third quarter of 2019 that its 30-day analysis of diners acquired in prior quarters looked promising at the outset. (Ex. 7 at 4.) The fact that this early analysis did not ultimately predict the future

performance of newly-acquired diners does not make the challenged statements false. Plaintiff's allegation that, "*at the end of the Class Period*, Grubhub had failed to build adequate restaurant density in new markets" suffers from the same problem: Plaintiff does not suggest that Grubhub knew, or could have known, that restaurant density would be a problem all along. (Opp'n at 6 (emphasis added).) The remaining statements, regarding profitability, were true when made and, in any case, were statements of opinion or corporate optimism of the sort courts have long held inactionable.

*Second*, Plaintiff fails to plead scienter because its allegations, considered in their totality, do not support any inference—let alone the required strong one—that Defendants acted recklessly or with intent to defraud. Plaintiff repeatedly invokes a drumbeat of supposed "negative trends" without alleging how Defendants could have known of such trends when the diners in question had just been acquired and when the initial data about their habits was promising. Plaintiff's remaining allegations—that Grubhub's CEO and CFO were knowledgeable, led messaging, explored various business strategies, and worked to ensure Grubhub's profitability and liquidity—create an opposing inference far more plausible than scienter: that Grubhub and its executives sincerely believed that their strategic investments in new-diner acquisition would pay off. Nothing in the Complaint supports an inference that Defendants intentionally or recklessly lied to Grubhub's investors.

The Complaint should be dismissed in full and with prejudice.

## I. THE COMPLAINT FAILS TO PLEAD FALSITY.

The alleged misstatements are each inactionable for the same reason: they attempt—against overwhelming authority—to seize on later developments and accompanying statements to allege that those future facts should have been known, and those later disclosures should have been made, sooner. *See, e.g.*, *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,

2

711 F.3d 754, 758 (7th Cir. 2013) ("There is no securities fraud by hindsight."); *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir. 1978) (dismissing complaint as "fraud by hindsight" where plaintiff "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007); *Hoffman v. Nationwide Mut. Ins. Co.*, 2011 WL 3158708 (N.D. Ill. July 26, 2011); *In re Baxter Int'l Inc. Sec. Litig.,* 2021 WL 100457, at *18–19 (N.D. Ill. Jan. 12, 2021); *Fryman v. Atlas Fin. Holdings*, *Inc.,* 462 F. Supp. 3d 888, 899–900 (N.D. Ill. 2020); *Neca-Ibew Pension Fund v. N. Tr. Corp.*, 2013 WL 1290202, at *5 (N.D. Ill. Mar. 28, 2013); *Pugh v. Tribune Co.*, 521 F.3d 686, 694 (7th Cir. 2008); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627–28 (7th Cir. 1990); *Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *3 (N.D. Ill. Sept. 26, 2018) (the PSLRA "imposes 'heightened pleading requirements' to discourage claims of 'so-called "fraud by hindsight"'").

**(1) New Diner Statements Were Not False or Misleading.** (App'x B at 1–16.)[1] Plaintiff's theory of falsity rests on the mistaken premise that Grubhub's statements in the first and second quarters of 2019 regarding its newly acquired diners' behavior "were false and misleading because the new diners were low-quality diners, ordering less frequently and using multiple services." (Opp'n at 6.) But Plaintiff fails to allege that any of Defendants' statements were inconsistent with any data available to Grubhub at the time those statements were made. (Br. at 6–7.) The fact that diners' *long-term* ordering behavior unexpectedly declined over time does not mean that Grubhub knew this information and withheld it from investors *from the beginning*. "[A]

---

[1] Defendants included an appendix with their opening brief. Plaintiff provided this Court with its own appendix, organizing the same challenged statements differently. Defendants have annotated Plaintiff's appendix and included it herewith as "Appendix B" to assist the Court in evaluating the various bases for dismissal with respect to each statement quoted and challenged in the Complaint.

3

securities fraud claim is not actionable when it hinges solely upon the argument, absent any other supporting allegations, that a defendant failed to predict a future development." *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at \*8 (S.D.N.Y. Mar. 8, 2019); *see also Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050–51 (7th Cir. 2012) (affirming dismissal of complaint as fraud by hindsight, concluding that companies "need not be prescient. The July 19 press release did not misrepresent the past or . . . current condition, and [the defendant] had no duty to foresee the future"). Plaintiff likewise argues that if there was "insufficient data to assess new diner quality during the class period," then there was no basis to call those diners "high quality" at the time. (Opp'n at 1.) But Plaintiff ignores that the short-term contemporaneous data supported Grubhub's assertions that new diners were high quality. (Br. at 2–4.) The fact that those diners' long-term performance worsened over time does not mean that, months earlier, Defendants' statements about diner quality were false when made.

Instead of alleging contemporaneous facts that contradicted the challenged statements, Plaintiff claims that Grubhub's subsequent disappointing results "did not magically appear at the very end of the Class Period," and so they must have been apparent sooner. (Opp'n at 10.) But "the mere allegation that the company 'must have known' the bad news before the date of disclosure is the essence of fraud by hindsight and will not sustain a securities fraud claim." *In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752, at \*18 (S.D. Ind. Mar. 29, 2001). Next, Plaintiff points to Defendants' disclosure of negative data later in the Class Period and suggests that Defendants "concealed" the cause of Grubhub's problems by sharing their opinion that these problems might be the result of factors not indicative of a longer-term problem. (Opp'n at 6.) In other words, Grubhub disclosed bad news as it occurred, but its opinion as to the cause of that bad news was supposedly wrong.

4

The problem for Plaintiff—aside from Grubhub's timely disclosure of disappointing developments—is that statements of opinion, like those made by Grubhub (*see* App'x B at 2–3, 5–16, are fraudulent only where they were "not truly believe[d]" or were "not supported by the available facts." *See Fryman*, 462 F. Supp. 3d at 897. Plaintiff makes no such showing. To the contrary, data supported Defendants' belief that new diners would perform well over the long term: while new diners often were poor performers and slow to adopt the platform at the start, they tended to improve as time went on. (Br. at 4.)[2]

**(2) Restaurant Density Statements Were Not False or Misleading.** (App'x B at 17–22.) Plaintiff next argues that Grubhub made misleading statements regarding its restaurant density. (Opp'n at 6.) However, Plaintiff concedes that it was only "*at the end of the Class Period*" that Grubhub learned that the strategic plan that Defendants believed would be successful had underperformed. (*Id.* (emphasis added).) Again, Plaintiff fails to allege that Grubhub's statements regarding restaurant density were contradicted by specific facts available to the Company *at the time the statements were made*. (Br. at 6–7.) *See, e.g.*, *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *7 (N.D. Ill. Oct. 19, 2009) (dismissing plaintiffs' claims for failure to sufficiently "allege any facts contemporaneous to the statements"); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) (dismissing complaint because it lacked "fact-based connections between a speaker, a statement, and specific contradictory information presumably known to that speaker at the time the statement was made").

---

[2] Grubhub's statements regarding what would happen with diner frequency are also protected by the PSLRA's safe harbor. (*See* App'x B at 6, 8, 11, 17; Br. at 10 n.6.) Plaintiff's claim that this argument is waived is wrong. (Opp'n at 8 n.4.) Defendants raised this argument in their opening brief and supported it by citing appropriate authority and directing the Court to specific examples of the cautionary language that Grubhub employed. (Br. at 10 n.6; *see* Ex. 3 at 2, Ex. 2 at 4, Ex. 4 at 28, Ex. 5 at 4, Ex. 6 at 31.) Plainly, the argument was preserved.

**(3) Profitability Statements Were Not False or Misleading.**  (App'x B at 23–26.)

Finally, Plaintiff alleges that Grubhub made false statements regarding the profitability of Grubhub's partnership-based business model, including that Grubhub believed that its business model was "sustainable," that it was doing a "better job" of deploying capital, and that its partnership "formula works." (Opp'n at 6; App'x B at 23, 24, 36.)  But Plaintiff's claim must be dismissed because Plaintiff does not allege that Grubhub's opinions about the strength of its business model were "both objectively false and disbelieved by the defendant at the time [they were] expressed."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (quotation marks omitted).[3]  For example, Plaintiff's allegation that Defendants began to pilot test adding non-partnered restaurants to its business model (Opp'n at 4, 12 n.7) does not establish that Grubhub's positive opinions about its partnership-based business model were objectively false, much less that Defendants did not sincerely believe them. Indeed, Grubhub maintained its partnership model even as bad news came to light.  (*See* Ex. 7 at 7 (Grubhub affirming its belief in the partnership model, noting that it "believe[d] that non-partnered options are the wrong long-term answer for diners, restaurants and shareholders").)

---

[3] Plaintiff claims that Defendants' statements about diner quality were not opinions because they were not prefaced by words like "I think" or "I believe" and "did not convey uncertainty."  (Opp'n at 7.)  Plaintiff is wrong.  This Court and others have repeatedly held that statements like the ones Grubhub made about the strength of its business and the quality of its diners (*see* App'x B at  6, 13, 14, 17, 19, 24, 26) are inactionable opinions even when they do "not contain qualifiers such as 'I think' or 'I believe.'"  *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *16–17 (N.D. Ill. Oct. 15, 2020) (dismissing statements about "the strength and complementary nature of [the company's] portfolio" as inactionable opinions); *see also Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014) ("opinions on the overall quality of the business" are inactionable) (emphasis added); *In re Frontier Commc'ns, Corp. Stockholders Litig.*, 2020 WL 1430019, at *11 (D. Conn. Mar. 24, 2020) (statements about the 'quality of the billing conversion," were inactionable opinions); *Toussaint v. Care.com Inc.*, 2020 WL 5751527, at *5 (D. Mass. Sept. 25, 2020) (statements about "safety and *quality*" were inactionable opinions) (emphasis added).

6

And, of course, many of the challenged statements expressing general optimism about Grubhub's business are subjective and unquantifiable, rendering them inactionable statements of puffery under settled Seventh Circuit law. (App'x B at 23, 25, 26.) Plaintiff's own cited cases make clear that puffery can be determined at the pleading stage. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at \*25 (N.D. Ill. Feb. 13, 2013) (holding that statements that the company was "redoubling commitment to quality" was "classic puffery" and immaterial as a matter of law); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007) (holding at the motion to dismiss stage that "vague" statements such as "demand for our core optical products . . . remains strong" were puffery). Indeed, this Court has routinely dismissed statements similar to the challenged statements as puffery at the motion to dismiss stage. *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (rejecting plaintiff's argument that whether a statement is puffery is a question of materiality and thus a factual matter not properly decided on a motion to dismiss); *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934 (N.D. Ill. 2016) (holding the term "record breaking" was inactionable puffery and dismissing complaint); *Saltzman v. Pella Corp.*, 2007 WL 844883, at \*4 (N.D. Ill. Mar. 20, 2007) (dismissing as puffery defendant's representations that its product was "manufactured to high quality standards"); *Segerdahl Corp. v. Am. Litho, Inc.*, 2019 WL 157924, at \*4 (N.D. Ill. Jan. 10, 2019) (dismissing as puffery a challenge to "overexaggerated marketing claims").

Plaintiff's argument that certain statements were not puffery because they were made in response to analyst questions or included in Grubhub's SEC filings fares no better. (Opp'n at 9; App'x B at 18, 23, 25, 26.) The particular form or location of the alleged misstatement does not determine its materiality, and the cases Plaintiff cites do not hold otherwise. Furthermore, this

7

Court has held that statements made in similar contexts were inactionable puffery as a matter of law. *See Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill.), *aff'd sub nom., Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001) (holding that CEO's comments made to investors and in the company's SEC filings were not misleading, including because "[v]ague statements about industry leadership and unquantified growth are classic puffery, and are generally not actionable.").

## II. THE COMPLAINT FAILS TO PLEAD SCIENTER.

Plaintiff does not identify facts sufficient to demonstrate the "strong inference" of scienter that Plaintiff admits is required. (Opp'n at 11.) Instead, Plaintiff takes a kitchen-sink approach to alleging scienter, basing its scienter theory on seven different categories of allegations that, considered in their totality, fall far short of raising any inference at all that Defendants acted with "an intent to deceive, demonstrated by knowledge of the statement's falsity, or reckless disregard of a substantial risk that the statement is false." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 601 (7th Cir. 2019).[4]

**(1) Grubhub's acquisition of diners (who would later turn out to be "low quality") before the challenged statements does not establish scienter.** Plaintiff claims that Defendants must have acted with scienter because "low-quality diners were acquired before the misleading statements." (Opp'n at 11.) But Plaintiff's Complaint makes no allegation that Grubhub knew (or had reason to know) that these newly acquired diners were low quality from the beginning. The mere fact that Grubhub's newly acquired diners ultimately exhibited poor performance does not

---

[4] As Defendants have explained, Plaintiff can plead scienter by alleging *particularized facts* giving rise to a *strong inference* that Defendants acted with "reckless disregard of a substantial risk." (Br. at 11, 14 n.8.) But recklessness must be "so severe that it is the functional equivalent of intent." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). Plaintiff's allegations (Opp'n at 11) do not come close to clearing this very high hurdle.

show that Defendants' statements about diner quality were false at the time they were made. Plaintiff ignores that diner performance is dynamic, not fixed. Unlike buying produce at a grocery store, where quality can be determined at a glance, Plaintiff fails to explain how Grubhub knew (or could have known) how its diners would perform over time from the very start. (*See* Ex. 7 at 4 (observing that "[w]hile retention of these newer diners was good, their ordering frequency wasn't '*maturing*' at the same level as earlier cohorts" and that by the third quarter, new diners "were not driving as many orders as [Grubhub] expected *at that point in their lifecycle*" (first emphasis in original, second emphasis added)).)

Next, Plaintiff alleges that Defendants analyzed newly-acquired diners on 7- to 30-day increments, so they must have known diner quality would worsen over time. (Opp'n at 11.) But Plaintiff fails to allege that any 7- to 30-day analysis (or indeed any analysis of any kind) ever indicated that these newly acquired diners would not increase their ordering over the long-term or otherwise indicated that the diners were "low quality." (Opp'n at 10.) To the contrary, and as Grubhub disclosed in the third quarter of 2019, Grubhub's contemporaneous 30-day analysis of these newly acquired diners looked promising but did not foreshadow that performance would worsen over the long haul. (Ex. 7 at 4.)

The more compelling inference is that Grubhub had reason (and data) supporting its belief that its diners were high quality at the time the challenged statements were made, but that this belief turned out to be wrong over the long-term, a development Grubhub promptly and candidly disclosed. For example, Plaintiff ignores that Grubhub's 2018 investment in marketing and delivery expansion initially showed positive initial returns across nearly every key metric. (Br. at 3–4, 13.) Plaintiff likewise ignores that Grubhub consistently disclosed the same key metrics every quarter, including problems with ordering frequency as they occurred. None of Plaintiff's

9

allegations suggest that Grubhub knew that newly acquired diners' performance would continue to decline over the long run. (Br. at 7, 12.) Plaintiff does not meaningfully address any of these flaws, all of which Defendants raised in their opening brief. (Br. at 1–4, 12–14.)

Unable to identify any contemporaneous facts that contradict the challenged statements, Plaintiff alleges that Defendants must have known the newly acquired diners were "low quality" in the first two quarters of 2019 because (Plaintiff claims) Defendants later disclosed (during the third quarter of 2019) that it was "logical" that those diners were "less valuable." (Opp'n at 11.) What Grubhub in fact disclosed was that "the [market] share that we were stealing *was less valuable than we expected it to be*"— not that the newly acquired diners were "low quality" from the outset. (Compl. ¶ 88 (emphasis added).) None of Plaintiff's allegations about the timing of diner acquisition create a strong inference scienter. [5]

**(2) Grubhub's ultimately disappointing restaurant density at the end of the Class Period does not establish scienter.** Next, Plaintiff attempts to bolster its scienter theory by alleging that Grubhub could not have been acquiring high-quality diners because *by the "end of the Class Period"* Grubhub did not achieve "adequate restaurant density in the new markets" needed to attract those diners in the first place. (Opp'n at 12 (emphasis added).) But the fact that

---

[5] Plaintiff's cases involving blatant or criminal misconduct are inapplicable. (Opp'n at 11–13.) *See Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020) (finding scienter in case involving allegations of underlying illegal conduct, specifically an "unlawful kickback scheme"); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018) (finding scienter where defendant admitted that he expected insurance claims to increase as a result of reduced underwriting standards, yet concurrently attributed the increase to other factors "with an intent to deceive investors"); *City of Lakeland Emps.' Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *4 (N.D. Ill. Jan. 23, 2012) (finding that defendant acted with scienter with respect to misstatements regarding remediation because he "was a party to the Consent Decree with the FDA and present at many meetings with the FDA relating to remediation"); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255–56 (N.D. Ill. 1997) (finding scienter where defendant had committed accounting violations).

10

Grubhub did not ultimately achieve "adequate restaurant density" does not establish that Defendants knew, months earlier, that they were acquiring "low quality" diners.[6] This Court has been clear that "result-based reasoning, which attempts to infer scienter from . . . [a later outcome], is impermissible." *Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 797 (N.D. Ill. 2006). Inferring scienter from these allegations not only "requires a degree of speculation that the PSLRA does not tolerate," *Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *13 (N.D. Ill. Dec. 6, 2017), but it relies on hindsight, which cannot establish scienter. *Boeing*, 711 F.3d at 758.

> **(3) Grubhub's decision to refinance its debt and add non-partnered restaurants does not establish scienter.** Plaintiff theorizes that Grubhub's decisions to "refinance its debt" and "add non-partnered restaurants" establish scienter.[7] (Opp'n at 12.) Plaintiff alleges, without any support, that "[t]hese actions were clearly in response to the negative frequency trends." (Opp'n at 12 n.7.) Although Plaintiff acknowledges Defendants' argument that "negative trends did not exist at the time of their statements," Plaintiff still does not identify any purported negative trends

---

[6] Plaintiff's sole purported authority for its argument here is a nonbinding decision that in fact supports Defendants. (Opp'n at 12.) As the case makes clear, "[f]raud by hindsight claims are insufficient if a changeable condition exists and there is no evidence or facts pled which demonstrate that the changeable condition did not in fact change post-statement." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 329 (D. Mass. 2002). Here, diner quality is of course a dynamic trend, and Plaintiff alleges "no evidence or facts" suggesting that diner quality "did not change post-statement"—only that Grubhub should have known sooner the results of future trends.

[7] While Plaintiff claims that Grubhub should have disclosed certain "pilot tests" (adding non-partner restaurants in addition to partner restaurants) sooner than it did (*i.e.* sooner than the third quarter of 2019), Plaintiff does not allege that Grubhub was conducting pilot tests before that quarter. To rebut this shortcoming, Plaintiff quotes an analyst report, speculating that Grubhub had been doing pilot tests with "non-partnered restaurants for almost a year." (Opp'n at 12 n.7 (quoting Compl. ¶ 117).) But Plaintiff offers no support for this allegation, which conflicts with the Complaint, a pleading that alleges that Grubhub had been completing pilot tests only "for months." (Compl. ¶ 87.) Plaintiff also says that Defendants "made false statements as late as 30 or more days into 3Q19," but fails to explain why the timing of those statements triggered a duty to disclose in between quarters. (Opp'n at 12 n.7)

11

that existed at the time of the challenged statements.  (*See id.* at 14–15.)  Plaintiff's claim that Defendants have no "alternative explanation" for these actions is likewise false.  (Opp'n at 12, n.7.)  Grubhub disclosed that it refinanced to have some debt as a more permanent part of its capital structure and greater strategic flexibility if opportunities arise and that it added non-partnered restaurants because they provided an "efficient" and "cheap" short-term solution to restaurant density.  (Br at 15; Ex. 7 at 7.)  Critically, Plaintiff nowhere alleges that either statement was false.  Plaintiff also ignores another, more compelling inference:  that companies increase their liquidity for any number of good reasons, none of which have anything to do with fraud.[8]  The same is true of Defendants' decision to add non-partnered restaurants: the fact that Defendants explored new strategies does not establish that Defendants knew, months earlier, that Grubhub's partner model was "failing" or that they were making false statements to investors.  *See In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752, at \*19 (holding that allegations of "[m]ismanagement, a poorly timed shift in business strategy, or even negligence on the part of [the company's] management as to its optimism . . . will not support a claim of securities fraud.").

(4) **Maloney and DeWitt's access to information does not establish scienter.**  Plaintiff also argues that Maloney and DeWitt's access to unspecified "confidential information" about Grubhub establishes scienter.  (Opp'n at 13.)  But that is true of all corporate executives, which is why "a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information."  *Cornielsen*, 916

---

[8] Plaintiff does not attempt to distinguish Defendants' authority (Br. at 15) and instead relies on *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 285, 288 (S.D.N.Y. 2011) (*cited in* Opp'n at 12), in which the court held that contemporaneous misconduct, including defendants' decision to "secretly borrow[] hundreds of billions of dollars," established scienter where defendants were simultaneously telling investors they "had capital and liquidity strength."  Plaintiff alleges nothing similar here.

F.3d at 602. Indeed, this Court recently held that defendants' purported access to information did not establish scienter because plaintiff "fail[ed] to particularly identify *what type* of 'non-public and proprietary information' allegedly undermined [defendants'] statements." *Baxter*, 2021 WL 100457, at *14. So too here. Merely alleging that Defendants had access to "confidential information" (Opp'n at 13), without "stat[ing] with particularity the information to which Defendants had access," is insufficient. *See Fryman*, 462 F. Supp. 3d at 902 (dismissing scienter allegations that "[d]efendants, through the use of predictive analytics and their close monitoring of claims, 'had access to information that undermined the veracity' of their statements").

(5) **Plaintiff's "core operations" allegations do not establish scienter.** Plaintiff next theorizes that Defendants must have acted with scienter because "diner quality and restaurant density were critical to Grubhub and investors" and therefore part of Grubhub's core operations. (Opp'n at 13.) But this Court recently rejected this same argument—that "[o]fficers of a company can be assumed to know of facts critical to a business's core operations"—because Plaintiff did not "adequately allege the existence of any internal information that contradicted [the company's] public statements." *Fryman*, 462 F. Supp. 3d at 902. Here, allegations about the importance of diners and restaurants cannot establish scienter because Plaintiff does not allege with particularity the existence *any* specific, contemporaneous information relating to those elements that contradicted the challenged statements. *See City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) ("Vague allegations that defendants had 'access to undisclosed information' have been rejected under the PSLRA.").

(6) **The magnitude of Grubhub's "negative frequency trends" does not establish scienter.** Plaintiff also claims that Defendants must have acted with scienter because "the negative frequency trends" Grubhub disclosed in the third quarter of 2019 were "so severe" that Defendants

13

must have foreseen them. (Opp'n at 13.) But, as this Court has held, the PSLRA does not permit this sort of speculation:

> '[I]nferring scienter from the magnitude of fraud' requires a court to blend hindsight, speculation and conjecture to forge a tenuous chain of inferences: (1) because the magnitude of the fraud was large, conspicuous warning signs must have existed; (2) these warning signs must have been available to the [defendants] during the [relevant time frame]; (3) these warning signs must have made the fraud obvious and conspicuous to the [defendants]; and therefore (4) the [defendants] must have known of the fraud.

*Baxter*, 2021 WL 100457, at *18 (first alteration added, further alterations in original).

Moreover, Plaintiff's argument defies logic. How could Defendants have understood the magnitude of any purported negative trend at the time of the challenged statements when no such trend existed and, indeed, a trend takes time to reveal itself? Defendants emphasized this flaw in their opening brief (Br. at 1–2, 13–14), but Plaintiff has not offered a meaningful response.[9]

**(7) Defendants' "motive" to make Grubhub profitable does not plead scienter.**

Plaintiff also speculates that "Defendants had motive to inflate Grubhub's stock so they could more cheaply acquire companies." (Opp'n at 14.) But "evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient to raise a strong inference of scienter." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008). Plaintiff does not even attempt to distinguish Defendants' authority on this issue. (Br. at 12.) Nor does

---

[9] Plaintiff shoots at a strawman when it claims that Defendants want Plaintiff "to specifically quantify the negative trends." (Opp'n at 14.) Actually, Defendants argued that "Plaintiff fails to allege that Defendants had information about the magnitude of any long-term decline in ordering frequency in the first two quarters of 2019, when the challenged statements were made." (Br. at 14.) Plaintiff cites only *In re Groupon, Inc. Sec. Litig.*, 2013 WL 12284524, at *2 (N.D. Ill. Sept. 18, 2013), in support of its point, but the portion of that opinion on which Plaintiff relies addresses Section 11 and Section 12 of the Securities Act—which are provisions of a different securities statute that impose strict liability and require no showing of scienter at all.

Plaintiff identity any other motive to commit fraud. "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *Boeing*, 711 F.3d at 758.

**(8) Plaintiff's remaining arguments are unavailing.** Plaintiff tries to escape the clear conclusion that no contemporaneous data contradicted any of Defendants' statements by claiming that "[t]he fact that the Complaint relies on post-Class Period admissions does not make it 'fraud by hindsight.'" (Opp'n at 14.) But Defendants have never argued that Plaintiff's allegations are "fraud by hindsight" because they are based on statements made after the Class Period. Rather, Defendants argued that Plaintiff alleged no facts suggesting that Defendants had any information that rendered any of their statements false or misleading *at the time they were made*.

Finally, Plaintiff argues that "Defendants ask the Court to improperly draw inferences in their favor." (Opp'n at 15.) That is false. "In considering a motion to dismiss a securities-fraud claim, a court must consider 'plausible opposing inferences' and determine whether a reasonable person would 'deem the inference of scienter at least as strong as any opposing inference.'" *In re Chicago Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020). The most cogent and compelling inference that may be drawn from the Complaint is that Defendants sincerely believed their strategic investments would pay off and, as soon as it was available, transparently reported to stockholders data that cut in the other direction. Simply put, Plaintiff has failed to support the malicious inference that it asks the Court to draw.[10]

### CONCLUSION

For the foregoing reasons and those set out in Defendants' opening brief, the Complaint should be dismissed in its entirety and with prejudice.

---

[10] Because Plaintiff has failed to state a claim under Section 10(b) and Rule 10b-5, the Section 20(a) claim fails, too. *See, e.g.*, *Heartland Fin. USA, Inc. v. Fin. Institutions Capital Appreciation Partners, I, L.P.*, 2002 WL 31819008, at *8 (N.D. Ill. Dec. 12, 2002).

Dated:  March 3, 2021

Respectfully submitted,

*/s/ John F. Hartmann*

John F. Hartmann, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  312/862-2000
312/862-2200 (fax)
john.hartmann@kirkland.com

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Madelyn A. Morris
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  212/446-4800
212/446-4900 (fax)
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
madelyn.morris@kirkland.com

*Attorneys for Defendants*

**Appendix B: Bases for Dismissal with Respect to Each Allegedly False or Misleading Statement[11]**

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | **New Diner Quality Statements** | | | | |
| 1 | April 25, 2019<br><br>Supplemental Information Presentation to Q1 2019 financial results | ¶65(a) | "*Net active diner adds have increased dramatically while CPA* [cost per acquisition] *has remained relatively flat over multiple years*." | ✓ | | | |
| 2 | April 25, 2019<br><br>Supplemental Information Presentation to Q1 2019 financial results | ¶65(b) | "*Diner quality improving even with increased investment; retention rates higher than historical cohorts*." | ✓ | ✓ | | |
| 3 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>Maloney | ¶66(a) | "*We added 1.6 million active diners in the first quarter, another record*, and finished the quarter with 19.3 million active diners, up 28% from the prior year. *As we will highlight later, these new diners have repeat* | ✓ | ✓ | | |

---

[11] All emphasis appears as in Plaintiff's Opposition.

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | *rates just as high, if not higher than diners we acquired a year ago*. In summary, *early returns on our investments have been great, high-quality growth and already improving per order economics*." | | | | |
| 4 | April 25, 2019 2019 Q1 Earnings Call Maloney | ¶66(b) | "As you can tell by the strong growth in active diners during the quarter, the campaign attracted many new diners in the marketplace. *Diners that place[d] their first order with Taco Bell during the free delivery period are returning to Grubhub at the same or better rates as a typical diner even after we ended the free delivery campaign*. Some come back and order Taco Bell again, but the majority are trying other restaurants on the platform as well." | ✓ | | | |

2

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| 5 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>DeWitt | ¶66(c) | "We believe that in aggregate, the Taco Bell campaign contributed an incremental few hundred thousand new diners and 100 to 150 basis points of incremental DAG growth during the quarter. *These new diners are high quality returning just as frequently as newly acquired diners from other channels* and they return to Taco Bell, but also engage with other restaurants on the marketplace at a high rate." | ✓ | ✓ | | |
| 6 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>Maloney | ¶66(d) | "We've also noted more recently that because of all the improvements in our platform and marketing, *we've been able to acquire high-quality new diners in* older and *newer markets* alike *even as we've dramatically increased marketing spend and new diner volume*." | ✓ | ✓ | | ✓ |
| 7 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>DeWitt | ¶66(e) | "Given the ramp in our investment pace in the fourth quarter, *we thought this was a good time to share additional metrics that help illustrate the stickiness of our marketplace, our ability to attract high-quality diners and reinforce our decision to* | ✓ | ✓ | | |

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | be more aggressive in marketing and with delivery market launches." | | | | |
| 8 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>DeWitt | ¶66(f) | "I can't speak to their economics. All I can point you to is our numbers, which show you that we've been able to acquire a lot more diners . . . *you're seeing the diners improve in quality over time* . . . I don't know if you've [had] a chance to read through the supplemental deck, *but the repeat rates on our January and February 2019 diners are higher across all of our markets than they were in 2018 or 2017. So the quality is going up*. *We're spending more money and the cost isn't increasing. And so the formula is working for us*," adding that "*the underlying growth in our business is stronger now than it has been in any point in the last two years*." | ✓ | ✓ | | ✓ |
| 9 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>DeWitt | ¶74(a) | "*Active diners grew 30% year-over year to 20.3 million* . . . [the 6% sequential decline in DAGs from 1Q 2019 to 2Q 2019] *was a bit exaggerated this year by the Taco Bell national television and free delivery campaign in the first quarter* | ✓ | ✓ | | |

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | that Matt referenced *as well as the timing of the Easter holiday*, which we mentioned last quarter." | | | | |
| 10 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(d) | "*Calculated orders per active diner was lower than last year* as it has been in past quarters*. But as a reminder, this isn't really a fair way to measure the activity of our individual diners for 2 reasons: first, we continue to mix shift away from New York in corporate diners where diners have a materially higher frequency than any other market in the U.S.*; and second, and perhaps slightly more nuanced*, we stepped up net diner additions in recent quarters*.<br><br>*Having a higher percentage of new diners distorts the frequency calculation because they have not been on the platform for the entire quarter, and they also continue to increase frequency in future years*." | ✓ | ✓ | | |
| 11 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(e) | "I talked a little bit about frequency and what is weighing on frequency. And I think that is a structural headwind as opposed to an ephemeral headwind because the diners in New York and the diners in corporate are | ✓ | ✓ | | ✓ |

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | going to – are always going to order more than the newest diners outside of New York and corporate. *As we look out into the farther markets, we are seeing good frequencies and ramps in frequencies over time*. I think the other thing that – *the other impact that will go away over time that's weighing on frequency a little bit is that we've gone through this period of really strong new diner acquisition*. And so just mathematically, when you have newer diners disproportionately in your active diner base, it's going to weigh on frequency a little bit. *So that impact should go – would go away over time* if new diner growth doesn't stay at a super high level, but the other kind of structural difference will be there forever." | | | | |
| 12 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(f) | "We have now operated in these new Grubhub Delivery markets for a couple of quarters and *as expected, diners in these markets are behaving a lot like diners do in other markets*. Specifically, *the order frequency of diners increases with the introduction of Grubhub Delivery,* | ✓ | ✓ | | |

6

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | *which improves restaurant inventory in a market and the average order values in these newer delivery markets regardless of population size or density in the market, are in line with other more established Grubhub markets*." | | | | |
| 13 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(g) | "*We are still finding plenty of opportunities to acquire diners at a reasonable cost*." | ✓ | ✓ | | |
| 14 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(g) | "[L]et's say, look, it costs us $100 to acquire a new diner but there's no way we think that the diner's ever going to be worth a total of $50, *we're not going to go out and make that trade off. We're still taking a view of hey, overall – based on the behavior that we see, based on profitability of the orders that we have and based on our infrastructure and everything else, what the value is over time.* And we're finding a lot of opportunities to deploy capital to do that. And frankly, *we're doing it -- a better job of it now than we were a year ago or* | ✓ | ✓ | | |

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | *18 months ago, as you can see in the diner growth.*" | | | | |
| 15 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>De Witt | ¶74(h) | "[T]he way to think about sales and marketing expense. We've always talked about as being 95% plus related to new diner acquisition, and we have – the number that we disclosed is net active diners, not gross new diners. And so *last quarter, we had a supplemental disclosure where we showed you guys what that gross CPA* [cost per acquisition] *looked like over time and what I'd say is that trend hasn't changed. We're still seeing plenty of opportunities to acquire new diners at a reasonable cost and that has not increased the cost there, whether*<br><br>*it's competitive or running out of runway or not launching.* Whatever it is, *we haven't seen a headwind on our ability to acquire new diners at similar cost as we have over the past several quarters*." | ✓ | ✓ | | |
| 16 | July 30, 2019<br><br>2019 Q2 Earnings Call | ¶74(i) | Analyst: "And one further clarification on this. Have you seen any indication – I know you said in the past that you're not fighting for | ✓ | ✓ | | |

8

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | De Witt | | share of stomach in marketing. But have you seen any data that suggests your diners are using multiple different services or different apps over the course of a month? Or are they really sticking to a single platform?" DeWitt: "Yes, *we haven't seen it*. I mean what I can tell you is once a cohort becomes stable, *we're still seeing really consistent behavior like what we showed you in the supplemental disclosure deck last quarter*. So I can't remember what year it was. It was '15, '16 or '17 cohort. *We're not seeing that change, and we didn't see a change last quarter and it didn't – it hasn't changed in an appreciable way this quarter either*. So *if it's happening, it's happening in addition, as opposed to substitutive*." | | | | |
|  | **Restaurant Density Statements** | | | | | | |
| 17 | April 25, 2019 2019 Q1 Earnings Call Maloney | ¶66(d) | "Over the years, we've noted over and over again that *our disciplined approach to diner acquisition, our broad and deep restaurant network and our ever-improving user experience create incredibly sticky* | ✓ | ✓ | | ✓ |

9

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| | | | *diner cohorts that should bring value to Grubhub for years to come*." | | | | |
| 18 | May 10, 2019<br><br>2019 Q1 10-Q | ¶69 | "*The Company experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sales*, during the three [and six months] ended March 31, 2019 as compared to the same period in the prior year. *Growth in all metrics was primarily attributable to* increased product and brand awareness by diners largely as a result of marketing efforts and word-of-mouth referrals, *better restaurant choices for diners in our markets* and technology and product improvements." | ✓ | | ✓ | |
| 19 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>Maloney | ¶74(b) | "*In these newer delivery markets, we had another quarter of strong* momentum and *DAG growth with the added restaurant inventory helping these markets scale*." | ✓ | ✓ | | |
| 20 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>DeWitt | ¶74(c) | "*Our strong active diner growth is a result of our ever-improving restaurant network*, efficient advertising and broad delivery coverage." | ✓ | ✓ | | |

10

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| 21 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>DeWitt | ¶74(f) | "We have now operated in these new Grubhub Delivery markets for a couple of quarters and *as expected, diners in these markets are behaving a lot like diners do in other markets*. Specifically**, the order frequency of diners increases with the introduction of Grubhub Delivery, which improves restaurant inventory in a market and the average order values in these newer delivery markets regardless of population size or density in the market, are in line with other more established Grubhub markets**." | ✓ | ✓ | | |
| 22 | August 6, 2019<br><br>2019 Q2 10-Q | ¶78 | "*The Company experienced significant growth across all of its key business metrics, Active Diners, Daily Average Grubs and Gross Food Sales*, during the three and six months ended June 30, 2019 as compared to the same period in the prior year. *Growth in all metrics was primarily attributable to* increased product and brand awareness by diners largely as a result of marketing efforts and word-of-mouth referrals, *better restaurant choices for diners* | ✓ | | | |

11

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
|  |  |  | *in our markets* and technology and product improvements." |  |  |  |  |
| **Profitability Statements** |  |  |  |  |  |  |  |
| 23 | April 25, 2019<br><br>2019 Q1 Earnings Call<br><br>Maloney | ¶66(g) | "In terms of fees, while major brands do have more leverage than local restaurants, *we are not as impacted in the pricing conversation because we actually bring real value and we're helping brands build a long-term and profitable business. So we're paid fairly for our services, which then allows us to achieve long-term sustainable economics*, which I think you also know is rather unique in our industry." | ✓ | ✓ | ✓ |  |

12

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| 24 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>DeWitt | ¶74(g) | "[L]et's say, look, it costs us $100 to acquire a new diner but there's no way we think that the diner's ever going to be worth a total of $50, *we're not going to go out and make that trade off. We're still taking a view of hey, overall – based on the behavior that we see, based on profitability of the orders that we have and based on our infrastructure and everything else, what the value is over time.* And we're finding a lot of opportunities to deploy capital to do that. And frankly, *we're doing it -- a better job of it now than we were a year ago or 18 months ago, as you can see in the diner growth.*" | ✓ | ✓ | | |
| 25 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>Maloney | ¶74(j) | "*There are a lot of players right now, making a lot of poor business decisions . . . we've been very consistent that our business is founded on partnership, working with restaurants, understanding what the restaurants really need and trying to help them achieve their business goals in digital pickup.*" | ✓ | | ✓ | |

| No. | Date of Statement | Complaint Paragraph | Statement | Not False/ Misleading | Inactionable Opinion | Immaterial Puffery | PSLRA Safe Harbor |
|---|---|---|---|---|---|---|---|
| 26 | July 30, 2019<br><br>2019 Q2 Earnings Call<br><br>DeWitt | ¶74(k) | "*[W]e have a very profitable model in terms of long-term sustainability, the breadth of restaurants, the combination of how we charge diners and what the restaurants pay us and the formula works*." | ✓ | ✓ | ✓ | |

14

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2021, I electronically filed Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

*/s/ John F. Hartmann*