UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GRUBHUB INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:19-cv-07665<br><br>CLASS ACTION<br><br>Judge Charles R. Norgle Sr.<br>Magistrate Judge Jeffrey Cole |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVE AND CLASS COUNSEL**

4879-1818-0638.v6

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...............................................................................................1

II.    ALLEGATIONS COMMON TO THE CLASS ................................................3

III.   THE PROPOSED CLASS REPRESENTATIVES .............................................6

IV.    THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
       CERTIFICATION UNDER RULE 23 .............................................................7

       A.    Legal Standard ......................................................................................7

       B.    The Proposed Class Satisfies the Standards for Class Certification Under
             Rule 23(a) ..............................................................................................9

             1.    The Class Is so Numerous that Joinder Is Impracticable ............9

             2.    Common Questions of Law and Fact Exist ...............................10

             3.    The Proposed Class Representative's Claims Are Typical of Those
                   of the Class .............................................................................12

             4.    The Proposed Class Representatives Will Fairly and Adequately
                   Protect the Interests of the Class ..............................................13

             5.    The Court Should Appoint Plaintiffs' Choice of Counsel as Class
                   Counsel Under Rule 23(g) ........................................................15

       C.    The Proposed Class Satisfies the Standards for Class Certification Under
             Rule 23(b)(3) .......................................................................................16

             1.    Common Questions of Law and Fact Predominate ...................16

             2.    Plaintiffs Are Entitled to the Fraud-on–the-Market Presumption of
                   Reliance ..................................................................................18

             3.    Grubhub Common Stock Traded in an Efficient Market During the
                   Class Period ............................................................................19

                   a.    Grubhub Common Stock Traded on the NYSE .............20

                   b.    *Cammer* Factor 1: High Weekly Trading Volume ........21

                   c.    *Cammer* Factor 2: Significant Financial Analysts and
                         Media Coverage ..........................................................21

**Page**

        d.      *Cammer* Factor 3: Numerous Market Makers and Institutional Investors.......................................................................22

        e.      *Cammer* Factor 4: Form S-3 Registration Statement Eligibility .....................................................................................23

        f.      *Cammer* Factor 5: The Cause and Effect Relationship Between Unexpected Material Disclosures and Changes in the Price of Grubhub Stock..............................................................24

        g.      *Krogman* Factor 1: Large Market Capitalization...........................25

        h.      *Krogman* Factor 2: Small Bid-Ask Spread ...................................26

        i.      *Krogman* Factor 3: Publicly-Traded Float....................................26

    4.      Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology ..............................................................27

    5.      A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy.......................................28

V.    CONCLUSION..........................................................................................................29

- ii -

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)......................................................................................................17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).................................................................................... *passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...................................................................................................2, 18

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................................22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)........................................................................................................28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)......................................................................................................17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).......................................................................................2, 17, 18, 19

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) .................................................................................14

*Holwill v. AbbVie Inc.*,
2021 WL 7366274 (N.D. Ill. Sept. 23, 2021) ................................................1, 2, 8

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020)
*on remand* 2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)........................................17

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................................23

*In re Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018).................................................................................15

*In re Groupon, Inc. Sec. Litig.*,
2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) ................................................ *passim*

4879-1818-0638.v6

**Page**

*In re Groupon, Inc. Sec. Litig.*,
  2015 WL 1043321 (N.D. Ill. Mar. 5, 2015),
  *objections overruled*, 2015 WL 13628131
  (N.D. Ill. May 12, 2015) ................................................................................................ *passim*

*In re Nature's Sunshine Prod. Inc. Sec. Litig.*,
  251 F.R.D. 656 (D. Utah 2008) ...............................................................................21, 22

*In re NeoPharm, Inc. Sec. Litig.*,
  225 F.R.D. 563 (N.D. Ill. 2004).............................................................................11, 29

*In re NetBank, Inc. Sec. Litig.*,
  259 F.R.D. 656 (N.D. Ga. 2009)............................................................................26, 27

*In re Sandridge Energy, Inc. Sec. Litig.*,
  2019 WL 4752268 (W.D. Okla. Sept. 30, 2019) .....................................................16

*In re Stericycle, Inc.*,
  2017 WL 635142 (N.D. Ill. Feb. 16, 2017) .............................................................13

*In re Sys. Software Assocs., Inc. Sec. Litig.*,
  2000 WL 1810085 (N.D. Ill. Dec. 8, 2000)..............................................................9

*Jaffe v. Household Int'l, Inc.*,
  No. 02-C-05893 (N.D. Ill. Oct. 20, 2016)................................................................16

*Karinski v. Stamps.com*,
  2020 WL 6572660 (C.D. Cal. Nov. 9, 2020)...........................................................16

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ..............................................................................10, 11

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................20, 25, 26

*La. Firefighters' Ret. Sys. v. N. Tr. Invs., N.A.*,
  312 F.R.D. 501 (N.D. Ill. 2015)..............................................................................12

*Levitan v. McCoy*,
  2003 WL 1720047 (N.D. Ill. Mar. 31, 2003)...........................................................8

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
  256 F.R.D. 586 (N.D. Ill. 2009)..............................................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)....................................................................................................17

- iv -

**Page**

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................................26, 27

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ..............................................................................................8, 17

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
    2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...................................................................... *passim*

*Roth v. Aon Corp.*,
    238 F.R.D. 603 (N.D. Ill. 2006) (Norgle, J.) .................................................................... *passim*

*Schleicher v. Wendt*,
    2009 WL 761157 (S.D. Ind. Mar. 20, 2009),
    *aff'd*, 618 F. 3d 679 (7th Cir. 2010).......................................................................................20

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ........................................................................................1, 8, 19

*Silverman v. Motorola, Inc.*,
    259 F.R.D. 163 (N.D. Ill. 2009)........................................................................................ *passim*

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) .................................................................................................10

*Tatz v. Nanophase Techs. Corp.*,
    2003 WL 21372471 (N.D. Ill. June 13, 2003) ................................................................. *passim*

*Villella v. Chem. & Mining Co. of Chile, Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ............................................................................................16

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
    2018 WL 1535156 (N.D. Ill. Mar. 29, 2018).........................................................8, 27, 29

## STATUTES, RULES AND REGULATIONS

17 C.F.R.
    §239.13.....................................................................................................................................23

Rule 23 of the Federal Rules of Civil Procedure ................................................................... *passim*

4879-1818-0638.v6

## I.    INTRODUCTION

City of Pontiac Reestablished General Employees' Retirement System ("Retirement System") and City of Pontiac Police & Fire Retirement System ("Police & Fire") (collectively, "Plaintiffs"),[1] respectfully submit this memorandum of law in support of the motion for class certification requesting that, pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g), the Court: (i) certify a class consisting of: All persons and entities that, during the period between April 26, 2019 and October 28, 2019, inclusive, purchased or otherwise acquired shares of the publicly traded common stock of Grubhub, Inc. ("Grubhub" or "Company") and were damaged thereby;[2] (ii) appoint Plaintiffs as Class Representatives; and (iii) designate Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

The Seventh Circuit and this Court have made clear that "[w]hen a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action" and "class certification is routine." *Schleicher v. Wendt*, 618 F.3d 679, 681-82 (7th Cir. 2010); *Holwill v. AbbVie Inc.*, 2021 WL 7366274, at \*2-\*3 (N.D. Ill. Sept. 23, 2021) (Norgle, J.) (stating that a securities fraud class action initiated "against a large, public company for alleged misrepresentations affecting the company's stock price . . . generally meets the standards for

---

[1]    On January 20, 2020, City of Pontiac General Employees Retirement System ("GERS") and Police & Fire were appointed Lead Plaintiff in this action.  ECF 25.  As set forth in Lead Plaintiff's Unopposed Motion to Substitute Lead Plaintiff, filed concurrently herewith, GERS has been replaced by the Retirement System.

[2]    Excluded from the Class are Defendants, Grubhub's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries and affiliates and members of their immediate families, any entity in which such excluded persons have or had a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity. Defendants are Grubhub, its former Chief Executive Officer ("CEO") Matthew Maloney ("Maloney"), and its former Chief Financial Officer ("CFO") and current CEO Adam DeWitt ("DeWitt") (Maloney and DeWitt are the "Individual Defendants").

- 1 -

4879-1818-0638.v6

certifying a class action").[3] This case is no exception. Just as in *AbbVie* and other securities cases in this District, this action is perfectly suited for class certification because it alleges securities law violations against a large, public company and its executives for making false and misleading statements that affected the price of Grubhub stock, which trades on the New York Stock Exchange ("NYSE"), a large and efficient market.

This action readily meets the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy. First, the proposed Class likely consists of thousands of injured investors dispersed throughout the country. Second, Class members' claims arise from a common course of misconduct by Defendants. Third, Plaintiffs' claims are typical of the Class because they were similarly injured by purchasing Grubhub stock during the Class Period at prices artificially inflated by Defendants' false and misleading statements, and suffered losses when the truth was revealed and the artificial inflation was removed. And fourth, Plaintiffs and Class Counsel have and will continue to adequately represent the Class, as reflected by their active and zealous representation of the interests of the Class to date, including defeating Defendants' motion to dismiss.

In addition, this action meets Rule 23(b)(3)'s predominance requirement because numerous common issues of fact and law are subject to common proof and plainly predominate over any individual issues. For example, because the market for Grubhub stock was efficient during the Class Period, as confirmed by the accompanying expert report by Chad Coffman ("Coffman Report"), all Class members are entitled to the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*"). As further evidence of predominance, the Coffman Report also explains that damages may be calculated based on a class-

---

[3]    Unless indicated otherwise, internal citations and quotations are omitted, and emphasis is added.

- 2 -

wide methodology that is consistent with Plaintiffs' theory of liability. And finally, as required by Rule 23(b)(3), proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims.

## II.     ALLEGATIONS COMMON TO THE CLASS

As set forth in Lead Plaintiff's Complaint for Violations of the Federal Securities Laws (ECF 36) (the "Complaint"), Grubhub was an early entrant in the online food ordering and delivery business. ¶¶2, 24.[4] More specifically, Grubhub maintains an online platform of listed restaurants, and its customers (diners) can search the platform, place an order through Grubhub, and the food will be delivered. *Id.* Historically, Grubhub relied on a "partnered" business model, meaning the Company would enter into agreements with restaurants before placing their menus on the Grubhub platform. ¶25. Grubhub would then receive commission payments on orders from the partnered restaurants, along with fees received directly from diners. ¶28. By contrast, Grubhub's competitors used a "non-partnered" model, which allowed them to add any area restaurant menu to their platforms without formal agreements. ¶40. In doing so, the Company's competitors earned no commission, but earned the fees charged to the diner. *Id.* Historically, Defendants refused to add non-partnered restaurants to Grubhub's platform and criticized the strategy as "the wrong long-term answer for diners, restaurants and shareholders," "expensive for everyone," "rife with operational challenges," and "unsustainable." ¶¶41, 60, 114-115.

Leading up to 2018, Grubhub began to lose market share to competitors in its existing markets, and decided to engage in rapid expansion to more than 200 new markets. ¶¶44-52. Whereas Grubhub's competitors could rapidly add restaurants to their platforms in new markets, Grubhub needed to negotiate partner contracts with all the restaurants it added, delaying Grubhub's

---

[4]     Unless otherwise noted, all "¶__" and "¶¶__" citations refer to paragraphs of the Complaint.

ability to expand into new markets.  ¶40.

To try to gain restaurant density in the new markets, while adhering to its partnered strategy, Grubhub began partnering with large "enterprise" restaurants in 2018 – such as Taco Bell and KFC – to use as "anchor" tenants in new markets, around which Grubhub would then try to build restaurant inventory.  ¶¶50-56.  However, expansion was only profitable if it resulted in the acquisition of "high quality" diners.  ¶¶57-61.  As Maloney explained, "high-quality" diners are "diners that . . . order[] more frequently."  ¶33.  The largest determinant of diner quality is the number of restaurants on the platform for a given area (or "restaurant density"), as diners are not likely to return to the platform if their desired restaurants are unavailable.  ¶39.

When Grubhub expanded to the new markets in 2018, it could not build sufficient restaurant density, and the new diners that came to Grubhub for promotional discounts or the inexpensive enterprise restaurants ordered less frequently and were not nearly as profitable or loyal as Grubhub's historical diners.  ¶¶33, 62-63, 83-88.  The quality of new diners was a central focus of investors and was discussed regularly during earnings calls.  *See* ¶¶100-108.  Defendants were aware of the negative trends in diner quality because, throughout the Class Period, Defendants meticulously "observe[d]" and "test[ed]" diner behavior and frequency to determine diner quality. ¶¶34-35, 47, 52, 62-63, 88, 102-107.  Seeing the negative trends of lower-quality diners in the new markets, Defendants internally abandoned Grubhub's longstanding partnered model of 15 years in favor of the long-maligned non-partnered model in a desperate attempt to ramp up restaurant density, reverse negative trends, and stem losses.  ¶¶117-119.  Defendants began adding non-partnered restaurants in early 2019 and refinanced Grubhub's debt in June 2019 to free up cash to engage in the non-partnered strategy.  ¶¶87, 117-119.  If not for the existence of negative diner-quality trends, Grubhub had no reason to change its business model to add non-partnered restaurants or to refinance its debt.  *Id.*

- 4 -

4879-1818-0638.v6

Nevertheless, during the Class Period, Defendants concealed the change in strategy and the negative trends that caused it, by claiming Grubhub's expansion into new markets was a success. For example, they claimed the new diners were "high quality" and even that "diner quality was improving." ¶¶65-67. Defendants emphasized that the partnered model continued to be "very profitable" and "sustainab[le]" thanks to Grubhub's "breadth of restaurants" and "better restaurant choices." ¶¶69, 74(k), 78. When reported metrics declined, Defendants blamed factors other than diner quality, such as the "timing of the Easter Holiday." ¶74(a). As a result of Defendants' false or misleading statements, Grubhub stock traded at artificially inflated prices, up to $79 per share. ¶132.

Then, after the market closed on October 28, 2019, after reporting two consecutive quarters of declining DAG growth, Defendants belatedly admitted that the declines were a result of negative trends in new diner ordering frequency.[5] ¶¶80-84. Defendants disclosed that "the value of our new diners is not as high as it has been in the past due to . . . lower [ordering] frequencies." ¶83. They explained that the lower frequencies were "more pronounced" for diners in the new markets, i.e., those acquired "at the end of 2018 and the first half of 2019." Id. Defendants admitted Grubhub's non-partnered competitors had superior restaurant density where "new potential diners find more restaurants." ¶84. Defendants also disclosed for the first time that Grubhub had been "putting non-partnered restaurants on the platform." ¶85. The next morning, Maloney admitted that Grubhub had "been piloting this [non-partnered strategy] for months" and had "tens of thousands of non-partnered restaurants already listed." ¶87. Maloney admitted that the lower-quality new diners acquired in the new markets "were stolen diners, who had a history of ordering

---

[5] Daily Average Grubs or "DAGs" is the number of orders placed on the Grubhub platform divided by the number of days in the quarter or year. DAGs was a primary metric the Company and analysts used to track and assess Grubhub's growth. ¶32(b).

4879-1818-0638.v6

on other platforms, and we didn't have the same restaurant network in many of these communities . . . so the fact that they're performing a little bit less, I think, is pretty logical." ¶88.

After these disclosures, the price of Grubhub stock crashed by 43%, from $58 per share to $33 per share. ¶90. Reflecting the view that Defendants had not been candid, analysts said "management will face a steep climb in an effort to regain Street credibility" and that the strategy change was "clearly an about-face from the arrows shot at competitor strategies on prior conference calls." ¶91(a), (d).

## III. THE PROPOSED CLASS REPRESENTATIVES

The proposed Class Representatives, the Retirement System and Police & Fire, already expended substantial time and effort in informing themselves about this case, working with counsel to vigorously prosecute this action on behalf of the Class, and participating in discovery. Plaintiffs have represented the Class by overseeing the litigation, communicating with Lead Counsel, and responding to Defendants' discovery requests. Plaintiffs have worked, and will continue to work, aggressively to obtain critical evidence supporting the Class' claims.

The Retirement System and Police & Fire are large institutional investors. The Retirement System is a defined benefit municipal retirement plan with hundreds of millions of dollars in assets under management providing benefits to plan participants and beneficiaries. *See* Declaration of Sheldon Albritton on behalf of Lead Plaintiff in Support of Lead Plaintiff's Motion for Class Certification ("Albritton Decl."), ¶2, attached as Exhibit 1 to the Declaration of Robert J. Robbins in Support of Lead Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel ("Robbins Decl."). Police & Fire is also a defined benefit plan, with more than $200 million in assets under management providing benefits to plan participants and beneficiaries. *See* Declaration of Craig Storum on behalf of Lead Plaintiff in Support of Lead Plaintiff's Motion for Class Certification ("Storum Decl."), ¶2, attached as Exhibit 2 to the Robbins

- 6 -

4879-1818-0638.v6

Decl.

Although GERS was appointed Lead Plaintiff along with Police & Fire, GERS has since been formally re-established as the Retirement System. ECF 25; Albritton Decl., 1 n.1. As explained in the accompanying Unopposed Motion to Substitute Lead Plaintiff, the alleged losses suffered by GERS in this action have been assumed by the Retirement System, and the Retirement System will continue to zealously represent the interests of the Class. The Retirement System – both as currently reestablished and while operating as GERS – and Police & Fire have worked diligently and collaboratively to prosecute this Action, and will continue to do so. *See* ECF 18-4, 20 at 5; Albritton Decl., ¶¶4-6; Storum Decl., ¶¶4-6.

## IV. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

### A. Legal Standard

Rule 23(a) permits class treatment where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a proposed class action must satisfy at least one of the three conditions imposed by Rule 23(b). Here, Plaintiffs move for class certification under Rule 23(b)(3), which permits certification where: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In determining whether class certification is appropriate, courts focus on the narrow question of whether the requirements of Rule 23 are satisfied. *See Amgen Inc. v. Conn. Ret. Plans*

- 7 -

& Tr. Funds, 568 U.S. 455, 465-66 (2013). Indeed, while the Court's analysis should be "rigorous," Rule 23 does not grant courts "license to engage in free-ranging merits inquiries at the class certification stage." *Id.* at 460, 465-66 ("the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case"). The question is not whether Plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *See In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014) (Norgle, J.) ("*Groupon I*") ("'[T]he court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.'") (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)).

Courts in this Circuit routinely find securities law claims, such as those here, to be uniquely appropriate for class treatment. *See Roth v. Aon Corp.*, 238 F.R.D. 603, 605-06 (N.D. Ill. 2006) (Norgle, J.) (recognizing that in the Seventh Circuit, there is a "strong policy favoring class certification" in securities actions, and Rule 23 is therefore "liberally construe[d]"); *see also Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *2 (N.D. Ill. Mar. 29, 2018) (Rule 23's requirements are to be "liberally construed in favor of maintaining securities fraud class actions"); *Tatz v. Nanophase Techs. Corp.*, 2003 WL 21372471, at *3 (N.D. Ill. June 13, 2003) ("The Seventh Circuit Court . . . has liberally construed Rule 23 in shareholder suits.").

This policy is rooted in the fact that "securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing." *Levitan v. McCoy*, 2003 WL 1720047, at *2 (N.D. Ill. Mar. 31, 2003). As the Seventh Circuit succinctly put it, "[w]hen a large public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action." *Schleicher*, 618 F.3d at 681-82; *see also AbbVie*, 2021 WL 7366274, at *2.

- 8 -

4879-1818-0638.v6

As set forth below, all of the requirements of Rule 23 are met and Plaintiffs' motion should be granted in its entirety.[6]

> **B.** **The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(a)**

> **1.** **The Class Is so Numerous that Joinder Is Impracticable**

Rule 23(a)(1) requires that the class "is so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). A plaintiff need not identify the exact number of class members, but rather may rely on reasonable inferences drawn from available facts to estimate the size of the proposed class. *See Tatz*, 2003 WL 21372471, at *6 (inferring hundreds of class members based on 13 million shares traded over the entire relevant time period). While there is no bright line test, courts have found that classes with "as few as 10 to 40 members" satisfy numerosity. *Id.* at *5. In securities fraud actions involving "nationally traded securities, numerosity may be assumed." *In re Sys. Software Assocs., Inc. Sec. Litig.*, 2000 WL 1810085, at *1-*2 (N.D. Ill. Dec. 8, 2000); *see also Groupon I*, 2014 WL 5245387, at *1 (putative class was sufficiently numerous when 40.25 million shares of stock were outstanding).

Numerosity is clear here. The Class in this case easily exceeds 40 members, as Grubhub had between 91.1 million and 91.4 million shares of common stock outstanding during the Class Period. *See* Coffman Report, attached as Exhibit 3 to the Robbins Decl., ¶73; *see also* Defendants' Responses And Objections To Lead Plaintiff's First Set Of Requests For Admission To All Defendants, Nos. 53, 54, attached as Exhibit 4 to the Robbins Decl. ("Defs' RFAs Response") (admitting, subject to objections, that "as of August 2, 2019, Grubhub had 91,353,172 shares of

---

[6] The proposed Class meets the "implicit requirement of 'ascertainability'" because it is "defined clearly and based on objective criteria." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *2, *8 n.7 (N.D. Ill. Feb. 26, 2020) (certifying class and finding ascertainability met because class was defined with "boundaries set both temporally and as to an identified type of security (common stock of TreeHouse purchased on the open market), thereby allaying any ascertainability concerns").

4879-1818-0638.v6

common stock that were outstanding" and "that there were more than 50 investors who purchase[d] or acquired Grubhub common stock during the Class Period").

In addition, during the Class Period, 585 institutional investors owned Grubhub common stock, the Company had an average market capitalization of $5.96 billion, and the average weekly trading volume of Grubhub stock was approximately 12.29 million shares on the NYSE. Coffman Report, ¶¶35, 74, 79; *see also* Defs' RFA Response Nos. 48, 59, 60 (admitting, subject to objections, that Grubhub traded on the NYSE, had an average market capitalization of $5.96 billion during the Class Period, and that Grubhub had an average daily trading volume of approximately 2.48 million shares). As such, there are hundreds, if not thousands, of members of the proposed Class who are geographically dispersed. *See Groupon I*, 2014 WL 5245387, at *1 (certifying securities class action and noting that "343 record holders existed . . . which likely represent thousands of individual shareholders of Groupon common stock").

### 2. Common Questions of Law and Fact Exist

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is not difficult to meet" and "has been characterized as a low hurdle, easily surmounted." *Roth*, 238 F.R.D. at 606. To be sure, commonality does not "require[] that *every* question be common." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (emphasis in original). Rather, the commonality requirement is usually satisfied by showing a "common nucleus of operative fact," which typically is found when "the defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

Courts in this District routinely conclude that the commonality requirement is satisfied in securities fraud actions just like this one. *See, e.g.*, *Tatz*, 2003 WL 21372471; *Roth*, 238 F.R.D. at 609; *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 169 (N.D. Ill. 2009). In such actions, common

- 10 -

4879-1818-0638.v6

questions of law and fact are present where the alleged fraud involves a defendant corporation's false and misleading statements to the public that artificially inflated the corporation's stock price, and ultimately resulted in damages sustained by the corporation's stockholders. *See Tatz*, 2003 WL 21372471, at *6; *Roth*, 238 F.R.D. at 605; *Motorola*, 259 F.R.D. at 166-67, 169; *see also Groupon I*, 2014 WL 5245387, at *1 (finding commonality "because at the heart of Lead Plaintiff's claims, and common to the class, are whether Defendants materially misrepresented or omitted" information in their statements to the market).

Plaintiffs easily clear the commonality requirement's "low hurdle." Plaintiffs and the Class' claims and injuries all arise out of Defendants' "standardized conduct towards members of the proposed class" – Defendants' material misstatements and omissions. *See Keele*, 149 F.3d at 594. Specifically, Plaintiffs allege that Defendants made materially false or misleading statements and omissions regarding, among other things, the quality of diners that Grubhub was acquiring in new markets, restaurant density, and Defendants' business model and sustainability. *See, e.g.*, ¶¶3, 41, 60, 63-66, 69, 74, 78, 114-115, 117-119.

Plaintiffs' allegations raise questions of law or fact common to all members of the Class, including whether: (1) Defendants violated the Securities Exchange Act of 1934 (the "Exchange Act"); (2) Defendants' statements misrepresented or omitted material facts; (3) Defendants acted knowingly or recklessly; (4) the price of Grubhub common stock was artificially inflated during the Class Period; and (5) investors suffered damages as a result of the decline in the value of Grubhub common stock when the truth was revealed. *See* ¶149. Questions like these routinely satisfy the commonality requirement. *See Roth*, 238 F.R.D. at 608 (common questions included whether defendants violated the federal securities laws and did so with scienter, and whether the company's stock price was artificially inflated); *In re NeoPharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 566 (N.D. Ill. 2004) (same). Therefore, the commonality requirement is satisfied.

4879-1818-0638.v6

### 3. The Proposed Class Representative's Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *La. Firefighters' Ret. Sys. v. N. Tr. Invs., N.A.*, 312 F.R.D. 501, 507 (N.D. Ill. 2015). Typicality is satisfied by showing that the class representative's claims share the "same essential characteristics as the claims of the class at large." *Motorola*, 259 F.R.D. at 169. Typicality does not require that each class member "suffer exactly the same injury" as the class representative. *Tatz*, 2003 WL 21372471, at *6. Courts "liberally construe" the typicality requirement. *Roth*, 238 F.R.D. at 606. In fact, "[a] finding that commonality exists generally results in a finding that typicality also exists." *Tatz*, 2003 WL 21372471, at *6.

The claims here satisfy the typicality requirement because they "arise[] from the same . . . course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *La. Firefighters'*, 312 F.R.D. at 507. Like all members of the Class, Plaintiffs purchased Grubhub common stock during the Class Period at prices artificially inflated by the same materially false or misleading statements and omissions. Plaintiffs, just like all other Class members, also suffered losses when the truth about Defendants' misleading statements and omissions was revealed and the artificial inflation was removed from the price of Grubhub common stock. *See, e.g.*, *Groupon I*, 2014 WL 5245387, at *1 (finding typicality because lead plaintiff in securities fraud case, like other class members, purchased stock during class period and "all were affected by the materially false and misleading statements alleged").

Plaintiffs' claims are not merely similar to those of other Class members, they are virtually

- 12 -

4879-1818-0638.v6

identical and will be proven with common evidence.  Because the same course of conduct injured Plaintiffs and all other Class members, and Plaintiffs will make the same legal arguments, based on the same facts, as would absent Class members in proving Defendants' liability, the typicality requirement is satisfied.

### 4.      The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To demonstrate adequacy, Plaintiffs must show that: "(1) their claims are not antagonistic to or in conflict with those of the proposed class; [and] (2) they have sufficient interest in the outcome of the case."  *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 599 (N.D. Ill. 2009).  Meeting this standard is not difficult: "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient."  *Motorola*, 259 F.R.D. at 173.  Plaintiffs satisfy both requirements.

First, none of Plaintiffs' interests are antagonistic to those of the proposed Class.  Plaintiffs, like all Class members, purchased Grubhub common stock at market prices during the Class Period and were injured by the same material misrepresentations and omissions and subsequent stock price decline that injured all proposed Class members.  *See, e.g.*, ECF 18 at Exhs. B-C; ECF 20 at 5 ("Like the purported class members, the Pontiac Retirement Systems claim to have sustained losses from defendants' misrepresentations and inflations of stock value, and these claims arise under the same theory that defendants' course of conduct violated federal securities laws."); *In re Stericycle, Inc.*, 2017 WL 635142, at *7 (N.D. Ill. Feb. 16, 2017) ("Because the class representatives assert precisely the same claims and seek the same relief as the class members, [they] have common interests with the proposed class and the adequacy requirement is met.").

- 13 -

4879-1818-0638.v6

Second, Plaintiffs have a sufficient interest in the outcome of the case and are committed to the vigorous prosecution of this case. *See* Albritton Decl., ¶¶4-6; Storum Decl., ¶¶4-6. Plaintiffs have already successfully represented the interests of the proposed Class and demonstrated their adequacy to serve as Class Representatives. Among other things, Plaintiffs: (1) have supervised and monitored the progress of the litigation; (2) have participated in discussions with Lead Counsel concerning case developments; (3) have reviewed Court filings and discovery; (4) understand their duty to the Class; and (5) are committed to vigorously prosecuting this action to maximize the recovery for all Class members. *See id.*, ¶¶4-9; *see Groupon I*, 2014 WL 5245387, at *2 (adequacy satisfied because lead plaintiff "has already begun participating in discovery and has retained counsel who is highly experienced in securities class action litigation"). Additionally, Plaintiffs, which are defined benefit retirement plans, are the "exact type of sophisticated institutional investor that Congress intended to lead securities class actions." *See TreeHouse Foods*, 2020 WL 919249, at *6-*7 (certifying class and rejecting adequacy attacks against institutional investor).

Further, Plaintiffs retained Robbins Geller, counsel who is qualified, experienced, and able to vigorously prosecute this case. As its firm résumé demonstrates, Robbins Geller has extensive experience litigating securities class actions before courts in this Circuit and throughout the country, and has achieved substantial and record-setting recoveries. *See* Robbins Geller Rudman & Dowd LLP Firm Résumé, attached as Exhibit 5 to the Robbins Decl.; Albritton Decl., ¶7; Storum Decl., ¶7; *see also Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 213 (S.D.N.Y. 2021) (finding Robbins Geller to be a "sophisticated" law firm "with considerable experience in complex securities cases").

Since its appointment as Lead Counsel, Robbins Geller has: (1) drafted a detailed consolidated complaint; (2) successfully opposed Defendants' collective motion to dismiss, which was denied in its entirety; (3) issued discovery to Defendants and third parties; (4) responded to

discovery on behalf of Plaintiffs; (5) prepared the instant motion for class certification; and (6) litigated vigorously against experienced defense counsel. *See In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640 (C.D. Cal. 2018) ("[T]he work of Robbins Geller lawyers in this case so far indicates that the Court can again expect that Robbins Geller lawyers will effectively help the class representative vigorously prosecute this case.").

In sum, Plaintiffs are well-suited to represent the Class, have no interests antagonistic to other Class members, and, together with its counsel, are willing and able to continue prosecuting this action on behalf of the Class. Accordingly, the adequacy requirement is satisfied.

### 5. The Court Should Appoint Plaintiffs' Choice of Counsel as Class Counsel Under Rule 23(g)

In addition to satisfying the adequacy prong of Rule 23(a)(4), Robbins Geller also satisfies the considerations of Rule 23(g), and should be appointed Class Counsel. Under Rule 23(g)(4), the Court must appoint counsel who will fairly and adequately represent the Class and, to that end, should consider: (1) the work . . . done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1).

As discussed in §IV.B.4., *supra*, Robbins Geller has identified, investigated, and vigorously pursued the Class' claims in this action and will continue to do so. In conducting an extensive investigation, drafting the operative complaint, prevailing on detailed briefing related to Defendants' motion to dismiss, and in serving and responding to discovery, Robbins Geller has consistently demonstrated its knowledge of the applicable law and has proven its willingness to commit substantial time and resources to representing the Class. Robbins Geller's lawyers have been appointed class counsel in numerous securities cases, and courts around the country recognize

- 15 -

the expertise and ability of Robbins Geller to effectively litigate complex class actions. *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893, Transcript at 65 (N.D. Ill. Oct. 20, 2016) ("[Robbins Geller] performed a very high-quality legal work in the context of a thorny case in which the state of the law has been and is in flux. They achieved an exceptionally significant recovery for the class. And the court agrees . . . that it was, in fact, a spectacular result for the class.");[7] *see also Karinski v. Stamps.com*, 2020 WL 6572660, at *9 (C.D. Cal. Nov. 9, 2020) (appointing Robbins Geller as class counsel and finding, "Robbins Geller has vigorously prosecuted this action and has substantial experience litigating similar types of class actions"); *In re Sandridge Energy, Inc. Sec. Litig.*, 2019 WL 4752268, at *9 (W.D. Okla. Sept. 30, 2019) ("[T]he attorneys of Robbins Geller are experienced class-action litigators and are sufficiently committed to this litigation."); *Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 59 (S.D.N.Y. 2019) (appointing Robbins Geller as class counsel and noting the firm "has extensive experience in securities class actions and complex litigation, as well, indicating its ability to manage this litigation and ably apply the applicable law"). Plaintiffs respectfully request that the Court appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

> **C. The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(b)(3)**

In addition to meeting the requirements of Rule 23(a), this case also satisfies Rule 23(b)(3)'s requirements that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

> **1. Common Questions of Law and Fact Predominate**

---

[7] A true and correct copy of the relevant excerpts of the *Household* transcript is attached to the Robbins Decl. at Exhibit 6.

4879-1818-0638.v6

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* Predominance "requires . . . that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis in original). As the Supreme Court and courts within this Circuit recognize, "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Messner*, 669 F.3d at 814-15 (same); *TreeHouse Foods*, 2020 WL 919249, at *8 (same).

The analysis of whether common questions predominate "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10, 815 (2011) ("*Halliburton I*"). The elements of Plaintiffs claims under Section 10(b) and Rule 10b-5 of the Exchange Act are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Because the elements of falsity, materiality, scienter, and loss causation present common questions of law and fact that predominate over individualized ones, in securities cases, "[w]hether common questions of law or fact predominate . . . often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810, 815 (loss causation is not to be considered at class certification); *see also Amgen*, 568 U.S. at 465 (plaintiff need not prove materiality at class certification); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 604 (7th Cir. 2020), *on remand to* 2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) (recognizing that falsity, materiality and scienter are merits questions and that "[a]t class certification, the issue is not whether plaintiffs will be able to prove these elements on the merits, but only whether their proof will be common for all plaintiffs, win or lose. A case built on public statements to markets is based on common evidence on these elements.").

- 17 -

Here, Plaintiffs and the Class are entitled to a presumption of Class-wide reliance under the fraud-on-the-market theory set forth in *Basic* and reaffirmed in *Halliburton II*. Damages will also be determined on a Class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct for all Class members. Accordingly, the predominance requirement is satisfied.

### 2. Plaintiffs Are Entitled to the Fraud-on–the-Market Presumption of Reliance

In *Basic*, the Supreme Court held that investors could satisfy the reliance element of Section 10(b) by invoking a rebuttable presumption of reliance. 485 U.S. at 245-47; *see also Halliburton II*, 573 U.S. at 283-84 (declining to overrule the *Basic* presumption of reliance). The fraud-on-the-market presumption of reliance is premised on the fact that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *see also Basic*, 485 U.S. at 229-30 (concluding that anyone who buys or sells stock at the market price may be considered to have relied on material misstatements); *Motorola*, 259 F.R.D. at 174 ("[C]lass members need not prove reliance on an individualized basis – class reliance will be presumed – if plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market."). "In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *Groupon I*, 2014 WL 5245387, at *2.

To invoke the presumption of reliance, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the

- 18 -

4879-1818-0638.v6

misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268, 277. Plaintiffs satisfy the prerequisites for invoking the fraud-on-the-market presumption of reliance in this case. First, the alleged misrepresentations were public, as they were disseminated to investors via Grubhub's SEC filings, press releases, earnings calls, and investor conferences. *See, e.g.*, ¶¶64-79.[8] Second, Plaintiffs, like other members of the proposed Class, purchased Grubhub common stock between the time the misrepresentations at issue in this case were made and the end of the Class Period. *See* ECFs 18-2, 18-3. Third, as detailed below, and in the accompanying Coffman Report, the market for Grubhub common stock was efficient at all relevant times. *See* Coffman Report, ¶¶31-84.

### 3. Grubhub Common Stock Traded in an Efficient Market During the Class Period

"Under the fraud-on-the-market doctrine, the 'price of a well-followed and frequently traded stock reflects the public information available about a company' and 'since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information.'" *Groupon I*, 2014 WL 5245387, at \*2 (quoting *Schleicher*, 618 F.3d at 682). In assessing market efficiency, courts look to the commonly accepted indicators set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), which include:

> (1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an S–3 Registration Statement; and (5) whether empirical facts demonstrate a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

*In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at \*3 (N.D. Ill. Mar. 5, 2015) ("*Groupon II*"), *objections overruled*, 2015 WL 13628131 (N.D. Ill. May 12, 2015) (recognizing that "a number

---

8    Materiality need not be proved at class certification. *See Amgen*, 568 U.S. at 465; *Halliburton II*, 573 U.S. at 282 (describing *Amgen*).

- 19 -

of other courts, including courts in this district, have adopted the *Cammer* factors") (collecting cases).[9]  In addition to the *Cammer* factors, courts also consider the factors set forth in *Krogman v. Sterritt*: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the 'float')."  202 F.R.D. 467, 474 (N.D. Tex. 2001); *see also TreeHouse Foods*, 2020 WL 919249, at *9 n.7, n.8 (citing *Krogman*).  As set forth below, a holistic consideration of all the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Grubhub common stock was efficient, entitling Plaintiffs and the Class to rely on the fraud-on-the-market presumption of reliance.

### a. Grubhub Common Stock Traded on the NYSE

During the Class Period, Grubhub common stock traded on the world's premiere exchange, the NYSE, which *Cammer* acknowledges creates a presumption of an efficient market.  *See Cammer*, 711 F. Supp. at 1292; Coffman Report, ¶¶46-47.  Indeed, the fact that a particular stock trades on a large market exchange, standing alone, can establish market efficiency.  *See TreeHouse Foods*, 2020 WL 919249, at *4 (citing the fact that "TreeHouse stock is traded on the NYSE" as among the reasons why "[p]laintiffs have demonstrated that the market for TreeHouse's stock is efficient"); *Schleicher v. Wendt*, 2009 WL 761157, at *7 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F. 3d 679 (7th Cir. 2010) (stating that a stock's "mere presence on the [NYSE] certainly tends to show an efficient market").  Accordingly, the fact that Grubhub traded on the NYSE weighs heavily in favor of finding market efficiency.  *See Groupon I*, 2014 WL 5245387, at *2 (finding because Groupon stock traded on the NASDAQ, it was "undeniably a frequently traded stock in an efficient market.").

---

[9]   Although the Seventh Circuit has not "explicitly adopted" the *Cammer* factors, it agrees that a presumption of reliance under the fraud-on-the-market theory exists for a large, well-followed firm, whose stock trades in a liquid market.  *TreeHouse Foods*, 2020 WL 919249, at *10 n.2.

### b. *Cammer* Factor 1: High Weekly Trading Volume

The existence of an actively traded market, as evidenced by large weekly trading volume, "suggests there is an efficient market . . . because it implies significant investor interest in the company." *Cammer*, 711 F. Supp. at 1286. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one . . . ." *Id.* at 1292.

Here, the average weekly trading volume for Grubhub common stock during the Class Period was 12.29 million shares, or 13.47% of shares outstanding during this timeframe. Coffman Report, ¶35. Grubhub's average weekly trading volume easily exceeds the 2% threshold established in *Cammer* and supports a finding that the market for Grubhub common stock was efficient during the Class Period. *See id.*, ¶35; *see also Groupon I*, 2014 WL 5245387, at \*1-\*2 & *Groupon II*, 2015 WL 1043321, at \*4 (certifying class, rejecting defendants' *Daubert* challenge to plaintiffs' market efficiency expert, and finding presumption of market efficiency where average of 1.8% of outstanding shares turned over weekly); *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 662 (D. Utah 2008) (finding that an average weekly trading volume of 2.7% of shares outstanding weighed in favor of market efficiency).[10]

### c. *Cammer* Factor 2: Significant Financial Analysts and Media Coverage

The existence of analyst coverage is another indicator of market efficiency because it shows that the company is closely reviewed and watched by investment professionals who, in turn,

---

[10] Mr. Coffman also analyzed Grubhub common stock's trading volume by evaluating the annualized turnover velocity of Grubhub common stock. Coffman Report, ¶36. Turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms, is the dollar value of shares traded divided by the dollar value of all shares outstanding. *Id.* Here, Grubhub common stock had an average annualized turnover of 673.3%, which is substantially higher than the average annualized turnover of 102% for stocks trading on the NYSE and NASDAQ and further supports market efficiency. *Id.*

4879-1818-0638.v6

state their views on the company and security, and make recommendations to investors. *See Cammer*, 711 F. Supp. at 1286. Here, analysts from at least 35 separate firms followed Grubhub during the Class Period, including major financial firms such as Cowen & Co., Jeffries, Credit Suisse, and Barclays. Coffman Report, ¶40; Defs' RFA Response Nos. 62, 63 (admitting, subject to objections, that more than 35 securities firms published reports on Grubhub during the Class Period); *see also Groupon I*, 2014 WL 5245387, at *2 & *Groupon II*, 2015 WL 1043321, at *4 (certifying class where 17 sell-side analysts covered stock). These analysts disseminated publicly-available information along with commentary, analysis, and recommendations. Coffman Report, ¶40. Indeed, at least 146 analysts' reports were generated during the Class Period. *Id*.

Courts also recognize that widespread media coverage supports a finding of efficiency. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (finding that "regular press coverage throughout the Class Period" weighed in favor of finding market efficiency). Here, 1,235 unique news articles concerning Grubhub were published during the Class Period. Coffman Report, ¶42. The public also had access to information about Grubhub from numerous SEC filings and other sources of public information. *Id.*; *see also* Defs' RFA Response No. 67 (admitting, subject to objections, Grubhub published press releases, filed periodic filings with the SEC, and held conference calls concerning Grubhub's financial results).

The extensive analyst coverage and the substantial dissemination of news and other information regarding Grubhub evidence the robust and active market for public information about Grubhub and further support market efficiency. Coffman Report, ¶43; *see also Nature's Sunshine*, 251 F.R.D. at 663 (four analysts supported finding of market efficiency).

> **d.** **_Cammer_ Factor 3: Numerous Market Makers and Institutional Investors**

Market makers are firms that are ready to buy or sell a particular stock on a regular and

4879-1818-0638.v6

continuous basis. Coffman Report, ¶44. The existence of market makers ensures "completion of the market mechanism" by reacting "swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1287.

Here, Grubhub common stock traded on the NYSE, a major exchange that is presumed to be efficient, report volume and trade details, and tends to have rules that virtually guarantee a liquid market, where shares swiftly change hands between buyers and sellers. Coffman Report, ¶¶46-47. In addition, there were at least 96 market makers for Grubhub stock and at least 585 major institutions owned Grubhub common stock during the Class Period. *See* Coffman Report, ¶¶48, 79. The significant number of market makers and institutional investors is additional evidence that the market for Grubhub common stock was efficient during the Class Period. *Id.*, ¶¶44-48, 79; *see Groupon I*, 2014 WL 5245387, at \*2 & *Groupon II*, 2015 WL 1043321, at \*4 (certifying class where there were "100 market makers willing to buy and sell [company's] stock); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (high institutional ownership has also been considered indicative of market efficiency).

        e.        **_Cammer_ Factor 4: Form S-3 Registration Statement Eligibility**

Eligibility for S-3 registration occurs when, among other things, a company is subject to Exchange Act reporting requirements for more than a year, has timely filed all required reports in the 12 months preceding an S-3 registration, and the market value of its "float," the amount of shares held by non-affiliates, exceeds \$75 million. *See* Coffman Report, ¶¶49-51; 17 C.F.R. §239.13. Whether a company is eligible for S-3 filing is an indicator of market efficiency because such companies typically disseminate high-quality corporate reports, including Exchange Act reports. *See Cammer*, 711 F. Supp. at 1284-85; *Groupon I*, 2014 WL 5245387, at \*2 & *Groupon II*, 2015 WL 1043321, at \*4 (certifying class where company had not yet met the minimum twelve-

- 23 -

month period of filing SEC reports but satisfied the remaining S-3 eligibility requirements). Here, Grubhub did not file Form S-3s during the Class Period, but nonetheless satisfied the conditions for S-3 registration eligibility throughout the entire Class Period, as it had an outstanding float of shares valued at over $5 billion, and a total average market capitalization of $5.96 billion, which is over 79 times the amount needed for S-3 registration. Coffman Report ¶¶51, 74, 78; Defs' RFA Response No. 59 (admitting, subject to objections, Grubhub's Class Period average market capitalization was $5.96 billion); *see also Cammer*, 711 F. Supp. at 1287 (emphasizing that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency"). Accordingly, this factor weighs in favor of finding market efficiency.

        **f.**        ***Cammer* Factor 5: The Cause and Effect Relationship Between Unexpected Material Disclosures and Changes in the Price of Grubhub Stock**

"[O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1291. "Experts use an event study to satisfy the fifth *Cammer* factor, which seeks a cause-and-effect relationship between the release of new information and movements in the stock price." *Groupon II*, 2015 WL 1043321, at *4. An event study measures how much a security price rises or falls in response to new, company-specific information and has been considered prima facie evidence of the existence of a causal relationship. *See id.*; Coffman Report, ¶¶53-54.

After performing an event study and conducting statistical analysis, Plaintiffs' expert, Mr. Coffman, determined there was a cause-and-effect relationship between new, unexpected public information about Grubhub and significant reactions in the market price of Grubhub common stock. *See* Coffman Report, ¶¶55-71. Specifically, Mr. Coffman's event study analysis focused on Grubhub's earnings announcements (including one preannouncement) immediately preceding,

- 24 -

4879-1818-0638.v6

during, and directly following the Class Period. *Id.*, ¶¶62-70. Using statistical analysis, Mr. Coffman isolated the portion of Grubhub stock movements that were not attributable to market or sector factors, *i.e.*, the "abnormal return," and determined whether the abnormal return was statistically significant. *Id.*, ¶¶59-63. A statistically significant abnormal return indicates that the stock price movement was caused by new, company-specific information. *Id.* Mr. Coffman's event study shows that, for eight of the 10 events tested, there was a statistically significant price reaction to Company-specific news at or above the 95% confidence level, with seven of the 10 events also statistically significant at the 99% level. *Id., ¶*64.[11] Mr. Coffman concluded that the event study analysis "demonstrate[s] a clear cause-and-effect relationship between new material news and changes in the market price of Grubhub Common Stock" during the Class Period. *Id.*, *¶¶*55, 71. As such, Plaintiffs have presented direct evidence of an efficient market. *See TreeHouse Foods*, 2020 WL 919249, at *4 (certifying class where plaintiffs, supported by expert report and event study conducted by Mr. Coffman, "satisfied the baseline test for market efficiency").

### g. *Krogman* Factor 1: Large Market Capitalization

A large total market capitalization makes it more likely that shares trade in an efficient market. Coffman Report, ¶72. Grubhub had an average market capitalization of $5.96 billion during the Class Period, placing Grubhub in the 79th to 84th percentile of the combined NYSE and NASDAQ. *Id.*, ¶74; *see also* Defs' RFA Response at No. 59. In other words, over the Class Period, Grubhub common stock had a higher market capitalization than between 79% and 84% of the firms on the combined NYSE and NASDAQ exchanges. Coffman Report, ¶74. Grubhub's sizeable market capitalization is further evidence of the efficiency of the market for Grubhub stock.

---

[11] Mr. Coffman also examined the behavior of Grubhub stock on earnings announcement dates collectively as compared to days with little Grubhub news, which further indicated that Grubhub stock responded to new Company-specific information throughout the Class Period. *See* Coffman Report, ¶¶67-68.

- 25 -

*Id.*, ¶¶73-75; *see McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (*Krogman* factor one met where company's market capitalization ranged from $292 million to $585 million); *Krogman*, 202 F.R.D. at 478 (finding company's market capitalization that was in the top sixty percent of the sample group weighed in favor of efficiency).

### h.    *Krogman* Factor 2: Small Bid-Ask Spread

The bid-ask spread represents a measure of the cost to transact in a market.  *See* Coffman Report, ¶76.  It is the difference between the price at which market makers are offering to buy a security and the price at which they are offering the security for sale.  *Id.*  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Conversely, a narrow bid-ask spread suggests market efficiency. *See* Coffman Report, ¶76.  Here, the bid-ask spread for Grubhub stock over the course of each month during the Class Period was between 0.0145% and 0.0284%, which is "well below the average and median bid-ask spread" exhibited by a random sample of 100 publicly traded stocks on the NYSE and NASDAQ.  *Id.*, ¶77; *see also In re NetBank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (spread of 0.29% per share indicated market efficiency).  The narrow bid-ask spread for Grubhub stock supports a finding of market efficiency.

### i.    *Krogman* Factor 3: Publicly-Traded Float

A stock's float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  Coffman Report, ¶78.  A large public float supports market efficiency because "the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."  *Krogman*, 202 F.R.D. at 478.  Here, Grubhub's public float averaged approximately 99% of shares outstanding.  *See* Coffman Report, ¶78.  These shares had a market capitalization of over $5 billion during the Class Period.  *Id.*  The large size and high percentage of Grubhub's float is indicative of the efficiency of the market for

- 26 -

Grubhub common stock. *Id.*; *see also McIntire*, 38 F. Supp. 3d at 433 (finding efficiency where insiders held between 57% and 69% of float during the class period).[12]

In sum, all of the *Cammer* and *Krogman* factors overwhelmingly weigh in favor of a finding that the market for Grubhub common stock was efficient during the Class Period. Accordingly, Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance in this case and common questions of reliance predominate.

### 4. Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology

While not necessary for class certification, damages in this case can be calculated on a Class-wide basis using the viable, widely accepted, and generally applied "out-of-pocket" methodology.[13] *See Walgreen*, 2018 WL 1535156, at *3 (recognizing the out-of-pocket method is "a commonly used method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale" that is also "generally regarded as reliable"); Coffman Report, ¶¶85-90. To do so, valuation tools, including an event study, would be used to establish if the alleged misrepresentations and omissions caused Grubhub's stock price to be artificially inflated, and if the corrective disclosure caused the inflation to dissipate. *Id.*, ¶¶87-89. The daily artificial inflation in the price of Grubhub stock caused by the alleged misrepresentations and omissions will then be calculated based on a uniform method common to

---

[12]  Mr. Coffman further determined that there was no statistically significant evidence of autocorrelation throughout the Class Period. *See* Coffman Report, ¶¶80-83. If a security is "autocorrelated," it means that past price movements are not fully reflected in the current price, and a trader could profit from taking advantage of the autocorrelation, which would suggest market inefficiency. *Id.*, ¶80. The lack of autocorrelation for Grubhub common stock further supports market efficiency. *NetBank*, 259 F.R.D. at 675 (recognizing that autocorrelation is a factor that would "suggest[] an inefficient market").

[13]  The out-of-pocket method measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale, with necessary adjustments for the Private Securities Litigation Reform Act's 90-day lookback provision. *See* Coffman Report, ¶85.

4879-1818-0638.v6

all Class members.  *Id.*  Damages per share would be the difference between inflation on the share purchase date and inflation on the share sale date.  *Id.*, ¶85.  The calculation of damages would be "formulaic[ally]" conducted the same way for all Class members.  *Id.*, ¶86

This Court has held that the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which addressed whether the plaintiff in an antitrust case could match its theories of liability to its theories of damages, to be "inapposite in a securities fraud class action."  *See Groupon I*, 2014 WL 5245387, at *2.  Even so, courts have consistently found that Mr. Coffman's out-of-pocket approach satisfies *Comcast* and is appropriate at class certification.  *See, e.g.*, *TreeHouse Foods*, 2020 WL 919249, at *9 (certifying class, recognizing that Mr. Coffman's use of "an event study to determine out of pocket losses due to inflation is 'widely considered an accepted method for the evaluation of [ ] damages to a class of stockholders in a defendant corporation,' even in the face of confounding information," and collecting cases concluding Mr. Coffman's use of the out-of-pocket method does not let individual questions predominate).

### 5. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy

Rule 23(b)(3) also requires that "a class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In assessing Rule 23(b)(3)'s superiority requirement, relevant factors include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Courts in this Circuit have recognized the superiority of the class action mechanism for adjudicating securities actions like this one.  *See, e.g.*, *Tatz*, 2003 WL 21372471, at *10 ("Rule 23

- 28 -

4879-1818-0638.v6

was designed for this exact type of case [a securities action].");  *Walgreen*, 2018 WL 1535156, at *1-*3 (noting that the Rule 23 prerequisites for certification "have historically been liberally construed in favor of maintaining securities fraud class actions");  *AbbVie*, 2021 WL 7366274, at *2 ("[S]ecurities fraud claims against a large, public company for alleged misrepresentations affecting the company's stock price . . . generally meet[] the standards for certifying a class action.");  *TreeHouse Foods*, 2020 WL 919249, at *8 n.7 (noting that "superiority of the class mechanism to individual suits in securities fraud cases such as this is generally taken as a given" and collecting cases).  The superiority requirement is met here.

First, "[a]s with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed. Many of these investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation." *Neopharm*, 225 F.R.D. at 568.  Second, Plaintiffs are unaware of any other related litigation commenced by Class members.  Third, it is without question that the parties and the Court have an interest in this litigation proceeding in a single forum to prevent inconsistent rulings and promote judicial economy.  *See Roth*, 238 F.R.D. at 608 ("Judicial economy and efficiency will be promoted by certifying this class, and resolving these matters in one suit.").  Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action.  Lead Counsel has handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well-established.

Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties if they arise.  *See* Fed R. Civ. P. 23(c)-(d).  Thus, the superiority requirement of Rule 23(b)(3) is satisfied.

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion be granted in its

- 29 -

4879-1818-0638.v6

entirety and that the Court enter an Order: (1) certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g); (2) appointing Plaintiffs as Class Representatives; and (3) designating Robbins Geller as Class Counsel.

DATED: June 1, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS (IL Bar # 572233)
BAILIE L. HEIKKINEN (IL Bar # 55998)
SAMUEL C. FELDMAN (IL Bar # 326206)
MATTHEW A. RICHARD (IL Bar # 1031327)
MASON G. ROTH (IL BAR # 1019757)


*s/ Robert J. Robbins*
ROBERT J. ROBBINS

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
bheikkinen@rgrdlaw.com
sfeldman@rgrdlaw.com
mrichard@rgrdlaw.com
mroth@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
BRIAN E. COCHRAN (IL Bar # 6329016)
FRANK A. RICHTER (IL Bar # 6310011)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
bcochran@rgrdlaw.com
frichter@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

- 30 -

- 31 -

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
MATTHEW HENZI
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
cbdunn@asherkellylaw.com
mhenzi@asherkellylaw.com

*Additional Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 1, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Robert J. Robbins*
ROBERT J. ROBBINS

ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Email: rrobbins@rgrdlaw.com

4879-1818-0638.v6

# Mailing Information for a Case 1:19-cv-07665 Azar v. Grubhub Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stefan Howard Atkinson**
  stefan.atkinson@kirkland.com

- **James E Barz**
  jbarz@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com,kjohnson@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Samuel Clifford Feldman**
  sfeldman@rgrdlaw.com

- **Sandra C Goldstein**
  sandra.goldstein@kirkland.com,sandra-goldstein-3843@ecf.pacerpro.com,kenymanagingclerk@kirkland.com,michelle.denny@kirkland.com

- **John F. Hartmann**
  jhartmann@kirkland.com,meghan.guzaitis@kirkland.com

- **Bailie Heikkinen**
  bheikkinen@rgrdlaw.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Madelyn A. Morris**
  madelyn.morris@kirkland.com

- **Matthew Alexander Richard**
  mrichard@rgrdlaw.com,evanyi@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Robert J. Robbins**
  rrobbins@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,khanson@rgrdlaw.com

- **Mason Glen Roth**
  mroth@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)