**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ROEI AZAR, *Individually and on Behalf of All Others Similarly Situated*,<br><br>    Plaintiff,<br><br>        v.<br><br>GRUBHUB, INC., et al.,<br><br>    Defendants. | Case No. 1:19-cv-07665<br><br>Hon. Charles R. Norgle, Sr. |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

John F. Hartmann, P.C.
Madelyn A. Morris
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: 312/862-2000
312/862-2200 (fax)
john.hartmann@kirkland.com
madelyn.morris@kirkland.com

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Mary T. Reale
Lindsey Edinger (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: 212/446-4800
212/446-4900 (fax)
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
mary.reale@kirkland.com
lindsey.edinger@kirkland.com

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 2

    A.    Grubhub Launches Its Strategic Plan and Is Transparent That Its Short-Term Performance Would Likely Suffer. ........................................................ 2

    B.    Q1 2019: Grubhub's Strategic Plan Shows Promising Initial Results. ................... 3

    C.    Q2 2019: Grubhub Acknowledges Shortcomings in Its Strategic Plan. ................ 4

    D.    Q3 2019: Grubhub Discloses Disappointing Results and Issues the Shareholder Letter. ................................................................................. 5

    E.    Plaintiff Files This Lawsuit. ..................................................................... 6

ARGUMENT ............................................................................................................... 6

I.    THE MOTION SHOULD BE DENIED BECAUSE PLAINTIFF HAS NOT SATISFIED RULE 23(A). ................................................................................ 7

    A.    Plaintiff's Proposed Class Representatives Are Inadequate. ................................. 8

    B.    Plaintiff Has Not Satisfied Rule 23(a)'s Typicality Requirement Because Retirement System and Police and Fire Are Subject to Unique Reliance Defenses. ............................................................................................. 14

II.    THE MOTION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES PREDOMINATE. ......................................................................................... 18

    A.    Plaintiff Fails to Explain How It Would Actually Calculate Damages on a Classwide Basis in This Case. ............................................................... 19

    B.    Mr. Coffman Provides No Methodology to Estimate Inflation for Each Day throughout the Class Period. ................................................................. 20

    C.    Mr. Coffman Makes No Attempt to Explain How He Would Develop a Model to Control for Confounding Information Unrelated to Plaintiff's Theory of Liability. ............................................................................................ 21

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cohen v. E.F. Hutton & Co., Inc.*,
   1988 WL 89437 (N.D. Ill. Aug. 22, 1988) ...............................................................................15

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)................................................................................................ *passim*

*In re Enron Corp.*,
   529 F. Supp. 2d 644 (S.D. Tex. 2006) .....................................................................................10

*Epstein v. Am. Rsrv. Corp.*,
   1988 WL 40500 (N.D. Ill. Apr. 21, 1988) ...............................................................................14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...................................................................................................18

*In re Grupo Televisa*,
   2020 WL 3050550 (S.D.N.Y. June 8, 2020) ............................................................................11

*In re Grupo Televisa*,
   2021 WL 2000005 (S.D.N.Y. May 19, 2021) ..........................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014).........................................................................................................7, 14, 18

*Hardy v. City Optical*,
   39 F.3d 765 (7th Cir. 1994) .....................................................................................................14

*Helfand v. Cenco, Inc.*,
   80 F.R.D. 1 (N.D. Ill. 1977).......................................................................................................8

*Holwill v. AbbVie Inc.*,
   1:18-cv-06790 (N.D. Ill.),........................................................................................................19

*Kleen Prod. LLC v. Int'l Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015)...............................................................................................18

*Loritz* v. *Exide Techs.*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015)......................................................................18, 19

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)..........................................................19, 20, 21

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*,
  254 F. Supp. 3d 1007 (N.D. Ill. 2017) ............................................................8, 10, 11, 12

*Pruitt v. Pers. Staffing Grp., LLC*,
  2020 WL 3050330 (N.D. Ill. June 8, 2020) ...........................................................8, 9, 10, 11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013) ..............................................................................18

*Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ......................................................................18, 19

*Rocco v. Nam Tai Elecs., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ..........................................................................15

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307, 316 (E.D. Va. 2007) ..............................................................1, 12

*Sicav v. Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .....................................................18, 19

*Steimel v. Wernert*,
  823 F.3d 902 (7th Cir. 2016) ...............................................................................7

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008)..............................................................................................14

*Susman v. Lincoln Am. Corp.*,
  561 F.2d 86 (7th Cir. 1977) .............................................................................1, 7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).............................................................................................7

*Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*,
  2018 WL 1535156 (N.D. Ill. Mar. 29, 2018)........................................................18

**Statutes**

17 C.F.R. § 240 ...........................................................................................................6

15 U.S.C. § 78............................................................................................................6

**Rules**

Federal Rule of Civil Procedure Rule 23 ............................................................. *passim*

Rule 10b-5..................................................................................................................6

**PRELIMINARY STATEMENT**

Plaintiff bears the burden of proving that its proposed class satisfies Federal Rule of Civil Procedure 23 ("Rule 23").  Plaintiff's cavalier approach to class certification, however, is insufficient under Supreme Court and Seventh Circuit precedent, which requires this Court to engage in a "rigorous analysis" of Rule 23's requirements before certifying a class.  Plaintiff has selected class representatives who do not understand and cannot perform their fiduciary obligations to fairly and adequately protect the interests of the proposed class.  When deposed, one of Plaintiff's proposed class representatives knew almost nothing about this case and admitted that he had never seen the alleged misrepresentations forming the basis of this lawsuit.  What's more, Plaintiff's own damages expert testified in effect that the proposed class representatives are nominal plaintiffs.  Instead of working for the proposed class, he admitted that he considers Robbins Geller his client.

The motion should be denied because Plaintiff does not satisfy three elements of Rule 23: adequacy, typicality, and predominance.  ***First***, the proposed class representatives are inadequate because they have not performed even the basic responsibilities of a lead plaintiff.  Instead, they have abdicated their supervisory role and permitted counsel to control this litigation, against Congress's "emphatic command that competent plaintiffs, rather than lawyers, direct [securities] cases."  *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 92–93 (7th Cir. 1977) ("If the interests of a class are to be fairly and adequately protected, if the courts and the public are to be free of manufactured litigation, and if proceedings are to be without cloud, the roles of class representative and of class attorney cannot be played by the same person.").

***Second***, the motion should be denied because Plaintiff is subject to the unique defense that it did not rely on Defendants' alleged misstatements in deciding to purchase or sell Grubhub

securities. Investment advisors made these investment decisions, and, when deposed, they admitted that the alleged fraud played no role in their decisions to buy and sell Grubhub stock.

*Third*, the motion should be denied because it fails to satisfy a critical element of Rule 23—that issues common to the class "predominate" over individual issues. Individualized issues predominate here because Plaintiff has not proved that damages can be calculated on a classwide basis. Plaintiff attempts to meet its burden with a six-paragraph discussion of a hypothetical damages calculation. The problem is that this "model" is generic, conclusory, and incomplete: Plaintiff's expert copied and pasted it from a completely different case, with different facts, and a different theory of liability. At bottom, Plaintiff fails to provide any information about how it would actually calculate damages on a classwide basis *in this case*, promising that it will provide a damages methodology sometime in the future. That is not enough. The motion should be denied.

## BACKGROUND

### A. Grubhub Launches Its Strategic Plan and Is Transparent That Its Short-Term Performance Would Likely Suffer.

In 2015, Grubhub held around 70% of the U.S. third-party online and mobile food ordering business. (Compl. ¶ 46.) For years, it thrived by using a partnership-based business model. However, as new competitors entered the space, Grubhub's U.S. market share fell to 38% by the end of 2018. (Compl. ¶ 48.) Grubhub recognized that the new competitive landscape would require a new strategy to attract new diners and build restaurant density (*i.e.*, add new restaurants that would use Grubhub's platform).

So, in Q3 2018, Grubhub announced that it was implementing a new strategy, where it would invest in delivery market expansion, new diner advertising, and accelerated brand sales efforts in Q4 2018. (Compl. ¶¶ 53–54.) Grubhub was transparent that this new strategy to attract new diners in new markets would require significantly increased costs and that short-term

2

performance would likely suffer. For example, during its Q3 2018 Earnings Call, Grubhub disclosed that its profitability would likely decrease in Q4 2018. (ECF No. 40-1, FQ3 2018 Earnings Call Tr. at 9.) Consistent with that guidance, adjusted EBITDA per order decreased in Q4 2018. (Compl. ¶ 58.) Then, during the Company's Q1 2019 Earnings Call, Matt Maloney, Grubhub's CEO, further disclosed that Grubhub was implementing its new strategic plan with the expectation that it would "weigh on [Grubhub's] profitability during the fourth quarter and to some degree throughout 2019." (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5.)

**B.     Q1 2019: Grubhub's Strategic Plan Shows Promising Initial Results.**

To track the success of its new strategy, Grubhub relied on traditional metrics (such as quarterly revenue, net income, and EBITDA), as well as non-GAAP metrics, including "Daily Average Grubs" or "DAGs,"[1] which the Company had reported to investors for years. (Compl. ¶¶ 31–32.) Grubhub also tried to assess the "quality" of new diners by looking at, among other things, Daily Average Grubs and new diners' reorder rates (*i.e.*, how often new diners returned to and placed orders on Grubhub's platform). Grubhub's diners were high quality when, among other things, they had high reorder rates (*i.e.*, they frequently returned to and placed orders on the Grubhub platform), and Grubhub logged high Daily Average Grubs (*i.e.*, diners collectively were placing a large number of daily orders on Grubhub's platform). (Compl. ¶ 33.)

In Q1 2019, Grubhub had reason to be optimistic that its new strategy was working. As of Q1 2019, Grubhub's new diners appeared to be high quality at that point in their lifecycle, based on their reorder rates and Daily Average Grubs. Grubhub disclosed these promising returns to investors (Compl. ¶ 65)—consistent with its long-standing practice of promptly and transparently

---

[1]     "DAGs" reflects "the number of orders placed on the Grubhub platform divided by the number of days in the quarter or year." (Compl. ¶ 32(b).)

disclosing to stockholders what is happening at the Company:

- **More people were joining the platform.** Grubhub was experiencing record-setting active diner growth, adding 1.6 million active diners in the first quarter of 2019 and finishing the quarter with 19.3 million active diners, up 28% from the prior year. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5; ECF No. 40-3, Supplemental Information Presentation at 3.)

- **Marketing costs were steady.** Grubhub was acquiring more high-quality (*i.e.*, repeat) diners. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5, 8; ECF No. 40-3, Supplemental Information Presentation at 3.)

- **Orders were up.** Grubhub generated 521,000 Daily Average Grubs in the first quarter of 2019, up 19% from the prior year. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5.)

- **Diners were spending more.** Diners who first ordered from the Grubhub platform in the first quarter of 2015 were spending just as much, if not more, in the first quarter of 2019 than they were in 2018 and 2017. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5; ECF No. 40-3, Supplemental Information Presentation at 5.)

- **Diner "quality" appeared strong.** Reorder rates in January and February 2019 were higher across all markets than they were in 2018 or 2017, suggesting that overall diner quality was improving. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 12.)

**C.     Q2 2019: Grubhub Acknowledges Shortcomings in Its Strategic Plan.**

In Q2 2019, however, Grubhub disclosed that the frequency of orders per active diner was beginning to suffer. For example, during the Q2 2019 Earnings Call, Grubhub's then-CFO Adam DeWitt disclosed that "[c]alculated orders per active diner [were] lower than last year." (Compl. ¶ 74(d).) As Grubhub explained, this decline in frequency could be attributed to one permanent factor—diners outside the New York market (traditionally Grubhub's largest market) had never ordered with the same frequency as diners in New York—and another, more temporary one—new diners took time to increase their ordering frequency. (*Id*.) Given the increase in new diners and the fact that new diners typically took time to warm up to the platform, the fact that orders per active diner were down was to be expected and was consistent with the growing pains Grubhub expected (and disclosed (*id.*)) with respect to new diners.

4

Grubhub disclosed in that same Q2 2019 Earnings Call that diner ordering frequency was not the only problem. Grubhub's Daily Average Grubs were down 6% from the prior quarter. (ECF No. 40-5, FQ2 2019 Earnings Call Tr. at 8.) As noted, Grubhub had previously disclosed that short-term performance would likely suffer, given the significant costs of the plan. (ECF No. 40-2, FQ1 2019 Earnings Call Tr. at 5.) But other metrics appeared strong, with active diners growing 30% year over year and costs to acquire those diners remaining steady. (Compl. ¶ 74(c).)

### D.    Q3 2019: Grubhub Discloses Disappointing Results and Issues the Shareholder Letter.

But, in August 2019, overall Daily Average Grub growth began trending noticeably lower than Grubhub's expectations. (ECF No. 40-7, Shareholder Letter at 3.) So Grubhub dug into the data. In doing so, Grubhub discovered that the problem was specific to its newly acquired diners' *long-term* behavior: (i) these new diners' order frequency was not "maturing" (*i.e.*, over time, they were not ordering with the same frequency as earlier diners); (ii) retention rates of diners acquired late in Q2 2019 were lower than for previous diner cohorts; and (iii) Grubhub's newest diners were increasingly ordering from multiple platforms, not just Grubhub. (ECF No. 40-7, Shareholder Letter at 4.)

Grubhub promptly disclosed these disappointing results to stockholders in Q3 2019 and lowered its outlook for the year. (ECF No. 40-7, Shareholder Letter at 9.) In an effort to provide investors with additional transparency, Grubhub also issued a sixteen-page Shareholder Letter with its Q3 Results, in which Mr. Maloney spoke directly to investors and explained why Grubhub's new diners were not maturing as expected. (ECF No. 40-7, Shareholder Letter at 14.)

That same day, Grubhub reduced its full-year earnings guidance by more than 25%, and indicated that it expected 2020 earnings of around $100 million, which was below market expectations. (Compl. ¶ 12.) After these disclosures, Grubhub's stock price declined, and Plaintiff

5

filed this lawsuit.  (Compl. ¶ 90.)

### E.      Plaintiff Files This Lawsuit.

Plaintiff filed the operative complaint on July 24, 2020.  Plaintiff alleges that Defendants made misrepresentations about (i) the quality of new diners, (ii) Grubhub's restaurant density, and (iii) the viability, superiority, and continued success of Grubhub's partnership business model. (Compl. ¶¶ 64–79.)  Plaintiff alleges that the Shareholder Letter revealed the "truth," and that, as a result, Grubhub's stock price declined.  (Compl. ¶¶ 83–85, 138.)

Plaintiff purports to bring claims on behalf of purchasers of Grubhub stock from April 25, 2019 through October 28, 2019.[2]  (Compl. ¶ 1.)  Based on these allegations, Plaintiff asserts claims arising under Section 10(b) of the Exchange Act and Rule 10b-5 and a control person liability claim under Section 20 of the Exchange Act.  (*See* 15 U.S.C. §§ 78j, 78t; 17 C.F.R. § 240.10b-5.) Plaintiff filed its motion for class certification on June 1, 2022.  (ECF Nos. 68–70.)  In support, Plaintiff submitted a report from longtime Robbins Geller designee Chad Coffman, which purports to establish that Grubhub stock traded in an efficient market during the proposed class period and that damages may be calculated on a classwide basis.

### ARGUMENT

Class-action treatment is the "exception," not the "rule."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  This Court may certify a class only if—after a "rigorous analysis"—it finds that Plaintiff has "affirmatively demonstrate[d] [its] compliance" with the requirements of Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Because "Rule 23 does not set

---

[2]      Defendants' position on the merits is that no misstatements were made and therefore there is no class period of any length.  Alternatively, Defendants contend that this Court should shorten Plaintiff's proposed class period because extensive discovery has not surfaced *any* documents that could support Plaintiff's allegations that actionable misstatements existed and affected Grubhub's stock price during various periods of time throughout the class period.  Defendants reserve all rights to make these and related arguments at a later stage in the proceedings.

forth a mere pleading standard," *id.*, plaintiffs "must actually ***prove***—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*").

To satisfy Rule 23, Plaintiff must prove by a preponderance of evidence that, among other things, (i) the proposed class meets all the requirements of Rule 23(a), and (ii) "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast*, 569 U.S. at 33; *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016) ("The party seeking class certification bears the burden of showing, by a preponderance of the evidence, that a proposed class meets the requirements of Federal Rule of Civil Procedure 23.")

Here, the motion should be denied because (i) Plaintiff has not proved that the proposed class meets all the requirements of Rule 23(a) and (ii) issues common to the class do not "predominate" over individual issues.

## I.     THE MOTION SHOULD BE DENIED BECAUSE PLAINTIFF HAS NOT SATISFIED RULE 23(A).

The motion should be denied because Plaintiff has not proved that its proposed class satisfies Rule 23(a).  For a class to be certified, Plaintiff must prove by a preponderance of evidence that its proposed class and class representative satisfy each prong of Rule 23(a): numerosity, commonality, typicality, and adequacy.  *Comcast*, 569 U.S. at 3.  The Court must "undertake a stringent and continuing examination of the adequacy of representation by the named class representative." *Susman*, 561 F.2d at 89.

Plaintiff has not met its burden because the proposed class representatives are inadequate and subject to unique defenses that render their claims atypical.

7

### A. Plaintiff's Proposed Class Representatives Are Inadequate.

To satisfy Rule 23(a), Plaintiff must prove that its proposed class representatives are adequate. "An adequate class representative must have an understanding of the basic facts underlying the claims, some general knowledge of the case, and a willingness and ability to participate in discovery." *Pruitt v. Pers. Staffing Grp., LLC*, 2020 WL 3050330, at *4 (N.D. Ill. June 8, 2020). "Courts have repeatedly emphasized the importance of class representatives having reviewed court papers prior to filing, answering interrogatories (obviously in a truthful way), conferring with attorneys about the prosecution of the action, and understanding the facts of the case." *Id.* "A plaintiff who seeks to be the class representative cannot simply shift its duties to class counsel." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1023 (N.D. Ill. 2017). "The class is entitled to more than blind reliance upon even competent counsel by uninterested and inexperienced representatives." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 7–8 (N.D. Ill. 1977).

There are two proposed class representatives in this case: City of Pontiac Reestablished General Employees' Retirement System ("Retirement System") and City of Pontiac Police & Fire Retirement System ("Police and Fire"). Both are inadequate.

### 1. The Retirement System Is an Inadequate Class Representative.

The Retirement System is an inadequate class representative because it does not know the basic facts of this case and has not performed the responsibilities of a lead plaintiff.

At his deposition, the Retirement System's representative, Sheldon Albritton, knew almost nothing about this case.



Mr. Albritton also knew nothing about the alleged misrepresentations forming the basis of this lawsuit.

---

[3]      References to "Ex. __" are to exhibits accompanying the Declaration of Stefan Atkinson, dated August 12, 2022.

[4]

Rule 23 requires that a proposed class representative have an "understanding of the basic facts underlying the claims," but the Retirement System had none. *Pruitt*, 2020 WL 3050330 at *4. This renders it inadequate. *Id.* (denying class certification because plaintiff did not know "basic information about this case").

The Retirement System is also inadequate because it has not performed the basic responsibilities of a class representative. ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ That is "nowhere near the time a meaningful review would require." *See In re Enron Corp.*, 529 F. Supp. 2d 644, 733 (S.D. Tex. 2006); *Pruitt*, 2020 WL 3050330 at *6 (finding class representative inadequate because he "does not know basic information about the case" or "about the complaint"). ██████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

Instead, the Retirement System did exactly what the law says it cannot: it "shift[ed] its duties to class counsel." *Physicians Healthsource*, 254 F. Supp. 3d at 1023. █████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

10

██████████████████████████████████████████████████

██████████████████████████████████████████████████

The Retirement System has permitted "counsel to run the case with little or no involvement from [it], which is inconsistent with a class representative's responsibility of monitoring class counsel and protecting the interests of absent class members." *Pruitt*, 2020 WL 3050330 at *5.

The Retirement System's representative also has not participated in discovery. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ "[T]aking an active and honest and attentive . . . role in discovery is one of the hallmarks of an otherwise adequate class representative," but the Retirement System's representative has done the opposite. *Physicians Healthsource*, 254 F. Supp. 3d at 1024.

Even more troubling is that Mr. Albritton's testimony raises serious concerns about the accuracy of verified documents Plaintiff submitted in this case. In its verified responses and objections to Defendants' interrogatories, Plaintiff represented that Mr. Albritton "provided information for, and participated in, the preparation of these R&Os." (Ex. 2, Lead Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories at 17.) And, Mr. Albritton verified, under the penalty of perjury, that he "reviewed Lead Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories." (Ex. 3, Verification of City of Pontiac General Employees' Retirement System at 1.) ██████████████████████

██████████████████████████████████████████████████

11



Mr. Albritton's testimony also raises serious concerns about the accuracy of the PSLRA certification he signed in support of Lead Plaintiff's Motion for Class Certification. In that certification, he swore that the Retirement System "reviewed and discussed with counsel the filing of significant pleadings and briefs," including the complaint. (ECF No. 70-1 ¶ 5.)

Given that the Retirement System has submitted verified documents that appear to be inaccurate, "[t]hat's certainly a serious credibility problem—and one that pertains directly to the facts of the case—which counsels against finding the plaintiff an adequate class representative." *Physicians Healthsource*, 254 F. Supp. 3d at 1026.

### 2. Police and Fire Is an Inadequate Class Representative.

Nor is Police and Fire an adequate class representative. Congress issued an "emphatic command that competent plaintiffs, rather than lawyers, direct [securities] cases." *Shiring*, 244 F.R.D. at 316. But, like the Retirement System, Police and Fire has permitted counsel to control this litigation entirely.

12

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████    █████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████    ███████████████████████

Like the Retirement System, Police and Fire barely knows the facts of this case.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[5] Plaintiff's purported expert, Chad Coffman, further confirmed that Plaintiff's counsel is controlling this litigation. ████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

13



**B.      Plaintiff Has Not Satisfied Rule 23(a)'s Typicality Requirement Because Retirement System and Police and Fire Are Subject to Unique Reliance Defenses.**

The motion should be denied for another reason: Plaintiff has not satisfied Rule 23(a)'s typicality requirement because it is subject to the unique defense that it did not rely on Defendants' alleged misstatements in determining to purchase or sell Grubhub securities.  Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[A] plaintiff against whom the defendants have a defense not applicable to other members of the class is not a proper class representative."  *Hardy v. City Optical*, 39 F.3d 765, 770 (7th Cir. 1994).

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  In this case, Plaintiff has tried to prove reliance by invoking the "fraud-on-the-market"

14

presumption. (ECF No. 69 at 18-19.) This presumption can be rebutted. Where, as here, "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." *Halliburton II*, 573 U.S. at 268-69. This showing of non-reliance defeats Rule 23's typicality requirement. *See Epstein v. Am. Rsrv. Corp.*, 1988 WL 40500, at *4-5 (N.D. Ill. Apr. 21, 1988) (denying class certification because proposed class representative was subject to unique reliance defense); *Cohen v. E.F. Hutton & Co., Inc.*, 1988 WL 89437, at *2-3 (N.D. Ill. Aug. 22, 1988) (same); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("[A] named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3).").

Here, the proposed class representatives are subject to a unique reliance defense. Neither representative made the decision to buy or sell Grubhub stock; their investment managers did.



The fraud-on-the-market presumption does not apply because discovery has shown that Plaintiff's investment managers would have made the same investment decisions regardless of the claimed fraud.

The manager who bought and sold Grubhub stock on behalf of Police and Fire (Kevin Yousif) admitted that the alleged fraud played no role in his investment decisions.

As a result, any alleged fraud played no role in any decisions to buy or sell Grubhub stock, as Mr. Yousif repeatedly admitted during his deposition:



16

The same is true for the Retirement System's manager, Xponance.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ As a result, Xponance

did not (and could not) rely on any public information in deciding to buy or sell Grubhub stock.[6]

Xponance did not (and could not) rely on Grubhub's public statements or alleged fraud. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ This means that, even if

Xponance believed that Grubhub made false statements or committed fraud, it would have made

the same investment decisions, as Xponance's representative admitted during her deposition:

████████████████████████████████████████████

_____

[6] ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

17



Because both investment managers would have made the same investment decisions "even had [they] been aware that the stock's price was tainted by fraud," the presumption of reliance does not apply. *Halliburton II*, 573 U.S. at 269.

## II. THE MOTION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES PREDOMINATE.

The motion should also be denied because individual issues predominate. To satisfy Rule 23's predominance requirement, Plaintiff must prove that its damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35.[7] "[T]he Court must rigorously screen expert evidence when certifying a class to ensure that the damages model only seeks to prove damages that flow from the harm alleged." *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 602 (N.D. Ill. 2015). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. "No damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

---

[7] Courts in the Seventh Circuit and elsewhere apply *Comcast* to purported securities class actions. *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 423-24 (7th Cir. 2015); *Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *3 (N.D. Ill. Mar. 29, 2018); *Sicav v. Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015); *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015); *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014).

### A. Plaintiff Fails to Explain How It Would Actually Calculate Damages on a Classwide Basis in This Case.

Plaintiff fails to satisfy Rule 23's predominance requirement because its damages model is generic and therefore fails to explain how Plaintiff would actually calculate damages on a classwide basis *in this case*. It amounts to no damages model at all.

"When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018). Courts routinely deny class certification where, as here, plaintiff offers generic techniques for computing damages. *See, e.g.*, *Sicav*, 2015 WL 268855, at *6 (declining to certify class because plaintiffs failed to show, "concretely, how [they] propose[d] to reliably establish damages"); *Loritz*, 2015 WL 6790247 at *22 (finding plaintiffs' "general techniques for computing damages in securities fraud cases" insufficient under *Comcast*); *Ft. Worth Emps.' Ret. Fund*, 301 F.R.D. at 141-42 (declining to certify class because plaintiffs' expert merely "mention[ed] three methods" and failed to provide the court with "assurance beyond [the expert's] say-so" that "there [was] a damages model that [would] permit the calculation of damages on a classwide basis").

Plaintiff tries to satisfy its burden under Rule 23 with Mr. Coffman's conclusory, six-paragraph discussion of a hypothetical damages calculation. (ECF No. 70-3, Coffman Rpt. ("Rpt.") ¶¶ 85–90.) In doing so, Mr. Coffman does not explain how he will apply these generic valuation techniques to the facts and circumstances of this case. He does not even take the facts of this case into account.

19

For good reason: Mr. Coffman copied and pasted his proposed damages model from his report *in an entirely different case*.[8]  (*See* Appendix A;

A copy-and-pasted model does not satisfy Plaintiff's burden of showing how it would actually calculate damages on a classwide basis in *this case*.  Nor does it "measure only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35.  How could it, when every case necessarily involves different facts and a different theory of liability?

**B.      Mr. Coffman Provides No Methodology to Estimate Inflation for Each Day throughout the Class Period.**

Plaintiff fails to show that damages can be calculated on a classwide basis for another reason: Mr. Coffman provides no methodology to estimate inflation for each day throughout the class period.   Under Plaintiff's own theory, Defendants' statements conveyed diner quality statistics that varied over time throughout the Class Period, thereby impacting Grubhub's stock price at varying degrees at various points in time.  As a result, Mr. Coffman concedes that he needs to estimate inflation for each day throughout the Class Period.  (Rpt. ¶ 89.).  But he does not provide any methodology to do so.

At most, Mr. Coffman suggests that he could use "valuation techniques." (Rpt. ¶ 89.)  But he does not identify what methodology he would apply in this case, only promising that he will at

---

[8]      Appendix A is a redline comparing the damages sections of the reports Mr. Coffman submitted in this case and in *Holwill v. AbbVie Inc.*, 1:18-cv-06790 (N.D. Ill.), ECF No. 123-1.

some point in the future. That is not enough. Plaintiff cannot meet its burden of showing that damages can be calculated on a classwide basis simply by referring to generic "valuation tools."[9] *See Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at \*19.

> **C.      Mr. Coffman Makes No Attempt to Explain How He Would Develop a Model to Control for Confounding Information Unrelated to Plaintiff's Theory of Liability.**

Finally, Plaintiff fails to show that damages can be calculated on a classwide basis because its expert does not explain how he will control for confounding information unrelated to Plaintiff's theory of liability.

Mr. Coffman admitted that any model would "need to consider whether and to what extent any non-fraud related information (*i.e.*, 'confounding information') contributed to the observed price movement." (Rpt. ¶ 88.) There is clearly confounding information in this case: on the same day that Grubhub issued the Shareholder Letter, Grubhub reduced its full-year earnings guidance by more than 25%, and indicated that it expected 2020 earnings of around $100 million, which was below market expectations of $341 million. (Compl. ¶12.) This information could have negatively impacted Grubhub's stock price. As a result, any damages model would need to exclude the decline attributable to this information.

But Mr. Coffman does not even try to meaningfully explain how he would perform that analysis. Instead, he says he "may utilize" unspecified "valuation techniques." (Rpt. ¶ 88.) He does not identify those techniques, let alone explain what his analysis would look like in this case.

---

[9]      Plaintiff also fails to show that damages can be calculated on a classwide basis because Mr. Coffman does not describe how he would reliably estimate the amount of inflation caused by each individual alleged misrepresentation. This means that, if the Court finds that some of the alleged misrepresentations are not actionable, then Mr. Coffman's proposed methodology leaves the Court with no reliable basis to estimate the amount of alleged inflation caused by the remaining, actionable, alleged misrepresentations.

Simply asserting "that there are unspecified 'tools' available to measure damages" "amounts to 'no damages model at all.'" *Ohio Pub. Emps. Ret. Sys.*, 2018 WL 3861840, at *19.

## CONCLUSION

For the foregoing reasons, the motion should be denied.

22

Dated:  August 12, 2022

Respectfully submitted,

*/s/ Stefan Atkinson*

John F. Hartmann, P.C.
Madelyn A. Morris
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  312/862-2000
312/862-2200 (fax)
john.hartmann@kirkland.com
madelyn.morris@kirkland.com

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Mary T. Reale
Lindsey Edinger (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  212/446-4800
212/446-4900 (fax)
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
mary.reale@kirkland.com
lindsey.edinger@kirkland.com

*Attorneys for Defendant*s

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2022, I electronically filed Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification with the Clerk of the Court through the CM/ECF system, which will automatically send notification of the filing to all counsel of record.

*/s/ Stefan Atkinson*

Stefan Atkinson, P.C.

**Appendix A: Redline Comparing  Damages Sections of Reports Mr. Coffman Submitted in This Case and *Holwill v. AbbVie Inc.*, 1:18-cv-06790 (N.D. Ill.), Dkt. 123, Ex. A.**

**VIII. DAMAGES**

8~~1~~5.  Counsel for the Lead Plaintiff~~s~~ also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's~~'~~ theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale ~~(or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase~~, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide). The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

8~~2~~6.  Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

8~~3~~7.  Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis. Nevertheless, whatever the method for determining the

artificial inflation per share, it would be common to all class members.

84~~8~~. For example, the most ~~widely used~~widely used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (*i.e.*, a "corrective disclosure"). Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.*, "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.*~~-~~, price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

85~~9~~. The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation~~,~~", which implies that the

artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be ~~more~~ reasonable to apply "constant percentage inflation~~,~~"<u>,</u> which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other ~~cases~~<u>circumstances</u>, the artificial inflation ~~has~~<u>may</u> evolve~~d~~ based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

~~86~~<u>90</u>. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.